1  David W. Quinto (Bar No.106232)
2  dquinto@onellp.com
   Telephone:   (213) 604-1777
3  **ONE LLP**

4  Joanna Ardalan (Bar No. 285384)
   jardalan@onellp.com
5  **ONE LLP**
6  9301 Wilshire Blvd.
   Penthouse Suite
7  Beverly Hills, CA 90210
   Telephone:   (310) 866-5157
8  Facsimile:   (310) 943-2085

9

10 Attorneys for Plaintiff
   Kjersti Flaa

11

12                **UNITED STATES DISTRICT COURT**

13               **CENTRAL DISTRICT OF CALIFORNIA**

14                    **WESTERN DIVISION**

15 | KJERSTI FLAA, an individual, | Case No.   2:20-cv-06974 |
16 |         Plaintiff, | |
17 |         v. | **COMPLAINT FOR:** |
18 | HOLLYWOOD FOREIGN PRESS ASSOCIATION, a California Mutual | **(1) Violation of the Right of Fair Procedure;** |
19 | Benefit Corporation; AUD BERGGREN MORISSE, an individual; | **(2) Declaratory Relief;** |
20 | TINA JOHNK CHRISTENSEN, an individual; ANIKO SKORKA | **(3) Sherman Act § 1 Violation;** |
21 | NAVAI, an individual; LORENZO | **(4) Sherman Act § 2 Violation; and** |
22 | SORIA, an individual; MEHER TATNA, an individual; and DOES | **(5) Cartwright Act Violation** |
23 | 1-20, inclusive, | |
24 |         Defendants. | **DEMAND FOR JURY TRIAL** |

25

26

27

28

---

**COMPLAINT**

1    Plaintiff Kjersti Flaa ("Flaa"), through her undersigned counsel, hereby

2    brings this Complaint against the Hollywood Foreign Press Association ("HFPA"),

3    Aud Berggren Morisse ("Morisse"), Tina Johnk Christensen ("Christensen" ),

4    Aniko Skorka Navai ("Navai"), Lorenzo Soria ("Soria"), Meher Tatna ("Tatna"),

5    and Does 1-20, inclusive ("Defendants") for violating her California common law

6    right of fair procedure; Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.

7    §§ 1, 2; California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, et seq.; and

8    for a judicial declaration under 28 U.S.C. § 2201 that various provisions of

9    defendant HFPA's Bylaws contravene the obligations imposed on it as a mutual

10   benefit corporation exempted from any obligation to pay taxes pursuant to 26

11   U.S.C. § 501(c)(6).  This Court has subject matter jurisdiction pursuant to 28

12   U.S.C. §§ 1331, 1337, 15 U.S.C. § 15(a), 26 U.S.C. § 7428, 28 U.S.C. § 1507, and

13   principles of pendent jurisdiction.  Flaa alleges as follows:

## INTRODUCTION

15   1.    Lord Acton famously observed that, "Power tends to corrupt; absolute

16   power corrupts absolutely.  Defendants have proved his point.  Through fortuitous

17   circumstance, the HFPA's 87 members have been able to monopolize the foreign

18   entertainment reporting market in "the Entertainment Capital of the World"—Los

19   Angeles.  Remarkably, they have accomplished that feat at the taxpayers'

20   expense—and that (among other things) makes their activities unlawful.

21   2.    The HFPA is a California as a mutual benefit corporation exempted

22   from both state and federal taxes pursuant to Section 501(c)(6) of the Internal

23   Revenue Code.  As such, it is required to benefit *all* members of the class of

24   workers it represents—foreign entertainment reporters who reside in Southern

25   California--equally, without regard to whether they are members.  But it does no

26   such thing because its members are unwilling to share the enormous economic

27   benefits membership provides.

28

3.     The HFPA was founded during World War II for high-minded purpose and began conferring "Golden Globe®" awards in the late 1940s.  The date of its annual awards ceremonies substantially preceded the date of the Academy of Motion Picture Arts & Science's Academy Awards® ceremony at which ©Oscar® statuettes are conferred.  As motion picture studios began spending ever increasing sums of money on "Oscar campaigns," they hit upon winning Golden Globe awards as a way to build momentum for a successful Oscar campaign.

4.     As a consequence, HFPA members are now invited to attend press junkets, film festivals, and set visits around the world at no expense to themselves (and are freely allowed to accept the studios' largesse); coveted interview slots with news making actors, directors, producers, screenwriters, and other industry professionals are reserved for them; and HFPA members are paid lavish sums of money to provide nominal services to the HFPA.

5.     The HFPA does not provide any benefit of any kind to non-member foreign entertainment reporters who live in Southern California.  Instead, the HFPA engages in very substantial and shocking discrimination *against* them for the benefit of its members.  It allocates foreign markets among its members; requires applicants to execute agreements pledging not to offer to write for any publication claimed by a member *and* not to write for any rival publication, either; refuses to admit qualified applicants who might compete in a market claimed by an existing member; leverages the fact that its members vote for the Golden Globe awards to monopolize the opportunities to attend industry events to the exclusion of non-members; leverages its Golden Globe awards to monopolize the available interview slots for "hot" directors, actors, producers, screenwriters, cinematographers, etc.; pays all travel expenses for its members (but not non-members) to attend film festivals and press junkets around the world at a cost in excess of $1.1 million dollars annually; leverages its Golden Globe awards to

1  induce motion picture studios to assume the cost of five-star hotel stays and
2  gourmet meals while abroad (to the exclusion of non-members); and pays its
3  members (but not non-members) very substantial sums to work for the HFPA
4  doing little or nothing.  By way of example, it pays one of its members more than
5  $20,000 annually merely to assign the seating at the Golden Globes awards
6  ceremony, two members in their mid-90s get $12,000 annually to serve on the
7  "History Committee," and former presidents are paid $1,000 a month for life
8  without even a notional requirement that they provide a service in exchange for
9  their sinecure.

10       6.     The HFPA is so focused on protecting its monopoly position and tax-
11  free benefits that it has adopted Bylaw provisions that exclude from membership
12  all objectively qualified applicants who might possibly compete with an existing
13  member.  There are no standards or guidelines for satisfying the subjective portions
14  of the applications process and rejected applicants have no right to demand either
15  that the applications procedure be fair or that they be allowed to appeal an adverse
16  decision made for obviously improper and unlawful reasons.

17       7.     Through this action, Plaintiff Flaa seeks to enforce the right of fair
18  procedure long applied by California to private organizations that affect a person's
19  ability to earn a lawful living; declare unlawful the provisions of the HFPA's
20  Bylaws used unfairly to deny admission to qualified applicants; and recover under
21  applicable anti-trust laws for the economic harm she has suffered as the result of
22  defendants' unlawful conduct.

23  **PARTIES**

24       8.     Plaintiff Kjersti Flaa is a citizen of Norway domiciled in the County
25  of Los Angeles in the State of California.

26       9.     Defendant Hollywood Foreign Press Association is a California
27  Mutual Benefit Corporation having its principal place of business in the City of
28  West Hollywood, State of California.

10.     Defendant Aud Berggren Morisse is a citizen of Norway domiciled in the City of Los Angeles, State of California.

11.     Defendant Tina Johnk Christensen is a citizen of Denmark domiciled in the City of Glendale, State of California.

12.     Defendant Aniko Skorka Navai is, upon information and belief, a citizen of Hungary domiciled in the City of Los Angeles, State of California.

13.     Defendant Lorenzo Soria is a citizen of Italy domiciled in the City of Los Angeles, State of California.

14.     Defendant Meher Tatna is a citizen of India who claims to be domiciled in the City of West Hollywood, State of California.

15.     Defendants Does 1-20, inclusive, are sued under fictitious names because their true names and capacities are presently unknown to Plaintiff. Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants designated herein as a DOES 1 through 20, inclusive, is legally responsible in some manner for the events, happenings, and unlawful conduct referred to herein, whether as an independent actor, co-conspirator, agent, or principal, and caused damage to Plaintiff as hereinafter alleged.  Plaintiff will seek leave of court to amend this Complaint to show the true names and capacities of the Defendants designated herein as DOES when the same have been ascertained. As used herein, "Defendants" shall include and be deemed to refer to each of the Defendants, whether acting individually, jointly, and/or severally.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 15 U.S.C. § 15(a), 26 U.S.C. § 7428, and 28 U.S.C. § 1507.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**COMPLAINT**

## FACTS COMMON TO ALL CLAIMS

Plaintiff Flaa's Career in Entertainment Journalism.

18.    Plaintiff Flaa was raised in Oslo, Norway. She earned a bachelor's degree in Teaching, followed by Communications and Media Studies from Oslo University College (HiO) in 1997.  She then spent three years in London working as an account manager for Kingston Technology before finding her passion: writing.  In 2003, she embarked on her journalism career at Egmont Publishing House, working for *In-Side Magazine* and eventually becoming its beauty editor. She was subsequently was hired to work in the feature department of Norway's second largest newspaper's weekend supplement feature, *Dagbladet Magasinet*. From there she moved to Aller Publishing House, becoming the text editor of Norway's biggest tabloid magazine, *Se og Hør*.

19.    In 2007, Flaa moved to New York City to work as a freelance journalist in the United States.  She reported on entertainment, lifestyle, fashion, and trends for major newspapers and magazines in Norway, including *Dagens Næringsliv, D2 Magazine, Verdens Gang, Dagbladet, KK, Henne, Tara, Cosmopolitan* and *Aftenposten*. She became the principal celebrity interviewer for the biggest entertainment television show in Norway: "*God Kveld Norge*" (*Good Evening Norway*), on TV2.  She also produced entertainment news segments for Norway's NRK TV and Radio (the Norwegian equivalent to the BBC) and became a frequent panel moderator and guest host.

20.    Flaa began transitioning to living in Southern California in 2015, where she founded and became the creative director of a production company, Content Now TV in 2018.  Her company produced 130 episodes of the short form entertainment series "Hollywood Stories" for Scandinavia's biggest streaming network, VIAPLAY, in 2018. The show was sold to over 40 countries.  Flaa has also produced entertainment segments for *Entertainment Tonight MBC Arabic*, and served as the Hollywood correspondent for SBS, Channel 6, *Shownieuws* in

Holland for five years.  Flaa also serves as the moderator for NOW - Nordic Oscar Weekend - an annual three-day seminar and event in Los Angeles having as its principal goal to build a bridge between entertainment industry professionals in Scandinavia and Hollywood.  As a testament to her skill, her celebrity interviews on the YouTube "*Flaawsome Talk*" channel have been viewed 69.7 million times.

21.     Flaa's professional achievements have earned her professional recognition.  She has appeared as a Hollywood expert in five documentaries shown in Germany by *Kabel Eins* and has been profiled multiple times by major outlets in Norway concerning her success reporting on celebrities and her involvement with NOW.   She also earned the second place at the SoCal Journalism Awards Contest in 2018 for a profile of Jane Fonda, and her television interview of Henry Winkler earned second runner-up honors at the 12th National Arts & Entertainment Journalism Awards in 2019.

22.     Flaa's achievements as an entertainment journalist and her outstanding personal qualities have been acknowledged by members of the HFPA. One of the members who nominated her for admission to the HFPA in 2018, H.J. Park (a South Korean journalist), wrote that Flaa "would be a great addition to the HFPA" and would "be an active member of our group attending screenings, press conferences and meetings."  He further noted that Flaa "is also known in the industry for being easy going with a sympathetic personality."

23.     In co-sponsoring her the same year, Diederik van Hoogstraten of The Netherlands wrote that Flaa, "is known as a serious, enterprising journalist . . . well-known in her country as a leading tv reporter covering the entertainment business."  He also noted that among journalists and publicists in Los Angeles, "she is extremely well regarded."  He then observed that, "Ms. Flaa is a kind and generous person.  As her acquaintance I can say with certainty that her personality would be a welcome addition to the HFPA."  Notwithstanding her qualifications

**COMPLAINT**

and endorsements, the HFPA declined to admit Flaa to membership in 2018 (but did admit Henry Arnaud of France after previously rejecting him five times).

24.     In 2019, Flaa again applied for admission. Ramzy Malouki (Tunisia) initially co-sponsored Flaa, writing that he was sponsoring a candidate for admission for just the second time in his then 13-year membership because "Kjersti Flaa is an amazing journalist, as well as a genuinely sympathetic person with integrity."

25.     Flaa's second 2019 member nominator, Frank Rousseau, a French journalist who reports for Guiana and Guadalupe, noted that Flaa "is a highly respected and talented journalist with a great reputation," and had "received a talent-visa by the US government for extraordinary abilities in her field of journalism (01)."

26.     In 2019, the HFPA rejected all five objectively qualified applicants.

The HFPA Carefully Cultivates a Public Perception of High-Minded Purpose.

27.     The HFPA's self-description posted on its website at www.goldenglobes.com is, like so much else in Hollywood, a fictionalized account of its activities and true nature.  It states, in part, that:

> [T]he **Hollywood Foreign Press Association** had humble origins that
> stemmed solely from a group of journalists' desire to efficiently and
> accurately cover all aspects of the world of entertainment.
> Today's organization has its roots in the early 1940s when Pearl
> Harbor had drawn America into World War II. Audiences, hungry for
> diversion, were seeking out films offering escape, inspiration, and
> entertainment; and filmmakers such as Orson Welles, Preston Sturges,
> Darryl Zanuck and Michael Curtiz were working hard to fulfill the
> need. Amid the turmoil of war and the difficulties with
> communications, a handful of Los Angeles-based overseas journalists
> banded together to share contacts, information, and material. . . .

In 1943 the journalists, led by the correspondent for Britain's Daily Mail, formed the Hollywood Foreign Correspondents Association and conceived the motto "*Unity Without Discrimination of Religion or Race***.**"

. . .

In 1950 differing philosophies among members created a schism within the organization . . ..

The separation ended in 1955 when the journalists reunited under the collective title "**The Hollywood Foreign Press Association**" ***with firm guidelines and requirements for membership***. (Emphasis supplied).

28.     The HFPA's March 31, 1967 Articles of Incorporation as a California Mutual Benefit Corporation expressly acknowledged its objective to become "qualified for exemption from Federal income tax under the Internal Revenue Code," and therefore asserts that the HFPA will make donations and dispense charitable contributions "exclusively for religious, charitable, scientific, literary and/or educational purposes, and/or for the prevention of cruelty to children or animals."

29.     The HFPA's more narrowly focused stated purposes included (i) promoting interest in the study of the arts, including specifically promoting the development of the motion picture art form; (ii) advancing appreciation of drama and religious, classical, artistic, musical, literary, and social tradition by the exhibition of motion picture performances; (iii) providing facilities for education and instruction in the arts of motion picture production; (iv) establishing favorable relations and cultural ties between foreign countries and the USA through the exhibition of motion picture photoplays; (v) promoting interest in the motion picture art form; (vi) to educate the American public in the motion picture art form and in motion picture players throughout the world; (vii) broadening the national

culture by exposing the American public to the cultures of foreign countries through the exhibition of motion picture photoplays; (viii) recognizing outstanding achievements by conferring annual Awards of Merit within the motion picture and television industry, both domestic and foreign; and (ix) assisting needy and destitute individuals and families in or connected with the entertainment industry.

30.     In November 1967, the HFPA was granted its coveted tax-exempt status.

31.     Consistent with the HFPA's high-minded statements of purpose and eleemosynary intent, its website now touts its "multi-million-dollar donations to charity." Taken at face value, that claim might seem credible. Per a September 14, 2018 report by Daniel Holloway in *Variety*, NBC pays "roughly $60 million per year" for the right to broadcast the Golden Globes ceremony. However, as of May 31, 2020, the HFPA was holding just a piggy bank less than $60,000,000 in cash and its records reflected that over the past 30 years, its total annual charitable donations have averaged less than $1,000,000.

<u>Membership in the HFPA Brings Enormous Economic Benefits</u>.

32.     Qualified applicants for admission to the HFPA are virtually always rejected because the majority of its 87 members are unwilling to share or dilute the enormous economic benefits they receive as members. Because the HFPA's members will not admit anyone who might possibly compete with an existing member, either by selling to the same publications or to competing publications, the average age of HFPA members has steadily increased. Only half the HFPA's members are considered truly "active"; the remaining half either do the bare minimum required to maintain their "active" status or are relieved from having to meet minimum requirements by virtue of their longevity with the organization. The HFPA's 87 members—all of whom are eligible to vote for the Golden Globe Award winners—include 5 persons in their 90s, an approximately equal number in their 80s, and numerous members in their 70s.

33.     One benefit members receive flows from the importance that motion picture studios assign to winning Academy Awards of Merit®, popularly known as "©Oscars®."  Motion picture studios annually spend millions of dollars on "Oscar campaigns."  The HFPA confers its Golden Globe awards while members of the Academy of Motion Picture Arts & Sciences are in the process of deciding which persons and achievements will be nominated to contend for an Oscar.  Winning Golden Globe awards is therefore viewed both as a means to create "buzz" for a successful Oscar campaign, and as a predictor (or self-fulfilling prophesy) of success on Oscar night.

34.     As a consequence, studios go far out of their way to accommodate HFPA members by inviting them to attend every industry function, event, and screening, and, most importantly, making their top producers, directors, actors, and other talent available for exclusive interviews with HFPA members.  When foreign entertainment reporters make their seasonal migration to Los Angeles for "Awards Season," they, like their Los Angeles-based brethren excluded from membership in the HFPA, find themselves competing for any invitations and interview slots that remain after the HFPA's members have gotten their fill.

35.     The opportunities for HFPA members to ply their trade to the exclusion of non-members are not limited to "awards season" but are continual and ongoing.  All year long, HFPA members enjoy all-expenses-paid trips to film festivals around the world where the studios treat them lavishly and accommodate their every desire. They do so because such concepts as "conflict of interest," "impropriety," "impartiality," and "appearance of objectivity" are unknown to the HFPA.

36.     Further, there is no special requirement for voting such as, for example, watching the nominated motion pictures and television shows. One member now in is upper 90s is, sadly, deaf and legally blind. He does, however, cast 1 of the 87 votes that determine who will win a Golden Globe and therefore

**COMPLAINT**

enjoys the same perquisites befitting of royalty as the other voters.   The studios, of course, resent having to lavish enormous sums of money on, and being required to cater to, the desires of a few dozen aging journalists who are regularly heard snoring through screenings, but given the importance of the Golden Globes, they see no way to end the farce.

37.   Unsurprisingly, foreign entertainment reporters in Los Angeles excluded from membership in the HFPA are greatly impaired in their ability to report stories that can generate meaningful income for them.

38.   A second economic benefit HFPA membership confers lies in the worldwide press junkets available to members.  The HFPA's annual "Return of Organization Exempt From Income Tax" provided to the I.R.S. reflects that the HFPA spends in excess of $1.1 million annually solely to purchase airplane tickets for its members to attend film festivals, press junkets, and set visits.  HFPA members are typically not even expected to do anything except earn frequent flier miles while abroad on press junkets. They are not required to write any article at all based on their first 5 junkets.  By the time they have gone on 10 junkets, they are required to have written just 1 article, and just 2 articles after going on 15 junkets. While abroad on junkets, the studios typically pick up the tab for 5-star accommodations and haute cuisine wine and meals.

39.   Most reporters have never been well paid.  That is especially true of reporters for news outlets in less populous countries, such as the foreign entertainment reporters who live in Southern California.  Their ability to earn a living is becoming ever harder as technological advances allow reporters abroad to conduct interviews in Los Angeles without ever needing a passport.  When foreign reporters in Southern California do sell articles and interviews, they frequently receive just a few hundred dollars for their work.  As a consequence, most support themselves by moonlighting at another job.

**COMPLAINT**

40.     Foreign entertainment reporters in Los Angeles excluded from membership in the HFPA are thus economically disadvantaged because they cannot afford to compete with reporters able to tap into the HFPA's largesse.

41.     A third economic benefit conferred by membership in the HFPA lies in the economic benefits the HFPA directly provides to its members.  Upon information and belief, every HFPA member save one is on its payroll. Twenty of the 87 members of the HFPA chair committees.  For that, each is paid a four-figure monthly salary. During May 2020, when entertainment reporting and travel were at a standstill, one HFPA member was paid a substantial sum for his services on the Travel Committee.  At least two 95-year-old members are paid $1,000 per month to serve on the History Committee.  Even the member who serves as a parliamentarian at the HFPA's meetings is handsomely compensated.  Members also earn tens of thousands of dollars a month by writing articles in their native tongue for posting on the HFPA's website—something they are free to do whenever they want to enlarge their bank accounts.

42.     Members who are also officers or board members are paid especially well.  During the 2017 tax year, Defendant Lorenzo Soria was paid $93,637, Defendant Meher Tatna was paid $87,341, Vice President Anke Hormann was paid $44,376, Treasurer Ali Sar was paid $43,804, and directors were paid from $9,395 to $57,043. All former presidents are paid $1,000 per month for life.

43.     During the months immediately preceding the Golden Globes telecast, payments by the HFPA to its members skyrocket.  For example, merely deciding who will get seated for the Golden Globes presentation in the International Ballroom at the Beverly Hills Hotel pays more than $20,000.

44.     A recent Return of Organization Exempt From Income Tax filed by the HFPA reflected that it although it had just 6 employees, it that year paid "salaries, other compensation, [and] employee benefits" of $2,910,914, "other

salaries and wages" of $2,539,179, and "other employee benefits" of $120,176--
$5,561,269 in total.

45.     Even HFPA members who no longer qualify for active membership
status enjoy advantages unavailable to non-members.  Members who lose their
"active" status by failing to sell 6 articles and attend 45 press conferences per year
remain entitled to attend all press conferences, screenings, and events, and
otherwise enjoy the privileges of active membership, including getting tickets to
the Golden Globes.  They lose only their ability to earn money from the HFPA,
travel at its expense, and cast votes for the Golden Globe awards.

46.     These benefits are, of course, also denied to the foreign entertainment
reporters in Los Angeles who are not permitted to join the HFPA.

The HFPA's Members Act in Concert to Protect One Another From Competition.

47.     On the rare occasions when a new member is allowed to join the
HFPA, membership is conferred only subject to an understanding concerning how
and where the new member will sell his or her reporting.

48.     Those understandings are memorialized by the HFPA, itself. Its
membership directory includes such categories as "Name," "Address," "City and
State," "Telephone," "Cell," "Fax," "Email," and "Country."  One might think that
"Country" refers to the nation where the reporter was born or resides, or whose
passport the reporter carries, but one would be wrong.  It refers to the geographic
market or markets allocated to that reporter.  For example, Ramzi Malouki of
France is identified with the "Country" of "Africa"; Defendant Tatna of India is
identified with Singapore and has staked a claim to Malaysia; Defendant Navai of
Hungary is identified with "Hungary, Singapore"; Theo Kingma of The
Netherlands is identified with "Australia, The Netherlands" and used to claim
Cuba, as well; Frank Rousseau of France is identified with "Guiana, Guadalupe";
Yenny Nun-Katz of Chile is identified with "Chile, Peru"; Jenny Cooney of

Australia is identified with "Australia, New Zealand"; Dierk Sindermann of Germany is identified with "Austria, Germany, Switzerland," etc.

49.    The HFPA members' assigned territories are flexible.  Karen Martin was once responsible for Japan but is now responsible for Germany. Ramzi Malouki was identified with "Algeria, Belgium, France, Morocco, Tunisia" before those countries were exchanged for "Africa."  Jack Tewksbury once had France and Russia but now has only Argentina.  A description of the HFPA's members identifying the countries they were identified with five years ago may be found at https://www.vulture.com/2015/01/who-exactly-picks-the-golden-globes-winners.html.

50.    All told, the 87 HFPA members report for 49 "countries."  It does not follow, though, that because there are more members than "countries," there is competition. Other factors explain why some countries have more than one designated reporter.  Several pairs of members are married; some are journalists while others are photographers; some journalists report in print while others report for electronic media; some report for outlets in the same country but in different languages; and some have been allowed to join because the reporters assigned to those countries have become largely inactive with advancing age and no longer object to the admission of a compatriot.

51.    In "Meet the Total Randos Who Decide the Golden Globes" published by Vocativ on January 9, 2015, Molly Fitzpatrick provided a description of the HFPA's members that few people in the motion picture or television industries would dispute:

> Two or three dozen HFPA members—we're erring on the generous
> side—are legitimate, respected media figures, like Silvia Bizio, a
> frequent contributor to Italy's La Repubblica, and Rocio Ayuso, Los
> Angeles correspondent for Spain's El Pais.  But most of the
> association's so-called journalists are intermittent freelancers at best.

Their bylines, usually in obscure publications, tend to be impossible to
find.  (Unsurprisingly, the HFPA didn't respond to a request for
member biographies or records of their work.)  Many might as well be
ghosts online, an effect compounded by the fact that the group's
membership skews geriatric.

52.     The HFPA's Bylaws enshrine the members' purported right to
protection from competition.  Section 4.12 provides that if "a member is accused of
offering to write for a publication that is already represented by another member . .
. the aggrieved member may lodge a Grievance."  Further, "members should not
solicit publications represented by other members."  It is also impermissible to
offer to write for a publication without remuneration.

53.     The sense that they are entitled to protection from competition has
become so ingrained that HFPA members even demand that others respect that
purported right—so much so that Frederik Malling Juul, the Head of Theatrical
Distribution for SF Studios in Denmark, wrote to the HFPA in 2019 concerning
defendant Tina Johnk Christensen.  Juul said that, "for a long time, [he had] not
been able to understand, how the HFPA gains anything from being associated with
Tina Johnk [Christensen] as the Danish representative."  Addressing his studio's
views, Juul averred:

> [W]e are appalled by the behavior of one of your members using her
> membership [in] the organization as a power-tool fighting others.
> And getting ahead, just because she is part of your organization, and
> not because of her journalistic skills…. From where we are sitting,
> Tina works out of the interest of ONE person and one person only. . . .
> Tina herself.  I can honestly tell you, that we are not just one sole
> distributor with these claims.  When I talk to my colleagues and their
> heads of publicity, it is a unanimous vote.

Defendant Christensen was also the subject of a complaint made by Danish journalist Sara Madsen to the HFPA's General Counsel, Gregory Goeckner, and Defendants Tatna and Soria, among others, in 2019.  Under a caption headed, "work ethics and potential violation of The Cartwright Act," the journalist said, in part:

> You now being a member of the HFPA, obviously gives you access to incredible talent, yet you seem to be using your HFPA position to push the big studios and the local distributors to make sure journalists like me don't have access to junkets.

> Due to this purposeful sabotage, I've just lost four big feature interviews on one of the biggest releases of the year with four of the most extraordinary names in the industry.  Interviews that I had sold as they were already confirmed by the distributor and the studio . . ..

> It has been brought to my attention that you were using your HFPA position to put pressure on the studio forcing them to cancel my slots.  In a junket that has nothing to do with the HFPA, but was arranged for International journalists.

> I have emails confirming this, and I am at the moment in contact with a lawyer who is looking into this matter based on The Cartwright Act, as your actions affect my livelihood, keep me from doing my work and cause me to lose income.

54.     Swedish member Magnus Sundholm was blocked and rejected for membership for eight years at the insistence of Defendant Morisse, a Norwegian journalist who feared that Sundholm might compete with her.  Morisse was very vocal in objecting to having another Scandinavian as a member.

55.     Defendant Tatna misrepresented facts to her fellow members to prevent a Singaporean journalist from gaining admission in 2015.  Although Tatna usually writes for publications in India, she had begun working for a Singaporean

magazine and did not want competition.  She therefore spread the word that the editor of the Singaporean publication had told her that if the Singaporean applicant were admitted, the publication would stop accepting articles written by Tatna.  The applicant was denied admission before the editor confirmed that he had never said any such thing

56.     In 2015, HFPA member Nellee Holmes, whose territory is the Russian Federation, wanted to protect herself from possible competition by Ukrainian applicant Lena Basse.  Holmes not only required that Basse agree not to write for various Russian outlets but demanded a bribe in the form of Basse's Golden Globe ticket allocation.  Although HFPA members' ticket allocations then had a combined face value of $3,000, they were worth considerably more on the black market.  Defendant Soria, who was then as now the HFPA's president attempted to sweep the incident under the rug while the membership voted to give Holmes a slap on the wrist for demanding the bribe.

57.     That a member might demand a bribe could not have come as a surprise.  After all, the HFPA's publicist had earlier sued the HFPA and its former president (and current member) Philip Berk for fraud and engaging in "unethical and potentially unlawful deals and arrangements which amount to a 'payola' scheme."

58.     Outside journalists familiar with the HFPA privately refer to it as "the cartel" with good reason.

The HFPA's Practices Have Institutionalized a Culture of Corruption.

59.     The HFPA sees no ethical conflict in allowing the very people who vote on awards to accept thousands of dollars in emoluments from the very entities competing for those awards.  Section 4.4 of the HFPA's Bylaws express the only limitation on voting rights: "members who work for motion picture, radio, and television companies or their agents, in publicity or promotion, shall not vote for the Golden Globe Awards.  Any member who actively participates . . . in a motion

18

**COMPLAINT**

1  picture or a television program during the preceding year . . . shall not be eligible

2  to nominate or vote for such motion picture or television program." Otherwise, the

3  sky's the limit concerning what the HFPA's members may accept from the studios.

4  Indeed, when Disney PR agent Jerry Rojas offered in 2019 to treat six members

5  who were then in Bali to a two-night stay in a five-star hotel in Singapore without

6  any pretense of a work-related purpose, the members were happy to accept and the

7  HFPA paid for their airfare.

8      60.    Members of the HFPA feel so entitled that when the COVID-19

9  outbreak shut down virtually all motion picture and television production, they

10  wanted to disburse HFPA funds directly to HFPA members.  Told that it would be

11  unlawful to do so, they grudgingly agreed to contribute $400,000 to the Los

12  Angeles Press Club to offer grants to out-of-work correspondents.

13      61.    The Bylaws include an *in terrorem* provision intended to protect the

14  HFPA's code of silence while denying members equal protection of law.  Section

15  4.6(A) provides that any member may be expelled "for cause," but the Bylaws

16  nowhere define "cause."  Moreover, if a grievance procedure is invoked, the HFPA

17  may be represented by its general counsel but members are prohibited from having

18  an attorney present.

19      <u>The HFPA Has Erected Numerous, Arbitrary Hurdles to Membership</u>.

20      62.    The HFPA's requirements for admission to membership have both

21  objective and subjective requirements.  Both are skewed to keep new members out.

22      63.    The objective requirements for becoming a member are significantly

23  more demanding than the requirements for remaining an active member.  And,

24  owing to a May 2020 Bylaw amendment that upon information and belief was

25  made for the purpose of preventing Plaintiff Flaa from gaining admission,

26  applicants can no longer satisfy the application requirements by reporting for

27  television, although persons who are already members may rely on television

28  reporting to prove they satisfy the requirements for active membership.

64.   Otherwise, the objective requirements include providing (i) credentials from publications **appointing** the applicant as their correspondent; (ii) 24 clippings of the applicant's articles from the past 3 years (vs. 18 clippings for members); (iii) proof the applicant was paid for those articles; (iv) proof the applicant has belonged to the Motion Picture Association of America ("MPAA") for 2 years; and (v) two letters of sponsorship from active members.

65.   Although the requirement that an applicant must find two sponsors might seem unremarkable, it is an important part of the process by which the HFPA prevents qualified applicants from obtaining membership.  Members apply enormous pressure on other members not to sponsor reporters they do not care for or, more importantly, who might possibly compete with them.  One of Plaintiff Flaa's 2019 sponsors was pressured into withdrawing his sponsorship of her the day before nominations were due. A Japanese entertainment reporter has been blocked from even applying for membership for 18 years because the senior Japanese members of the HFPA will not support her, and, without their support, no one will sponsor her.

66.   HFPA insiders acknowledge that the sponsorship requirement is unjustifiable and routinely bars qualified foreign entertainment journalists from membership in the HFPA. One member recently said of the membership admissions process, "this is making even more clear [] that we really need to get rid of sponsors.  I have not put myself out there very often, but every time I do I get attacked."  Another has acknowledged that he, "fought hard to get rid of sponsors this past year . . . It's tough when these battles are lost again and again because of an antiquated minority standing in the way of change."  Upon information and belief, even the HFPA's in-house general counsel, Gregory Goeckner, favors removal of the sponsorship system.

67.   And, lest any member become open minded about allowing qualified applicants to join, HFPA, members are strictly limited to sponsoring no more than

one applicant per year.  And, as a further check on the theoretical possibility that too many qualified applicants might join, Section 4.1(E)(3) of the HFPA's Bylaws prohibits the admission of more than 5 members in any year.

68.     The subjective requirements pose an even greater hurdle to membership.  After an applicant has managed to find two members willing to risk the wrath of their fellow members by acting as a sponsor and has been certified as satisfying all objective requirements for membership, the applicant must next be approved by a majority vote of the members.

69.     Significantly, the HFPA has no guidelines whatever for approving or disapproving an applicant.  Only one thing is certain—that the quality of an applicant's work is irrelevant.  For many years, applicants' press clippings were made available for inspection by members who visited the HFPA's offices in West Hollywood but were not otherwise made available to members.  Any who did not visit thus voted without ever seeing an applicant's work.

70.     In 2018, Plaintiff Flaa's qualifying reporting articles were made accessible to all HFPA members via a link.  Not one member accessed her reporting.  In 2020, the HFPA announced that it would not automatically make applicants' qualifying works available to members but would instead provide a link to any member who requested it.  Although it subsequently backed down, the point has repeatedly been made that an applicant's professional *oeuvre* is unimportant to the admissions decision.

71.     Because the HFPA has no guidelines for members to follow in deciding whether to anoint applicants as "New" or "provisional," non-voting members—the precursor stage to becoming a voting member—character assassination of applicants and sponsors alike has become the rule, not the exception.  Within the past few years, one newly-wed female applicant was accused by the rumor mill of sleeping with male members in exchange for their votes; another applicant was accused of money laundering; yet another applicant

1  was smeared with the accusation that she wanted to become a member only

2  because she was a psychologist who wanted to find celebrity clients; still another

3  applicant was accused of seeking membership only to help her father make more

4  connections in the industry.  Defendant Navai did not mince words in telling one

5  applicant's husband, "I'd rather vote for a dog than your wife."

6         72.    Surviving such hazing is viewed by members as just another hurdle all

7  applicants must clear.  In 2018, Defendant Christensen warned Flaa that, "no one

8  gets in the first year so don't expect that to happen to you.  We all have to go

9  through it."

10        73.    Following a smear campaign ending in the rejection of a Belgian

11  applicant she had sponsored, Italian member Alessandra Venezia declared at a

12  membership meeting that she was "deeply ashamed to be part of a company that

13  allowed such a nasty campaign against a totally talented journalist."  A Latin

14  American member wrote in 2019 that, "it's not hard to become a target for gossip

15  and bullying among our group. . .There is jealousy, envy, resentment, bitterness….

16  and that's in their good days."  An Asian member said this year: "It's so ridiculous

17  that some members try to block the bonafide journalist for their personal selfish

18  satisfaction and I find it's as ridiculous for the association to let them get away

19  with it."

20        74.    A letter Flaa received anonymously in July 2020 said the following

21  about Sundholm, one of Flaa's sponsors (with whom she has been in an exclusive

22  relationship with for five years):

23              Dear Kjesti [sic]

24              Hoping all is well in your fabulous existence.

25              It's well known that you usually explain not getting your way

26        as people being somehow 'jealous' of you.  Let me assure you, no one

27        is jealous of you and in particular, your relationship with Magnus

28

**COMPLAINT**

Sundholm, who for years has famously been considered the equivalent of the town bicycle.

Before you, he slept with each and any female entertainment journalist in the industry in LA, New York, London etc, with publicists and HFPA colleagues, and the occasional actress, usually openly cheating on whichever unfortunate 'girlfriend' he was involved with at the time. So now, it's you and you may rest assured that not a single individual feels envy of any kind towards you, more like contempt for your staggering arrogance and delusion. What a pair!

75.   During recent years, reporters objectively qualified for admission to the HFPA but who were prevented by the sponsorship requirement for applying or rejected by vote of the membership have included Semira Ben-Amor (Finland), Raffi Boghosian (Dubai), Claude Budin-Juteau (France), Yong Chavez (Philippines), Alison De Souza (Singapore), Maria Estevez (Spain), Rosa Gamazo (Spain), Sabrina Joshi (India), Catherine Nitelet-veddder (Belgium), Joanna Ozdobinska (Poland), Gill Pringle (England), Yuki Saruwatari (Japan), Sophia Silva (Uruguay), Evie Sullivan (Austria), and Christian Thiele (Germany). One rejected applicant managed to find a bright side, though: "the gossip press voted against [me] but the nice thing was [and] is that all, and I mean all, the successful real journalist[s] voted for me."

76.   During 2018-2019, just one of the six applicants certified by the HFPA as objectively qualified survived the membership vote. But even the rare applicants who do pass the membership vote would be premature in toasting their good fortune. The process described above is merely the process for becoming a "provisional member." Section 4.2(B) of the Bylaws requires that provisional members *repeat* the process after a year to become active members.

77.    Notwithstanding the numerous and unlawful roadblocks to membership, the HFPA has been creating more at an accelerating rate.  It amended Article IV of its Bylaws, entitled "Membership," twice in 1996, once more in each 1998, 2002, 2009, 2014, 2017, four times in October 2019, once more in December 2019, and yet again in May 2020 (when it decided that although members could rely on television reporting to remain qualified, applicants could no longer use television reporting to become qualified in the hope that the amendment would defeat Plaintiff Flaa's application).

78.    Not only are the Bylaws subject to change on a whim (as the HFPA demonstrated by suddenly excluding applicants, but not members, who rely on television journalism to demonstrate that they are active reporters), but they are malleable.  To aid a favored applicant, the HFPA's Credentials Committee decided in 2020 that the required period of MPAA membership need not be continuous, or even recent.

Flaa's Rejections by the HFPA Were Unrelated to Her Superior Achievements or Personal Traits.

79.    Before being forced to withdraw his 2019 endorsement of Flaa for membership, Ramzy Malouki  acknowledged the reason Flaa was rejected for membership in 2018:

> I am aware . . . that when Kjersti applied to [the] HFPA last year, the Scandinavian members did not agree.  Upon their requests, Kjersti was willing to sign legal documents to prove that she would never sell to their clients.  Please note that even as a non-member, Kjersti has dropped Aud [Morisse's] newspaper VG as an outlet to assure [Morisse] that she would never interfere with her work.  Kjersti has never sold an article to Denmark in her entire career as a journalist.

(Defendants Aud Berggren Morisse and Tina Johnk Christiansen are from Norway and Denmark, respectively.)   Unfortunately, defendant Morisse got to Malouki,

**COMPLAINT**

who subsequently explained that Morisse was so upset that he could not continue to serve as Flaa's sponsor.  He thereupon withdrew his sponsorship one day before applications were due.

80.    In a letter to his fellow HFPA members, Frank  Rousseau also addressed Flaa's 2018 rejection: "Kjersti applied for membership last year where she experienced an unjustifiable campaign against her, including blackmailing from an HFPA member, as well as fabricated stories, to make people vote against her."

81.    Magnus Sundholm (of Sweden) stepped in to sponsor Flaa after Malouki was pressured to withdraw his sponsorship.  Sundholm said of Flaa to his fellow HFPA members:

> Her original sponsor, a hard news reporter and former war
> correspondent, was so pressured by some female members in the
> organization that he saw no other option than to step down [as her
> sponsor].  This behavior echoes of last year.  Then, her 74-year-old
> sponsor was harassed in text messages and called all sorts of nasty
> things by the same members.  So, you might wonder, what has Kjersti
> done to trigger this kind of bullying?  Is it because she is:
>
> 1)    An accomplished journalist with over 17 years in the
>        profession?
> 2)    Well liked and endorsed by all the studios and distributors?
> 3)    Successful on YouTube with her celebrity interviews?  55
>        million views.  400 interviews.  52,000 subscribers.
> 4)    Producing celebrity interviews for the largest entertainment
>        TV-show in Norway?
> 5)    Working for one of the major newspapers in Norway?
> 6)    Skilled in producing, video editing and photography?

7)     Frequently asked by HFPA members for help on how to grow their online presence?

82.     Sundholm also addressed the concern that Flaa might compete with other HFPA members, declaring, "Kjersti has never in her career sold a single article to Denmark, Sweden or Finland." He next addressed Flaa's 2018 rejection:

Kjersti had an agreement with Aud last year, which Aud, without any explanation, chose not to honor last minute. Kjersti has since had no luck in getting any response of contact with Aud. Our Danish member has yet to come up with an honest explanation for her continu[ou]s aggressive campaign against [Flaa].

<u>The Individual Defendants Have Conspired to Deny Flaa Fair Procedure and Have Engaged in or Aided and Abetted Unlawful Anti-Competitive Conduct</u>.

83.     To ensure that Plaintiff Flaa would not compete with them in "their" markets of Norway and Denmark, Defendants Christensen and Morisse attempted to secure a signed agreement from Flaa committing Flaa to never compete with them as a *quid pro quo* for not blocking her from admission to membership in the HFPA. Going even further, Christensen demanded that Flaa agree in writing that if admitted, Flaa would never support Danish entertainment reporter Sara Gerlach Madsen for membership. Christensen and Morisse openly campaigned against Flaa's admission on the basis that although Flaa had pledged to restrict her journalistic activities to television interviews as a means to assure them that she would not compete for print reporting using material gathered at HFPA press conferences, they believed that Flaa would not be able to sustain herself by doing television interviews and would be driven by financial need to compete with them in the print entertainment reporting market. Christensen and Morisse claim to have a private agreement that allows either to sell to the "other's" market when the other person is not able to cover a given story. They were, however, unwilling to run the

risk that Flaa might disturb their monopoly by using admission to the HFPA to compete with them.

84.     To that end, they campaigned against Flaa's admission by, among other things, telling HFPA members that Flaa would ruin Morisse's "career" (Morisse was already in her mid-70s) if she were admitted to membership.  HFPA member Jack Tewksbury later disclosed that Christensen and Morisse were both in tears as they persuaded him to vote against Flaa in 2018.

85.     In 2019, Christensen attempted to persuade Frank Rousseau to withdraw his sponsorship of Flaa, claiming to "have proof" that Flaa was a bad person.  Rousseau cut that short by demanding to see it.

86.     Also in 2019, Christensen and Morisse teamed up again, this time to persuade Ramzi Malouki to withdraw his sponsorship of Flaa on the eve of the application deadline.  Morisse again claimed that if admitted, Flaa would "ruin" Morisse's "career."

87.     Attempting to cover their tracks, Christensen and Morisse jointly asked Malouki to tell the HFPA's then-president, Defendant Meher Tatna, that it was entirely his idea to withdraw his sponsorship and deny that Christensen and Morisse had anything to do with his decision.  Informed of what had happened, Tatna not only refused to remonstrate Christensen and Morisse but angrily criticized another member for privately explaining to the membership why Malouki had withdrawn his support of Flaa.  Tatna also contacted members individually, ordering them not to speak to *The Wrap*.   As Tatna explained, if word of what had happened were to get out, the HFPA's reputation would be harmed.  Tatna's actions and failure to act thus conveyed to the membership that voting to deny a qualified applicant admission for anti-competitive reasons was perfectly acceptable.

88.     *The* Wrap annually reports on the HFPA's membership votes as best it can (most rejected applicants refuse to speak to *The Wrap* fearing that doing so

would forever kill any possibility that they might someday be admitted), and 2019 was no exception.  Attempting to leave *The Wrap* with nothing to report, Defendant Tatna contacted members individually, ordering them not to speak to it.  Tatna told them that if word of what had happened were to get out, the HFPA's reputation would be harmed.  Then, putting her best public relations spin on the HFPA's actions, Tatna piously conveyed to *The Wrap* that the HFPA would again amend its Bylaws, this time to ensure that more applicants were admitted.  True to form, the HFPA promptly amended its Bylaws to ensure that it became more difficult to obtain admission.

89.     In 2020, Christensen and Morisse have been even more invidious in attempting to prevent Flaa from gaining admission to the HFPA.  Taking into consideration that Morisse's health would no longer permit her to work full time even if she wanted to, Christensen and Morisse schemed to back another Norwegian reporter they had earlier tried to smear as a dishonest journalist, Mari Glans.  Remarkably, they did so after telling Defendant Soria that the Norwegian journalism market did not have room for more than one journalist.

90.     Although Glans had not planned to apply for admission this year and did not have the necessary journalistic credentials, Morisse volunteered to serve as Glans's second sponsor when Elisabeth Sereda (of Austria) announced that she would become Glans's first sponsor.  Sereda assured her fellow members that Glans, "writes SOLELY for Norwegian publications and is not in competition with any other member," and that Sereda "would still not have considered sponsoring her without the approval of our Norwegian member Aud [Morisse]."  Christensen and Morisse have told others that through this stratagem, they hope to prevent Flaa from at last surviving the initial membership vote.  By adding Glans, a Norwegian, to the HFPA's membership roll, they would be able to persuasively tell other members that there were enough Norwegian members for the foreseeable future and could delay Flaa's admission for decades.

91.     Defendant Navai openly acknowledges that Flaa is "a very good journalist" or an "outstanding journalist."  She collaborated with Flaa for over seven years, asking Flaa to cover press junkets for her when she was traveling. Nevertheless, she believes that the HFPA should exclude anyone who might compete with a member in selling articles to a given publication.  She further believes that the HFPA should deny membership to anyone who has sold articles to a publication that itself competes with a publication for which a member writes. By accusing Flaa to other members of having done those things,  saying that Flaa wanted Morisse "to retire and die," and  "ageism," Navai has actively participated in the scheme to unlawfully deprive Flaa of admission to the HFPA.

92.     As the HFPA's current president, Defendant Soria has attempted to protect the HFPA's corrupt and unlawful practices by enforcing its implied oath of *omertà*.  After Flaa sent a privileged pre-litigation offer to enter into a confidential settlement to the HFPA's outside counsel, Marvin Putnam, Soria invited a German member, Frances Schoenberger, to meet him for lunch.  There, Soria shared Flaa's privileged settlement offer with Schoenberger (who is neither a board member nor an officer of the HFPA) before dispatching her to convey a message to Magnus Sundholm.  Sundholm is a 25-year veteran of Scandinavia's largest newspaper, *Aftonblandet*, a member of the HFPA, and lives with Flaa.  The message Schoenberger conveyed to Sundholm was: "Obviously you have leaked numbers from the HFPA's treasurer's report.  Members are never going to go for this, and you can't continue being a member if this moves forward, and you can't come to press conferences because there could be sensitive information there.  You cannot continue to work as the official photographer for the HFPA.  We have a good thing going.  That can all be taken away."  Schoenberger further intimated that unless Flaa abandoned her legal claims, one of her sponsors would again be pressured into withdrawing his endorsement thereby making Flaa ineligible for admission.

The sponsor has, however, emphatically refused to withdraw his sponsorship of Flaa.

## FIRST CLAIM FOR RELIEF

### Violation of the Common Law Right of Fair Procedure

### (Against All Defendants)

93.     Flaa repeats and realleges paragraphs 1-92, above, as though fully set forth at length.

94.     California has long recognized a common-law right of fair procedure that attaches to quasi-public organizations that make decisions affecting a person's ability to practice a lawful trade or profession.  When quasi-public organizations do so, they have a duty to devise fair procedures, and to implement those procedures fairly, in admitting qualified applicants.  Their admissions decision-making must be both substantively rational and procedurally fair.

95.     As an organization afforded tax-free treatment by both the Internal Revenue Service and the California Franchise Tax Board, defendant HFPA is a quasi-public organization.  In exchange for its tax exemption, it is required to act in the best interests of the entire class of professionals from which its members derive—foreign entertainment reporters residing in Southern California—without regard to membership status.  It may not offer preferential treatment to members at the expense of non-members.

96.     The HFPA is also a quasi-public organization in that it serves as a gatekeeper organization for foreign entertainment reporters in Southern California seeking to practice their profession.

97.     Since the California Supreme Court first applied the right-of-fair-procedure doctrine 76 years ago, California courts have in a variety of circumstances recognized the effect that exclusion from membership in a private organization may exert upon a person's ability to pursue a particular profession or calling.  Subsequent California decisions have applied the right of fair procedure to

1   the admissions practices of professional societies, membership in which is a

2   practical prerequisite to the pursuit of a profession.

3        98.   Such is the case here.  Admission to membership in the HFPA brings

4   with it access to events at which all the important players in the motion picture and

5   television industries are present, including, importantly, those with new releases to

6   discuss.  Membership in the HFPA also brings with it special access to those

7   persons at those events.  Moreover, membership in the HFPA allows members to

8   defray the cost of attending the press junkets vital to their work.

9        99.   The HFPA not only fails to offer a fair procedure for seeking

10   membership, it does not even make a pretense of doing so.  It has objective

11   requirements that applicants for membership must meet but arbitrarily requires that

12   an applicant must also find two sponsors for no evident purpose.  It also requires

13   two votes of approval by the membership without providing any guidelines or

14   standards for approving or rejecting applicants.  It places no emphasis whatever on

15   evaluating the quality of an applicant's work.  Instead, it freely allows its members

16   to base their admissions decisions on whether an applicant might become a

17   competitive threat to an existing member.  Indeed, the HFPA's Bylaws even

18   attempt to prohibit competition among members.  The HFPA also freely allows

19   members to reject applicants based on their personalities and does nothing to

20   correct or prohibit the spread of character slurs and false accusations that

21   invariably confront every applicant. The emotional toll that character assignation

22   campaigns take has led numerous applicants to stop re-applying for membership,

23   thereby abandoning any hope of ever being admitted.  And when all is said and

24   done, a rejected applicant has no right to appeal, no right to contest the

25   misinformation communicated about him or her, and no right to a review of any

26   sort.

27        100.  In 2018 and 2019, the individually named defendants took advantage

28   of the utter institutional lack of fair procedure to unfairly and maliciously

**COMPLAINT**

1 communicate false or misleading information concerning Flaa to other HFPA

2 members, or to use their authority as officers of the HFPA to combat or prohibit

3 misinformation campaigns, as alleged hereinabove.  The foreseeable and intended

4 consequence of their acts and omissions was to ensure that Flaa would unfairly be

5 denied admission.

6      101.   As a direct and proximate cause of Flaa's unfair rejection for

7 membership in the HFPA when she first applied, she was unable to get access to

8 hundreds of press conferences attended by major Hollywood talent.  Had she been

9 able to attend (as all HFPA members were), she would have been able to conduct

10 and sell many dozens of print interviews to Norwegian and other Scandinavian

11 publications.  In addition, she would have been able to conduct dozens of video

12 interviews that she would then have been able to sell to television shows and

13 online media outlets in Scandinavia.   Further, Flaa has a fast-growing YouTube

14 channel on which she shares her video interviews.  Her channel has over 64,000

15 subscribers and typically gets between one and two million views per month.  Had

16 she been admitted to the HFPA, Flaa would have been able to conduct far more

17 celebrity video interviews and would have derived far more income from her

18 YouTube channel as a consequence.

19      102.   Accordingly, Flaa seeks preliminary and permanent injunctive relief

20 against Defendants prohibiting them from denying her admission to the HFPA as a

21 full member and from denying future qualified applicants the benefits of fair

22 procedure by modifying the requirements of their existing membership admissions

23 process in the following respects:

24      (a)   Elimination of the sponsorship requirement.

25      (b)   Elimination of the membership vote.

26      (c)   Elimination of the "New Member" category of membership, making

27           everyone who would be a New Member under the Bylaws as currently

28           constituted an "Active Member."

103.   Flaa additionally seeks damages against Defendants jointly and severally according to proof at trial, together with her costs and reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF
### Declaratory Relief
### (Against Defendant HFPA)

104.   Flaa repeats and realleges paragraphs 1-92 and 94-103, above, as though fully set forth at length.

105.   For-profit companies enjoy a large measure of freedom in deciding whom to hire, how many persons to hire, how much to pay employees, what benefits to offer, how to distribute profits, and the like.  In exercising those freedoms, they do not need to consider the needs and interests of their competitors but are free to consider their concerns alone.   But there is a *quid-pro-quo*.  They must pay taxes.

106.   Companies give up a measure of those freedoms though when they successfully petition the government to be relieved of the burden of paying taxes. They may no longer act purely in their own self-interest but must serve a broader good.

107.   Defendant HFPA enjoys a tax-free existence under Section 501(c)(6) of the Internal Revenue Code and a corresponding exemption from paying California state taxes.  In exchange, it may not engage in economic activities that favor its members.  As was explained during the Hearings on Tariff Schedules of the Revenue Act of 1913 Before the Subcommittee of the Commerce on Finance, 63d Cong., 1st Session at 2001, 2003 (1913), the tax exemption created by Section 501(c)(6) was to help "cooperative agencies of good citizenship . . . ***increase the incomes, not of themselves, but of the individuals in their communities***, ***irrespective of membership in the organizations."*** (Emphasis added.)  In other words, the benefits provided by an organization exempt under Section 501(c)(6)

may not accrue solely to its members but must benefit members of its industry generally, as numerous courts have held.

108.   As shown at length above, the benefits that accrue to the few, the fortunate, the members of the HFPA, do not accrue to members of the industry generally.

109.   It is through its Bylaws that the HFPA excludes foreign entertainment reporters residing in Southern California from enjoying the benefits that HFPA members fight so fiercely to withhold from industry colleagues.

110.   An actual case or controversy exists in that Plaintiff Flaa contends, and Defendant HFPA denies, that the following provisions of the HFPA's Bylaws are unlawful in light of the HFPA's commitments and obligations as a tax-exempt Section 501(c)(6) mutual benefit corporation:

1.   Section 4.1(E), which provides as follows:

E.   New members shall be:

1.   New members must fulfill all the requirements for active membership.

2.   After a period of one year, new members are eligible to apply for Active Membership.

3.   A maximum of five new members a year may be accepted into the Association.

2.   Sections 4.2(A)(6), (7), which provide as follows:

6.   Sponsorship from two active members, including a letter of recommendation from each sponsor detailing:

(a) How long the member has known the applicant.

(b) How long the applicant has been located in this area.

(c) How long the applicant has been writing about the entertainment industry.

**COMPLAINT**

(d) Any other information that would support the applicant's journalistic credentials.

7.  Each active member may sponsor only one new applicant for membership each year.

3.  The following portion of Section 4.2(A), following subsection (7):

If the applicant meets the requirements, then the application shall be submitted to the membership for 30 days' consideration.  If active members have any questions or concerns about the application, they shall promptly advise the Credentials Committee about those questions or concerns in writing.  The Credentials Committee shall investigate all such questions or concerns, including contacting the applicant for additional information if appropriate, and if necessary, shall then convene an open meeting in which members can share their questions or concerns in person.  After this, the Credentials Committee shall advise the membership of their conclusions so that the active members are able to consider those conclusions in their decision on the application.  Prior to the next meeting active members shall decide by secret ballot and by a majority vote of those active members voting on each applicant whether to accept the applicant as a member.  All members shall submit their ballots to the Association's accounting firm prior to the August membership meeting.  The accounting firm shall count the votes and attend the August membership meeting to announce the results.

4.  Section 4.2(B), which provides as follows:

B.     New members who fulfill the requirements for Active membership after a period of one year, having been scrutinized by the Credentials Committee, may apply for active membership and be confirmed by the majority of active members.  All members shall

35

**COMPLAINT**

submit their ballots to the Association's accounting firm prior to the August membership meeting.  The accounting firm shall count the votes and attend the August membership meeting to announce the results.

111.   Accordingly, Plaintiff Flaa seeks a judicial declaration that the foregoing Bylaw provisions, and any others that are substantially similar in sum and substance or that would achieve the same ends, are unlawful and unenforceable.

### THIRD CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

### (Against All Defendants)

112.   Flaa repeats and realleges paragraphs 1-92, 94-103, and 105-111, above, as though fully set forth at length.

113.   Southern California, and the Los Angeles area in particular, constitutes a substantial market for foreign entertainment reporters who reside in the area and earn a livelihood by gathering and selling entertainment news.

114.   Plaintiff Flaa is a participant in the entertainment news reporting industry in the Southern California market.

115.   Defendants have entered into an unlawful contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce as alleged hereinabove.

116.   Defendants' actions have caused injury not only to competition but to Plaintiff Flaa individually, by reason of which Flaa has suffered actual damages in an amount to be proven at trial, which damages shall be trebled and awarded to Flaa as provided in Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

117.   Unless the actions of Defendants as alleged hereinabove are enjoined, competition in the relevant market will continue to be irreparably harmed in a manner that cannot be compensated by money damages.

**FOURTH CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

**(Against All Defendants)**

118.   Flaa repeats and realleges paragraphs 1-92, 94-103, 105-111, and 113-117, above, as though fully set forth at length.

119.   Defendants' actions as alleged hereinabove constitute a course of conduct calculated to monopolize the market for foreign reporting of entertainment news emanating from Southern California in violation of Section 2 of the Sherman Act.

120.   In engaging in the conduct described above, Defendants have acted with the specific intent to impede, prevent, or destroy competition in the international market for entertainment news gathered in Southern California and given their consistent pattern of unlawful behavior, there is a dangerous probability that their efforts will continue to succeed.

121.   Defendants' actions as alleged hereinabove have caused injury not only to competition but to Plaintiff Flaa individually, by reason of which Flaa has suffered actual damages in an amount to be proven at trial, which damages shall be trebled and awarded to Flaa as provided in Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

122.   Unless Defendants' actions as alleged hereinabove are enjoined, competition in the relevant market will continue to be irreparably harmed in a manner that cannot be compensated in monetary damages.

**FIFTH CLAIM FOR RELIEF**

**Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, et seq.**

**(Against All Defendants)**

123.   Flaa repeats and realleges paragraphs 1-92, 94-103, 105-111, 113-117, and 119-122, above, as though fully set forth at length.

**COMPLAINT**

124. Defendants' actions as alleged hereinabove have caused injury not only to competition but to Plaintiff Flaa individually, by reason of which Flaa has suffered actual damages in an amount to be proven at trial, which damages shall be trebled and awarded to Flaa as provided in Section 16750(a) of the Cartwright Act, Cal. Bus. & Prof. Code § 16750(a).

125. Unless Defendants' actions as alleged hereinabove are enjoined, competition in the relevant markets will continue to be irreparably harmed in a manner that cannot be compensated in monetary damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Flaa prays for relief as follows:

1. On the First Claim for Relief:

   A. For preliminary and permanent injunctive relief against Defendants prohibiting them from denying her admission to the HFPA as a full, voting member.

   B. For preliminary and permanent injunctive relief against Defendants prohibiting them from denying membership in the HFPA to objectively qualified applicants.

   C. For preliminary and permanent injunctive relief prohibiting the HFPA from enforcing the requirement that applicants for admission must have sponsors.

   D. For preliminary and permanent injunctive relief prohibiting the HFPA from treating persons who have satisfied its admissions requirements as "new" or "provisional" members or otherwise denying them the benefits of full membership for any period of time.

   E. For a damages award against Defendants jointly and severally in an amount to be proved at trial.

**COMPLAINT**

F.  For an award of costs and reasonable attorneys' fees against
Defendants jointly and severally.

2.  <u>On the Second Claim for Relief</u>:

For a judicial declaration that the following provisions of the HFPA's Bylaws are unlawful in light of the HFPA's commitments and obligations as a tax-exempt mutual benefit corporation:

Section 4.1(E), which provides as follows:

E.  New members shall be:

1.  New members must fulfill all the requirements for active membership.

2.  After a period of one year, new members are eligible to apply for Active Membership.

A maximum of five new members a year may be accepted into the Association.

Sections 4.2(A)(6), (7), which provide as follows:

6.  Sponsorship from two active members, including a letter of recommendation from each sponsor detailing:

(e) How long the member has known the applicant.

(f) How long the applicant has been located in this area.

(g) How long the applicant has been writing about the entertainment industry.

(h) Any other information that would support the applicant's journalistic credentials.

7.  Each active member may sponsor only one new applicant for membership each year.

The following portion of Section 4.2(A), following subsection (7):

If the applicant meets the requirements, then the application shall be submitted to the membership for 30 days'

39

**COMPLAINT**

consideration.  If active members have any questions or concerns about the application, they shall promptly advise the Credentials Committee about those questions or concerns in writing.  The Credentials Committee shall investigate all such questions or concerns, including contacting the applicant for additional information if appropriate, and if necessary, shall then convene an open meeting in which members can share their questions or concerns in person.  After this, the Credentials Committee shall advise the membership of their conclusions so that the active members are able to consider those conclusions in their decision on the application.  Prior to the next meeting active members shall decide by secret ballot and by a majority vote of those active members voting on each applicant whether to accept the applicant as a member.  All members shall submit their ballots to the Association's accounting firm prior to the August membership meeting.  The accounting firm shall count the votes and attend the August membership meeting to announce the results.

Section 4.2(B), which provides as follows:

> B.    New members who fulfill the requirements for Active membership after a period of one year, having been scrutinized by the Credentials Committee, may apply for active membership and be confirmed by the majority of active members.  All members shall submit their ballots to the Association's accounting firm prior to the August membership meeting.  The accounting firm shall count the votes and attend the August membership meeting to announce the results.

**COMPLAINT**

1          Any other Bylaw provisions substantially similar in sum and

2          substance to the foregoing or that would achieve the same ends.

3      3.    On the Third, Fourth, and Fifth Claims for Relief:

4      A. For treble damages according to proof at trial;

5      B. For preliminary and permanent relief prohibiting the HFPA and its

6          members from unlawfully competing with non-HFPA-member

7          foreign entertainment journalists residing in Southern California or

8          denying them the benefits of HFPA membership

9      C. For an award of reasonable attorneys' fees.

10     D. For costs of suit; and

11     E. For such other and further relief as the Court deems proper and just.

12

13  Dated:  August 3, 2020                    **ONE LLP**

14

15                                      By: /s/ David W. Quinto

16                                           David W. Quinto
                                             Joanna Ardalan

17

18                                           Attorneys for Plaintiff
                                             Kjersti Flaa

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

1

**DEMAND FOR JURY TRIAL**

2        Plaintiff Kjersti Flaa hereby demands trial by jury of all issues so triable

3    under the law.

4

5    Dated:  August 3, 2020                    **ONE LLP**

6

7                                              By: /s/ David W. Quinto

8                                                  David W. Quinto
                                                   Joanna Ardalan
9

10                                                 Attorneys for Plaintiff
                                                   Kjersti Flaa
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**