LATHAM & WATKINS LLP
  Marvin S. Putnam (Bar No. 212839)
    *Marvin.Putnam@lw.com*
  Robert J. Ellison (Bar No. 274374)
    *Robert.Ellison@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, California  90067
Telephone:  424.653.5500
Facsimile:  424.653.5501

LATHAM & WATKINS LLP
  Christopher S. Yates (Bar No. 161273)
    *Chris.Yates@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California  94111
Telephone:  415.391.0600
Facsimile:  415.395.8095

*Attorneys for Defendants*
Hollywood Foreign Press Association,
Aud Berggren Morisse, Tina Johnk
Christensen, Aniko Skorka Navai,
and Meher Tatna

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION JUDICIAL DISTRICT

| | |
|---|---|
| KJERSTI FLAA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>HOLLYWOOD FOREIGN PRESS ASSOCIATION, a California Mutual Benefit Corporation; AUD BERGGREN MORISSE, an individual; TINA JOHNK CHRISTENSEN, an individual; ANIKO SKORKA NAVAI, an individual; LORENZO SORIA, an individual; MEHER TATNA, an individual; and DOES 1-20, inclusive,<br><br>Defendants. | CASE NO. 2:20-CV-06974-SB-E<br><br>Honorable Stanley Blumenfeld, Jr.<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT BY DEFENDANTS HOLLYWOOD FOREIGN PRESS ASSOCIATION, AUD BERGGREN MORISSE, TINA JOHNK CHRISTENSEN, ANIKO SKORKA NAVAI, AND MEHER TATNA**<br><br>Date:     November 20, 2020<br>Time:     8:30 a.m.<br>Place:    Courtroom 6C<br>            First Street Courthouse<br>            350 W. 1st Street<br>            Los Angeles, CA 90012 |

1  **TO PLAINTIFF AND HER ATTORNEYS OF RECORD:**

2   **PLEASE TAKE NOTICE** that on November 20, 2020 at 8:30 a.m., or at

3  such later date and time as the Court may order, in the Courtroom of the Honorable

4  Stanley Blumenfeld, Jr., located at First Street Courthouse, 350 West 1st Street,

5  Los Angeles, California 90012, defendants Hollywood Foreign Press Association,

6  Aud Berggren Morisse, Tina Johnk Christensen, Aniko Skorka Navai, and Meher

7  Tatna[1] (collectively, "defendants") will and hereby do move for an Order

8  dismissing with prejudice plaintiff Kjersti Flaa's complaint for violation of the

9  right of fair procedure, Sherman Act § 1 violation, Sherman Act § 2 violation, and

10  Cartwright Act violation, and declaratory relief (the "complaint").

11   This motion is made following the conference of counsel pursuant to L.R. 7-

12  3, which took place on September 28, 2020.

13   This motion is based on this notice of motion, the accompanying

14  memorandum of points and authorities, the complaint, the Court's record in this

15  matter, the arguments of counsel, and other materials and argument that may be

16  presented prior to the Court's decision on this motion.

17

18

19  Dated:  October 5, 2020          LATHAM & WATKINS LLP
20                   Marvin S. Putnam
                     Christopher S. Yates
21                   Robert J. Ellison

22                   By /s/ Marvin S. Putnam
23                   Marvin S. Putnam
                     Attorneys for Defendants
24                   HOLLYWOOD FOREIGN PRESS
                     ASSOCIATION, AUD BERGGREN
25                   MORISSE, TINA JOHNK
                     CHRISTENSEN, ANIKO SKORKA
26                   NAVAI, and MEHER TATNA

27
   _____
28  [1] Defendant Lorenzo Soria was dismissed *without prejudice* by Flaa on September
   21, 2020.

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................... 10

II.     STATEMENT OF FACTS ...................................................................... 12

    A.      The HFPA Has Served The Entertainment Industry And
        Advanced Foreign Entertainment Journalism For Eight
        Decades. ....................................................................................... 12

    B.      Flaa's Prosperous Career As An Entertainment Reporter. ............... 13

    C.      Flaa Sues The HFPA And Certain Members Because She
        Has Not Yet Been Admitted To The Membership. ........................... 14

    D.      Flaa Asks This Court To Rewrite The HFPA's Bylaws. ................... 15

III.    LEGAL STANDARD ............................................................................. 16

IV.     ARGUMENT ......................................................................................... 17

    A.      Flaa's Right Of Fair Procedure Claim Should Be
        Dismissed. ..................................................................................... 17

        1.      Flaa's Admitted Success Bars Her Fair Procedure
            Claim. ................................................................................. 18

        2.      The Fair Procedure Doctrine Is Limited To Public
            Or Quasi-Public Entities. .................................................... 21

    B.      Flaa's Antitrust Claims Under The Sherman Act And
        California's Cartwright Act Are Fatally Flawed. ............................. 22

        1.      Flaa's Antitrust Claims Fail Because She Does Not
            Allege A Viable Antitrust Market. ....................................... 25

        2.      Flaa's Antitrust Claims Also Fail Because The
            Complaint Fails To Allege That The HFPA Has
            Market Power ...................................................................... 28

        3.      The Complaint Does Not Allege Any Antitrust
            Injury. ................................................................................ 29

    C.      Flaa's Claim For Declaratory Relief Should Be
        Dismissed. ..................................................................................... 31

        1.      This Court Lacks Jurisdiction Over Flaa's Claim
            For Declaratory Relief. ....................................................... 31

        2.      Flaa Fails To State A Claim For Declaratory
            Judgment. ........................................................................... 32

V.      CONCLUSION ...................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A-Z Int'l v. Phillips*,
  323 F.3d 1141 (9th Cir. 2003) ............................................................. 17

*Allen v. Beirich*,
  No. CV CCB-18-3781, 2019 WL 5962676 (D. Md. Nov. 13, 2019) ............... 32

*Am. New Covenant Church v. Comm'r of Internal Revenue*,
  74 T.C. 293 (T.C. 1980) ...................................................................... 32

*Apani Southwest Inc. v. Coca-Cola Enters.*,
  300 F.3d 620 (5th Cir. 2002) ............................................................... 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2008) ..................................................................... 16, 27

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ................................................................ 24, 29, 30

*Audette v. Int'l Longshoremen's & Warehousemen's Union*,
  195 F.3d 1107 (9th Cir. 1999) .............................................................. 34

*Austin v. McNamara*,
  979 F.2d 728 (9th Cir. 1992) .......................................................... 24, 30

*Balisteri v. Pacifica Police Dep't*,
  901 F.2d 696 (9th Cir. 1988) ............................................................... 16

*BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*,
  36 F.3d 664 (7th Cir. 1994) ................................................................. 30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................... 16, 27

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ......................................................... 26, 30

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) .............................................................. 30

*Brown Shoe Co. v. United States.*,
  370 U.S. 294 (1962) ........................................................................... 24, 25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ..................................................................... 24, 29, 30

*Campbell v. City of San Antonio*,
  43 F.3d 973 (5th Cir. 1995) .................................................................. 16

*Choate v. U.S.*,
  413 F. Supp. 475 (N.D. Okla. 1976) ..................................................... 33

*Christoferson Dairy, Inc. v. MMM Sales, Inc.*,
  849 F.2d 1168 (9th Cir. 1988) ......................................................... 29, 30

*Cueto v. World Sav. Bank, FSB*,
  No. 17-CV-01144-H-AGS, 2017 WL 3131859 (S.D. Cal. July 24,
  2017) ..................................................................................................... 34

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................. 17

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) ................................................................ 16

*Ezekial v. Winkley*,
  20 Cal. 3d 267 (1977) ........................................................................... 19

*FTC v. Qualcomm, Inc.*
  969 F.3d 974 (9th Cir. 2020) ........................................................... 25, 31

*Harrison v. Christus St. Patrick Hosp.*,
  430 F. Supp. 2d 591 (W.D. La. 2006) .................................................. 32

*Jones v. Hobbs*,
  745 F. Supp. 2d 886 (E.D. Ark. 2010) ................................................. 33

*King v. Regents of Univ. of Cal.*,
  138 Cal. App. 3d 812 (1982) ...................................................... 19, 20, 21

*Laborers' Int'l Union of N. Am., Local 341 v. Main Bldg. Maint., Inc.*,
  435 F. Supp. 3d 995 (D. Alaska 2020) ................................................. 17

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
  884 F.2d 504 (9th Cir. 1989) ................................................................ 30

*LLM Bar Exam, LLC v. Barbri, Inc.*,
   271 F. Supp. 3d 547 (S.D.N.Y. 2017), *aff'd*, 922 F.3d 136 (2d Cir.
   2019) ........................................................................................................... 29

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ...................................................................................... 33

*Merit Healthcare Int'l, Inc. v. Merit Med. Sys., Inc.*,
   721 F. App'x 628 (9th Cir. 2018) .................................................................. 33

*Mindermann v. S.F. Police Credit Union*,
   No. A124189, 2009 WL 4856778 (Cal. Ct. App. Dec. 17, 2009) .................... 21

*Moore v. James H. Matthews & Co.*,
   550 F.2d 1207 (9th Cir. 1977) ...................................................................... 26

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...................................................................... 25

*Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*,
   795 F.3d 1124 (9th Cir. 2015) ................................................................. 23, 24

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) ........................................................................ 16

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .......................................................... 23, 25, 28

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) .................................................................................. 25

*Oksanen v. Page Mem'l Hosp.*,
   945 F.2d 696 (4th Cir. 1991) ........................................................................ 31

*Oltz v. St. Peter's Cmty. Hosp.*,
   861 F.2d 1440 (9th Cir. 1988) ...................................................................... 26

*Oregon v. Legal Servs. Corp.*,
   552 F.3d 965 (9th Cir. 2009) ........................................................................ 17

*Pinsker v. Pac. Coast Soc'y of Orthodontists*,
   12 Cal. 3d 541 (1974) ................................................................................... 18

*Potvin v. Metro. Life Ins. Co.*,
   22 Cal. 4th 1060 (2000) ................................................................ 18, 19, 21, 22

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................. 28

*Redbox Automated Retail v. Buena Vista Home Ent., Inc.*,
  399 F. Supp. 3d 1018 (C.D. Cal. 2019) ................................................. 24

*Rsch. Consulting Assocs. v. Elec. Power Rsch. Inst., Inc.*,
  104 F.R.D. 619 (D. Mass. 1985) ........................................................... 31

*Rutman Wine Co. v. E. & J. Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987) ................................................................ 28

*Sater v. Chrysler Grp. LLC*,
  No. EDCV 14-00700-VAP, 2014 WL 11412674 (C.D. Cal. Oct. 7,
  2014) ...................................................................................................... 17

*SC Innovations, Inc. v. Uber Techs., Inc.*,
  434 F. Supp. 3d 782 (N.D. Cal. 2020) ................................................. 24

*Schmitt v. Protestant Mem'l Med. Ctr., Inc.*,
  No. 04CV00577 DRH, 2005 WL 4157466 (S.D. Ill. Feb. 23, 2005) .......... 32, 33

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ................................................................ 16

*Stevedoring Servs. of Am., Inc. v. Eggert*,
  953 F.2d 552 (9th Cir. 2002) ................................................................ 17

*StubHub, Inc. v. Golden State Warriors, LLC*,
  No. C 15-1436 MMC, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ............... 28

*Syufy Enters. v. Am. Multicinema, Inc.*,
  793 F.2d 990 (9th Cir. 1986) ................................................................ 28

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ......................................................... 23, 26

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
  536 F. Supp. 2d 1191 (C.D. Cal. 2008) ............................................ 26, 27

*United States v. Bravo-Diaz*,
  312 F.3d 995 (9th Cir. 2002) ................................................................ 17

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) .............................................................................. 26

*United States v. State of Wash.*,
  759 F.2d 1353 (9th Cir. 1985) ..................................................................33, 34

*Verizon Commc'ns, Inc., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ........................................................................................31

*Yari v. Producers Guild of Am., Inc.*,
  161 Cal. App. 4th 172 (2008)...................................................................*passim*

**STATUTES**

15 U.S.C § 1................................................................................................................23

15 U.S.C. § 2...............................................................................................................25

15 U.S.C. § 15.............................................................................................................24

15 U.S.C. § 26.............................................................................................................24

26 U.S.C. § 501...........................................................................................................32

26 U.S.C. § 501(c).......................................................................................................32

26 U.S.C. § 501(c)(3)..................................................................................................32

26 U.S.C. § 501(c)(6) ...........................................................................................*passim*

26 U.S.C. § 501(d).......................................................................................................32

26 U.S.C. § 7428....................................................................................................31, 32

26 U.S.C. § 7428(a)...............................................................................................31, 32

26 U.S.C. § 7428(a)(1)(E) ...........................................................................................32

26 U.S.C. § 7428(b)(1)................................................................................................31

28 U.S.C. § 2201(a).....................................................................................................31

Cal. Bus. & Prof. Code § 16750..................................................................................23

Protecting Americans from Tax Hikes Act of 2015 (PATH Act), Pub.
  L. No. 114-113, Div. Q, § 406 .......................................................................32

**RULES**

Fed. R. Civ. Proc. 12(b)(1) ....................................................................................16, 17

Fed. R. Civ. Proc. 12(b)(6) ................................................................................. 16, 26

## TREATISES

Wright & Miller, 5 Fed. Prac. & Proc., Civ. § 1216 (3d ed.) .................................. 16

## REGULATIONS

26 C.F.R. § 1.501(c)(6)-1 ....................................................................................... 12

1                      **MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.**   **INTRODUCTION**

3        This lawsuit asks this Court to interfere with the member applicant process

4 of the Hollywood Foreign Press Association ("HFPA"), a private, non-profit

5 membership association made up of international journalists based in Southern

6 California and dedicated to the promotion of cultural exchange in the film,

7 television, and theater arts. Specifically, plaintiff Kjersti Flaa expects the Court to

8 rewrite the HFPA's bylaws, overhaul the HFPA's rules and election processes for

9 new members, and force the HFPA to admit Flaa immediately to the membership,

10 without any membership vote, let alone one providing the requisite number of

11 votes for membership. To be clear, Flaa actually seeks an order barring the HFPA

12 from allowing its members to decide who becomes a member, requiring the HFPA

13 (an 87-person association) to open admission to *any* applicant who meets criteria

14 that *Flaa* herself deems appropriate, and granting her (and them) membership to

15 the association without a vote of its members. According to Flaa, members should

16 not have the opportunity to vote "no" to her membership application regardless of

17 their reasons for doing so. It matters not to Flaa that certain members are deeply

18 offended by her demonstrated ageism, history of racist remarks,[2] and multi-year

19 campaign of bullying and harassment against members she perceives opposed her

20 application. Because Flaa believes she has satisfied certain "objective" criteria that

21 

---

22 [2] In 2018, Flaa was roundly criticized for making racist remarks to Korean actress
Claudia Kim during an interview and subsequently justifying her comments
23 publicly with yet additional racist commentary. *See Ezra Miller Gets Mad At
Racist Comment That Was Directed At Claudia Kim*, SBS STAR (Nov. 8, 2018),
24 https://news.sbs.co.kr/news/endPage.do?news_id=N1005008453. Remarkably,
Flaa's character is on full display within the four corners of the complaint. Among
25 other telling allegations, she openly mocks the HFPA for allowing a supposedly
deaf and blind member in his late 90s to vote on the Golden Globe awards.
26 (Compl. ¶ 36.) She repeatedly derides the number of "aging journalists" in the
membership and the fact that older members are allowed on Committees. (*Id.* ¶¶
27 32, 36, 41.) And she accuses Lorenzo Soria, the recently deceased HFPA
President, of "enforcing [the HFPA's] implied oath of *omertà*," in a not-so-veiled
28 swipe at his Italian heritage. (*Id.* ¶ 92.)

1    she herself decided are fair, she now claims somehow to possess a legal right to

2    HFPA membership.

3          The salacious and inflammatory complaint is a far cry from a good faith use

4    of the judicial system.  A cursory review of the sweeping, often incoherent, and

5    internally inconsistent allegations, particularly when coupled with the international

6    press tour Flaa and her counsel launched after filing two months ago,[3] reveals

7    Flaa's bad-faith motives for this lawsuit:  to garner publicity, intimidate HFPA

8    members into voting her into the membership, and publicly shame members who

9    did not blindly support her membership application.  But Flaa comes nowhere

10   close to stating a viable cause of action.

11         *First*, Flaa's common-law right-of-fair-procedure claim fails because the

12   right of fair procedure does not apply to *exclusion* from organizations like the

13   HFPA, where lack of membership does not somehow restrict one's right to be a

14   foreign entertainment reporter.  Moreover, Flaa's admitted success as a foreign

15   entertainment journalist in Los Angeles, New York, and Norway—all while she

16   was *not* a HFPA member—is fatal to this cause of action.  *Second*, Flaa's antitrust

17   claims fail for multiple reasons including the fact that she does not allege the

18   HFPA has market power in any cognizable antitrust market or that she has suffered

19   any cognizable *antitrust* injury, which is once again confirmed by all of her

20   allegations touting her success as a journalist *despite not being a member of the*

21   *HFPA*.  *Finally*, the law is crystal clear that Flaa's declaratory relief claim fails

22   because she lacks standing to challenge the HFPA's non-profit status under the

23

24

---

25   [3] *See, e.g.*, Gene Maddus, *Norwegian Reporter on Her Fight With the Hollywood*
     *Foreign Press Association*, VARIETY (Aug. 4, 2020),
26   https://variety.com/2020/film/news/kjersti-flaa-hollywood-foreign-press-
     association-lawsuit-1234725121/; Gene Maddus, *Hollywood Foreign Press*
27   *Association Accused of Being an Illegal Cartel*, VARIETY (Aug. 3, 2020) (quoting
     Flaa's counsel), https://variety.com/2020/film/news/hollywood-foreign-press-
28   association-illegal-cartel-1234724207/.

1  Declaratory Judgment Act.  This Court is an improper forum for such a claim in

2  any event, and the claim is not based on any viable cause of action.

3        In sum, Flaa has no legal right to become a member of the HFPA and has

4  alleged nothing that suggests she could remedy the defects in her complaint.

5  Defendants respectfully request that her complaint be dismissed with prejudice.

6  **II.    STATEMENT OF FACTS**

7        **A.    The HFPA Has Served The Entertainment Industry And**

8             **Advanced Foreign Entertainment Journalism For Eight Decades.**

9        The HFPA was formed in 1943 by "a group of journalists [who] desire[d] to

10  efficiently and accurately cover all aspects of the world of entertainment."

11  (Compl. ¶ 27.)  Shortly thereafter, the HFPA began conferring annually the widely-

12  celebrated Golden Globe® awards to recognize outstanding achievement in the

13  entertainment industry and promote cultural exchange in the film, television, and

14  theater arts.  (*Id.* ¶¶ 3, 33.)

15        In November 1967, the HFPA was granted 501(c)(6) tax-exempt status as a

16  trade association under the Internal Revenue Code, consistent with its stated

17  purposes of, *inter alia,* "promoting interest in the study of the arts," "providing

18  facilities for education and instruction in the arts of motion picture production,"

19  "establishing favorable relations and cultural ties between foreign countries and the

20  USA," "recognizing outstanding achievements . . . within the motion picture and

21  television industry, both domestic and foreign," and "assisting needy and destitute

22  individuals and families [] connected with the entertainment industry."  (*Id.* ¶¶ 29,

23  30.)[4]  And that is exactly what it has done for the last half century.

24        The HFPA is deeply philanthropic, having made tens of millions of dollars

25  in charitable donations.  (*Id.* ¶ 31.)  This year alone, in light of the COVID-19

26

27

28

---

[4] Trade associations are also sometimes referred to as "business leagues" under
federal law.  *See* 26 C.F.R. § 1.501(c)(6)-1.

1  pandemic, the HFPA made a sizable donation to the Los Angeles Press Club to

2  provide immediate financial support to out-of-work journalists.  (*Id.* ¶ 60.)

3          **B.     <u>Flaa's Prosperous Career As An Entertainment Reporter.</u>**

4          Flaa has been a successful journalist for 17 years.  (*Id.* ¶¶ 18–21.)  She is not

5  and never has been a member of the HFPA.  (*Id.* ¶¶ 23, 26, 79–92.)  Born and

6  raised in Norway, Flaa worked in the feature department of Norway's second

7  largest newspaper and then became the text editor of Norway's largest tabloid

8  magazine.  (*Id.* ¶ 18.)  In 2007, she moved to New York City to work as a

9  journalist in the United States.  (*Id.* ¶ 19.)  From her new home in New York, Flaa

10  "reported on entertainment, lifestyle, fashion, and trends for major newspapers and

11  magazines in Norway" and "became the principal celebrity interviewer for the

12  biggest entertainment television show in Norway."  (*Id.*)  She also produced

13  entertainment news segments for "the Norwegian equivalent to the BBC" and

14  "became a frequent panel moderator and guest host."  (*Id.*)  In short, Flaa's own

15  allegations confirm her success as an entertainment reporter even though she was

16  based in New York and not Southern California.

17          In 2015, Flaa moved to Southern California where she acknowledges that

18  she continued to flourish as a foreign entertainment journalist.  (*Id.* ¶ 20.)  Flaa

19  "founded and became the creative director of a production company" that

20  "produced 130 episodes" of "a short form entertainment series" titled "Hollywood

21  Stories" for "Scandinavia's biggest streaming network."  (*Id.* ¶ 20.)  "Hollywood

22  Stories" was subsequently sold and distributed to over forty countries.  (*Id.*)  As of

23  the filing of her complaint, Flaa's "celebrity interviews on [her] YouTube [show]

24  '*Flaawsome Talk*' [] have been viewed 69.7 million times."  (*Id.*)

25          According to her complaint, Flaa has been repeatedly recognized for her

26  journalistic achievements.  She has appeared in five documentaries shown in

27  Germany as a "Hollywood expert" and has been profiled by "major outlets in

28  Norway concerning her success reporting on celebrities and her involvement with

1  [Nordic Oscar Weekend]," an annual event in Los Angeles.  (*Id.* ¶¶ 20–21.)  She

2  was the runner-up at the SoCal Journalism Awards Contest for her profile of Jane

3  Fonda and second runner-up at the 12th National Arts & Entertainment Journalism

4  Awards for "her television interview of Henry Winkler."  (*Id.* ¶ 21.)

5    **C.    Flaa Sues The HFPA And Certain Members Because She Has Not**

6         **Yet Been Admitted To The Membership.**

7    According to the HFPA's bylaws, admission to HFPA membership requires

8  a majority vote of active members.  (*Id.* at 35.)  The vote is conducted using secret

9  ballots, which are submitted to the HFPA's accounting firm for tabulation.  (*Id.*)

10  Flaa applied for membership in 2018 and 2019 and did not receive enough votes in

11  either year.  (*Id.* ¶¶ 23, 26.)  She applied again in 2020, but rather than wait for the

12  results of the October 2020 election (which would be reasonable since she alleges

13  it often takes multiple years of applications to become a HFPA member), she filed

14  this lawsuit seeking an order from this Court that she be deemed admitted to the

15  membership without a vote, contrary to the HFPA's bylaws.  (*Id.* ¶¶ 23, 89, 102.)

16    Flaa claims that her "rejections by the HFPA were unrelated to her superior

17  achievements."  (*Id.* at 24.)  She blames her failure to receive a majority vote in

18  two different years on defendants Tina Christensen (Denmark) and Aud Morisse

19  (Norway), who she alleges were "unwilling to run the risk that Flaa might disturb

20  their monopoly by using admission to the HFPA to compete with them" and

21  therefore "campaigned against Flaa's admission."  (*Id.* ¶¶ 83–84.)  Just a few

22  paragraphs later, however, Flaa acknowledges that defendants Christensen and

23  Morisse recently supported the application of Mari Glans, another Norwegian

24  journalist, and that "Morisse volunteered to serve as Glans's second sponsor,"

25  belying the allegation that opposition to Flaa's membership is based on concerns

26  about competition.  (*Id.* ¶ 90.)

27    Flaa alleges that "qualified applicants for admission to the HFPA are

28  virtually always rejected because the majority of its 87 members are unwilling to

share or dilute the enormous economic benefits they receive as members." (*Id.* ¶ 32.)  Notwithstanding her allegations regarding her own personal success despite never holding HFPA membership, Flaa claims that "foreign entertainment reporters in Los Angeles excluded from membership in the HFPA are greatly impaired in their ability to report stories that can generate meaningful income for them." (*Id.* ¶ 37.)   According to Flaa, "[HFPA] membership is conferred only subject to an understanding concerning how and where the new member will sell his or her reporting," and "[t]he HFPA's Bylaws enshrine the members' purported right to protection from competition." (*Id.* ¶¶ 47, 52.)  Flaa acknowledges, however, that the 87 members of the HFPA report for 49 countries, so her unsupported theory is, at best, mathematically dubious.  (*Id.* ¶ 50.)

### D. <u>Flaa Asks This Court To Rewrite The HFPA's Bylaws.</u>

Flaa claims the HFPA's bylaws contain "numerous, arbitrary hurdles to membership." (*Id.* at 19.)  The allegedly "arbitrary" hurdles include "two letters of sponsorship from active members," "proof the applicant has belonged to the Motion Picture Association of America ('MPAA') for 2 years," and "24 clippings of the applicant's articles from the past 3 years" along with "proof the applicant was paid for those articles." (*Id.* ¶ 64.)  If an applicant meets the "objective" criteria, "the applicant must next be approved by a majority vote of the members," which Flaa bizarrely contends is an unlawful "subjective" requirement.  (*Id.* ¶ 68.)  In other words, Flaa asks this Court to interfere with the admission process of the HFPA by rewriting the HFPA's bylaws to revise the organization's admissions criteria and eliminate altogether the vote of membership for the addition of new members, and to require that the HFPA automatically admit any applicant who satisfies Flaa's view of what the "objective criteria" for membership should be. (*Id.* ¶ 110.)

1  III.   **LEGAL STANDARD**

2       **Rule 12(b)(6).**  A Federal Rule of Civil Procedure 12(b)(6) motion "tests the

3  legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

4  "[T]he complaint must contain either direct allegations on every material point

5  necessary to sustain recovery . . . or contain allegations from which an inference

6  fairly may be drawn that evidence on these material points will be introduced at

7  trial."  *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (quoting

8  Wright & Miller, 5 Fed. Prac. & Proc., Civ. § 1216 (3d ed.)).  "Dismissal can be

9  based on the lack of a cognizable legal theory or the absence of sufficient facts

10 alleged under a cognizable legal theory."  *Balisteri v. Pacifica Police Dep't*, 901

11 F.2d 696, 699 (9th Cir. 1988).

12      To determine whether a pleading adequately states a claim for plausible

13 relief, the court must first "tak[e] note of the elements a plaintiff must plead to

14 state a claim."  *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2008).  A claimant must

15 "provide the grounds of her entitle[ment] to relief, [which] requires more than

16 labels and conclusions, and a formulaic recitation of the elements of a cause of

17 action will not do.  Factual allegations must be enough to raise a right to relief

18 above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

19 (internal and quotations omitted).

20      Moreover, "plaintiffs must include sufficient 'factual enhancement' to cross

21 'the line between possibility and plausibility,'" *i.e.*, "from conceivable to

22 plausible."  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990,

23 995, 997 (9th Cir. 2014) (quoting *Twombly*, 550 U.S. at 557, 570).  Although the

24 Court must accept well-plead facts as true, conclusory legal allegations and

25 unwarranted inferences cannot defeat a motion to dismiss.  *See, e.g.*, *Sprewell v.*

26 *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

27      **Rule 12(b)(1).**  The Ninth Circuit has made clear that "[i]t is fundamental to

28 our system of government that a court of the United States may not grant relief

1  absent a constitutional or valid statutory grant of jurisdiction." *United States v.*

2  *Bravo-Diaz*, 312 F.3d 995, 997 (9th Cir. 2002).  Therefore, "[p]ursuant to the

3  Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss an action if

4  it lacks jurisdiction over the subject matter of the suit." *Sater v. Chrysler Grp.*

5  *LLC*, No. EDCV 14-00700-VAP (DTBX), 2014 WL 11412674, at *2 (C.D. Cal.

6  Oct. 7, 2014).  A party seeking to invoke federal jurisdiction bears the burden of

7  establishing that jurisdiction exists "for each claim he seeks to press" and for "each

8  form of relief sought." *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir.

9  2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  "A

10  federal court is presumed to lack jurisdiction in a particular case unless the

11  contrary affirmatively appears." *A-Z Int'l v. Phillips*, 323 F.3d 1141, 1145 (9th

12  Cir. 2003) (quoting *Stevedoring Servs. of Am., Inc. v. Eggert*, 953 F.2d 552, 554

13  (9th Cir. 2002)).

14  A Rule 12(b)(1) jurisdictional attack may be facial or factual, "depending on

15  whether the challenger asserts that the complaint, on its face, is insufficient to

16  invoke federal jurisdiction or whether the challenger disputes the truth of the

17  allegations themselves.  For a facial attack, the court must only consider the

18  allegations of the complaint and documents referenced therein and attached

19  thereto, in the light most favorable to the plaintiff." *Laborers' Int'l Union of N.*

20  *Am., Local 341 v. Main Bldg. Maint., Inc.*, 435 F. Supp. 3d 995, 999 (D. Alaska

21  2020) (internal citation and quotations omitted).

22  **IV.   ARGUMENT**

23  **A.   Flaa's Right Of Fair Procedure Claim Should Be Dismissed.**

24  Flaa fails to state a claim for violation of the common law right of fair

25  procedure.  The right to fair procedure does not apply to the HFPA's membership

26  application process for two key reasons.  *First*, exclusion from HFPA membership

27  does not "effectively deprive an individual of the ability to practice a trade or

28  profession." *Yari v. Producers Guild of Am., Inc.*, 161 Cal. App. 4th 172, 177

(2008).  Flaa's admitted success as an entertainment journalist in Norway,[5] New York, and Los Angeles demonstrates that exclusion from the HFPA does not deprive her (or other entertainment journalists) from the ability to practice their profession.  (*See* Compl. ¶¶ 18–21.)

*Second*, the HFPA is not subject to the right of fair procedure.  Rather, only "private entit[ies] affecting the public interest," *i.e.*, "quasi-public" entities are subject to the common law right of fair procedure.  *See Potvin v. Metro. Life Ins. Co.*, 22 Cal. 4th 1060, 1070 (2000).  Flaa does not and cannot allege any facts suggesting that the HFPA qualifies as a "quasi-public" entity under controlling case law that limits the right of fair procedure to a limited set of private entities that provide "important products or services" to the public, have "superior bargaining power," or have received "legislative recognition of their public aspect." *Yari*, 161 Cal. App. 4th at 179.

### 1.    *Flaa's Admitted Success Bars Her Fair Procedure Claim.*

The common law right of fair procedure was first developed, and remains most expansive, when individuals are *expelled* or *suspended* from a private organization, though it was expanded to encompass *exclusions* from membership only "*in a special, limited category of private associations such as labor unions or professional and trade associations.*"  *Pinsker v. Pac. Coast Soc'y of Orthodontists*, 12 Cal. 3d 541, 551, 553 (1974) (emphasis added) (applying right of fair procedure to orthodontic associations that "wielded monopoly power . . . so as to clothe the [associations] with a public interest").  Accordingly, "California decisions have [] expanded judicial review [to] labor union membership policies" and to "the admission practices of professional societies [in which] membership [] is a ***practical prerequisite*** to pursuit of a medical or dental specialty, and to access

---

[5]  Flaa has enjoyed success as a foreign entertainment journalist in Norway even though she has never been a member of the HFPA and a member of the HFPA (defendant Aud Berggren Morisse) is Norwegian.  (*See* Compl. ¶¶ 18–21, 83.)

1  by practicing physicians to staff privileges in private hospitals." *Ezekial v.*
2  *Winkley*, 20 Cal. 3d 267, 271 (1977) (internal citations omitted and emphasis
3  added).

4      The reasoning for this expansion is that "certain private entities possess
5  substantial power either to *thwart* an individual's pursuit of a lawful trade or
6  profession, or to control the terms and conditions under which it is
7  practiced." *Ezekial*, 20 Cal. 3d at 272 (emphasis added); *id.* at 274 (holding right
8  to fair procedure applied to an attempt to *expel* plaintiff surgical resident where
9  defendant had "the power to . . . prevent [the] practice of a surgical specialty"); *see*
10  *also Potvin,* 22 Cal. 4th at 1069.  *Exclusion* from membership in a private
11  organization is thus subject to the common law right of fair procedure only when it
12  restricts one's "right to practice a lawful trade or profession."  *Ezekial*, 20 Cal. 3d
13  at 272; *see also Yari*, 161 Cal. App. 4th at 178 (dismissing right to fair procedure
14  claim where plaintiff did not allege that defendants "controlled his ability to
15  work").

16      Flaa wholly fails to make this necessary showing because she does not and
17  cannot allege that joining the HFPA is *necessary* to practice her trade as an
18  entertainment journalist, nor does she submit any facts demonstrating that her lack
19  of HFPA membership *forecloses* or *significantly impairs* her right or ability to
20  pursue her chosen career.  Rather, Flaa does the *opposite*, emphasizing repeatedly
21  that she is, and has been for two decades, a successful foreign entertainment
22  journalist *despite* the fact that she is not a member of the HFPA.  (*See* Compl. ¶
23  18–21.)  Flaa's claim for wrongful denial of a right to fair procedure therefore must
24  fail, as her "right to practice [her] profession has not been foreclosed" by the
25  HFPA.  *See King v. Regents of Univ. of Cal.*, 138 Cal. App. 3d 812, 817 (1982).
26      In *Yari*, a case that is particularly salient—and not just because Flaa's
27  counsel in this case successfully moved to dismiss a fair procedure claim on
28  similar facts—a film producer alleged the Producers Guild of America ("Producers

Guild")[6] and the Academy of Motion Picture Arts and Sciences (the "Academy")[7] violated the common law right of fair procedure by denying plaintiff's applications to receive Guild production credit, and thus qualify as a potential "Academy Awards®" Best Picture winner for the film *Crash*. *Yari*, 161 Cal. App. 4th at 174–75. The court, in holding that the common law right of fair procedure did not apply, noted that the plaintiff was a successful movie producer *despite* not receiving award recognition from defendants. Therefore, "defendants did not control [plaintiff's] right to practice the trade or profession of movie producing, and [] their negative response to his application for Best Picture producer credit did not significantly impair his ability to work." *Id.* at 178. Although the *Yari* complaint "alleged that Yari's career would have been enhanced if he had received Academy Award credit as a producer, and that his reputation was tarnished because he was not granted that credit, [] that is not the same as saying these defendants *controlled his ability to work*. Clearly, they did not." *Id.*

The same is true of Flaa's "exclusion" from membership to date in the HFPA. Flaa acknowledges that she is a successful foreign entertainment journalist. (*See* Compl. ¶ 18–21.) At best, like plaintiff in *Yari*, Flaa alleges that her career would be enhanced or improved as a HFPA member. (*See* Compl. ¶ 98 (alleging membership would bring better "access" and "defray" costs)). The complaint establishes that the HFPA does not control Flaa's "ability to work," and that the outcome of the two votes by HFPA membership not to accept Flaa has in no way interfered with her ability to seek work as an entertainment journalist in a legally cognizable way. *See Yari*, 161 Cal. App. 4th at 177–78; *see also King*, 138 Cal.

---

[6] The Producers Guild is a Section 501(c)(6) non-profit trade association that "represents, protects and promotes the interests of producers . . . in film, television and new media." *See* Declaration of Robert J. Ellison ("Ellison Decl.") ¶ 3, Ex. A at 4.

[7] The Academy is a Section 501(c)(6) non-profit trade association that "recognize[s] and uphold[s] excellence in the motion picture arts and sciences, inspire[s] imagination, and connect[s] the world through the medium of motion pictures." *See* Ellison Decl. ¶ 4, Ex. B at 5.

App. 3d at 817–18 (denying professor's fair procedure claim where the University "simply decided not to accord the special privilege of life-time employment" and the professor's "ability to seek other employment in his profession has not been curtailed in any respect, nor has his professional status been removed or damaged").  Flaa fails to state a fair procedure claim as a matter of law.

### 2.    *The Fair Procedure Doctrine Is Limited To Public Or Quasi-Public Entities.*

Private organizations "subject to the common law right to fair procedure" "all share[] an attribute of significance . . . [e]ach one [is] a private entity affecting the public interest," *i.e.*, a "quasi-public" entity.  *Potvin*, 22 Cal. 4th at 1070, 1072–73 (applying right of fair procedure to the *expulsion* of physicians from health insurers' lists of preferred providers if "the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area").  In attempting to make this showing, Flaa claims the HFPA is a quasi-public organization because (1) it is "afforded tax-free treatment by both the Internal Revenue Service and the California Franchise Tax Board" and (2) "it serves as a gatekeeper organization for foreign entertainment reporters in Southern California seeking to practice their profession."  (Compl. ¶¶ 95, 96.)

Flaa's allegations belie such a conclusory claim, which is unsupported by a single factual allegation.  Indeed, Flaa's acknowledged success as a foreign entertainment journalist cannot be reconciled with her bald allegation that the HFPA is a "gatekeeper organization."  In these circumstances, where an organization does not "perform the gatekeeper function for a profession," "courts will not compel the organization to maintain a fair procedure for an offended person."  *Mindermann v. S.F. Police Credit Union*, No. A124189, 2009 WL 4856778, at *8 (Cal. Ct. App. Dec. 17, 2009).

1    Moreover, the complaint demonstrates that the HFPA is not "quasi-public in
2    nature." *Potvin,* 22 Cal. 4th at 1070.  Quasi-public entities provide "important
3    products or services," have "superior bargaining power," or have received
4    "legislative recognition of their public aspect." *Id.*  In other words, quasi-public
5    entities are "private entit[ies] affecting the public interest." *Id.* at 1070.  Private
6    organizations such as labor unions, hospitals, medical associations, and "insurers
7    [with] power so substantial that the removal [of a doctor from a provider list]
8    significantly impairs the ability of an ordinary, competent physician to practice
9    medicine or a medical specialty in a particular geographic area" have been found to
10   be quasi-public, and thus subject to the right of fair procedure.  *Id.* at 1070–71.

11   In *Yari*, in rejecting plaintiff's claim that the Producers Guild and the
12   Academy are quasi-public, the court explained that "the movie industry is an
13   important industry, and movies may affect the ways in which people view the
14   world . . . [but, that] does not mean that [movie] industry-related organizations like
15   defendants operate in the public interest." *Yari*, 161 Cal. App. 4th at 180.  The
16   same reasoning applies to the HFPA.  The Producers Guild, the Academy, and the
17   HFPA are all non-profit trade organizations that promote the entertainment
18   industry, including through the Golden Globe® and Academy Award®
19   ceremonies.  Each has received 501(c)(6) status, demonstrating that "tax-free
20   treatment" (Compl. ¶ 95) is insufficient to confer quasi-public status on an entity.
21   *See Yari*, 161 Cal. App. 4th  at 181.  While the HFPA is certainly influential in a
22   culturally significant industry, the HFPA does *not* "operate in the public interest"
23   as a matter of law and is not a quasi-public entity.  Accordingly, the right to fair
24   procedure does not apply to the HFPA, and Flaa's claim should thus be dismissed
25   with prejudice.  *See id.* at 180–81.

26   **B.    <u>Flaa's Antitrust Claims Under The Sherman Act And California's</u>**
27   **<u>Cartwright Act Are Fatally Flawed</u>.**

28   Flaa claims that her exclusion from the HFPA violates the antitrust laws.  If

Flaa's contentions were correct, then any time an individual was not accepted for membership in a trade association or club that might be beneficial to her career, she could invoke antitrust law.  Not surprisingly, there is no support for Flaa's view in the law—and her antitrust claims, which are hopelessly muddled, fail on every level.

Flaa asserts that HFPA's failure to admit her as a member (1) was the result of a conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C § 1, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16750, that caused harm in the "substantial market for foreign entertainment reporters who reside in the area and earn a livelihood by gathering and selling entertainment news" and (2) that the HFPA has "monopolize[d] the market for foreign reporting of entertainment news emanating from Southern California."  (Compl. ¶¶ 112–125.)  According to the complaint, this allegedly anticompetitive conduct resulted in Flaa being unable to secure certain interviews of celebrities and prevented her from attending some functions hosted by movie studios.  If that does not sound like a viable claim under the antitrust laws, it is because it most certainly is not.

*First*, the complaint does not allege (as each of Flaa's antitrust claims requires) that the HFPA has market power in a properly defined relevant market.  "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'  That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).  Flaa has done neither.  The inconsistent markets that are alleged in two conclusory sentences are not proper antitrust markets, as a matter of law.  *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (The "[f]ailure to

1  identify a relevant market is a proper ground for dismissing a Sherman Act

2  claim.").[8]

3    *Second*, Flaa's complaint does not even try to allege that the HFPA has

4  market power.  This is not an overstatement; there are zero allegations regarding

5  the HFPA's alleged market power.  Once again, this mandates dismissal of Flaa's

6  antitrust claims.  *See SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d

7  782, 793–94 (N.D. Cal. 2020) (dismissing plaintiff's monopolization claims for

8  failure to allege monopolistic market power in the market for ride-sharing

9  services); *Redbox Automated Retail v. Buena Vista Home Ent., Inc.*, 399 F. Supp.

10  3d 1018, 1029–30 (C.D. Cal. 2019) (dismissing plaintiff's Sherman Act conspiracy

11  claims where plaintiff did not allege that defendant had market power in the market

12  for home movies).

13    *Third*, Flaa does not and cannot allege the required antitrust injury.  Private

14  antitrust plaintiffs must satisfy the standing requirements of Sections 4 and 16 of

15  the Clayton Act.  15 U.S.C. §§ 15, 26.  This requires a plaintiff to "prove antitrust

16  injury," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977),

17  and to prove it "is a proper party to bring a private antitrust action." *Associated*

18  *Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31

19  (1983).  Thus, allegations of an injury to a single competitor are almost always

20  insufficient unless accompanied by allegations of injury to *competition* as well.

21  *See Brunswick*, 429 U.S. at 488 (finding that "antitrust laws . . . were enacted for

22  'the protection of competition, not competitors'") (quoting *Brown Shoe Co. v.*

23  *United States.*, 370 U.S. 294, 320 (1962)); *see also Austin v. McNamara*, 979 F.2d

24  728, 739 (9th Cir. 1992) (the exclusion of a single competitor "does not prove

25                

26  [8] The same pleading flaws that warrant dismissal of Flaa's claims under the
Sherman Act mean that her Cartwright Act claim fails as well.  *See Name.Space,*

27  *Inc. v. Internet Corp. for Assigned Names and Numbers*, 795 F.3d 1124, 1131 n.5
(9th Cir. 2015) (noting that courts do not separately analyze Cartwright Act claims

28  based on the same conduct that makes up a federal claim, unless the Cartwright
Act analysis differs).

anticompetitive effect") (internal quotations and citation omitted).  Here, the complaint touts Flaa's success as a journalist even though she is not a member of the HFPA.  (*See, e.g.*, Compl. ¶¶ 18–21.)  These allegations demonstrate that Flaa has not suffered any injury-in-fact from the alleged antitrust violations.  But, as importantly, Flaa's own admissions confirm that membership in HFPA is not necessary in order to succeed as an entertainment reporter and that there has been no harm to competition.[9]

### 1.   *Flaa's Antitrust Claims Fail Because She Does Not Allege A Viable Antitrust Market.*

The key issues in antitrust cases subject to the Rule of Reason (whether alleging concerted action under Section 1 of the Sherman Act or Cartwright Act, or monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2), are assessed in relation to the legal construct of a "relevant market."  That is because in order for a court to determine the competitive effects of any particular practice, it first needs to identify the boundaries within which competition is allegedly restrained. *Newcal*, 513 F.3d at 1044; *Brown Shoe*, 370 U.S. at 324 (holding that determination of the relevant market is a "necessary predicate" to finding an antitrust violation).  As the Ninth Circuit recently reiterated, the "threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'"  *FTC v. Qualcomm, Inc.* 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)).

A relevant market has two components: a product component and a geographic component.  A properly alleged product market "must encompass the product at issue as well as all economic substitutes for the product."  *Newcal*, 513

---

[9] In addition, there are no plausible allegations that the HFPA or any defendant engaged in any unlawful concerted action—*i.e.*, conspired—with any other defendant with respect to Flaa.  The Complaint is certainly verbose, confusing and contradictory, but it is falls far short of pleading the evidentiary facts necessary to sustain a claim of an illegal agreement in restraint of trade.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015).

F.3d at 1045.  That means that a market has to include all products that are "reasonably interchangeable" with each other.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  And, relevant market allegations must also describe a geographic market that extends to the "'area of effective competition . . . where buyers can turn for alternative sources of supply.'"  *Oltz v. St. Peter's Cmty. Hosp.,* 861 F.2d 1440, 1446 (9th Cir. 1988) (quoting *Moore v. James H. Matthews & Co.,* 550 F.2d 1207, 1218 (9th Cir. 1977)).  Given these well-established requirements, the "[f]ailure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."  *Tanaka*, 252 F.3d at 1063; *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999) (affirming dismissal of antitrust claim based on, among other things, failure to "sufficiently identify the markets affected by Defendants' alleged antitrust violations"); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1195–96 (C.D. Cal. 2008).  The same is true for a failure to allege a geographic market that corresponds to the commercial realities.  *Tanaka*, 252 F.3d at 1063; *Ticketmaster*, 536 F. Supp. 2d at 1195–96, 1197; *see also Apani Southwest Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 626–27, 633 (5th Cir. 2002) (affirming Rule 12(b)(6) dismissal of antitrust complaint for failure to allege realistic geographic market).

Instead of alleging a legally cognizable antitrust market, the complaint asserts that the HFPA has restricted trade in the nebulous sphere of "foreign reporting of entertainment news emanating from Southern California."  (Compl. ¶ 119.)  Flaa also contends that "Southern California, and the Los Angeles area in particular, constitutes a substantial market for foreign entertainment reporters who reside in the area and earn a livelihood by gathering and selling entertainment news."  (Compl. ¶ 113.)  As cases like *Tanaka* and *Ticketmaster* make clear, these amorphous, conclusory statements are wholly insufficient to plead a relevant antitrust market.

To begin with, there are no facts alleged that suggest that "foreign reporting of entertainment news emanating from Southern California," is an appropriate product or geographic market.  The complaint's own allegations demonstrate that reporters residing outside of Southern California can successfully compete with one another and with Southern California reporters to cover "entertainment news." For example, Flaa alleges she worked as an entertainment reporter in New York City from 2007 to 2015, where she conducted celebrity interviews and produced entertainment news segments to be broadcast in Norway.  (Compl. ¶ 19.)  Even as she attempts to draw a tight circle around some "Southern California" or "Los Angeles market," Flaa's own career demonstrates that any geographic area of "effective competition" for entertainment news coverage could not possibly be that narrow.  By her own admission, she effectively competed as an entertainment reporter while spending eight years on the opposite coast of the United States, which dooms her alleged geographic markets.[10]

Beyond the muddled and fatally flawed geographic markets allegations, Flaa also has failed to allege an adequate product market.  Like the plaintiff in *Ticketmaster*, Flaa neglected to properly define the actual product at issue.  *See Ticketmaster*, 536 F. Supp. 2d at 1195–96.  Flaa attempts to group all of her professional activities—written journalism, producing and appearing in documentaries, moderating seminars, interviewing celebrities for television, etc.— under the banner of "gathering and selling entertainment news" (Compl. ¶ 113), but she does not allege that a consumer of her various activities—such as seminar

---

[10] The allegation that "Southern California, and the Los Angeles area in particular, constitutes a substantial market for foreign entertainment reporters who reside in the area and earn a livelihood by gathering and selling entertainment news," is similarly insufficient to plead a relevant geographic market.  This allegation is plainly in conflict with "common economic experience," *Twombly*, 550 U.S. at 546, and "common sense." *Iqbal*, 556 U.S. at 679.  As the Court knows, there are many United States reporters of news, including entertainment news.  The internet makes their stories readily available to consumers of news in Norway and other foreign countries.  This means that the "effective area" of competition is far broader than foreign entertainment reporters who reside in Southern California.

1  content and documentaries—would view them as "reasonably interchangeable" so

2  as to form a single product market.

3       Even more importantly, there are no allegations about why these many

4  forms of "entertainment news" are not reasonably interchangeable with other

5  forms of news or entertainment in the eyes of consumers.  *See Rebel Oil Co., Inc.*

6  *v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) ("If consumers view the

7  products as substitutes, the products are part of the same market."); *Syufy Enters. v.*

8  *Am. Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) ("[W]e begin with the

9  principle that assessment of a product market definition must take into account

10  whether products excluded from the definition are interchangeab[le] in use with

11  those included in the market and whether there is cross-elasticity of demand

12  between excluded and included products.") (internal quotations omitted); *StubHub,*

13  *Inc. v. Golden State Warriors, LLC*, No. C 15-1436 MMC, 2015 WL 6755594, at

14  *3–4 (N.D. Cal. Nov. 5, 2015) (dismissing complaint because alleged markets

15  were "not cognizable as a matter of law" since "neither encompasses all

16  interchangeable substitute products").  Put simply, there are no allegations of

17  reasonable interchangeability or cross-elasticity of demand, which means that

18  Flaa's alleged product markets fails as a matter of law.

19      **2.**    ***Flaa's Antitrust Claims Also Fail Because The Complaint***

20      ***Fails To Allege That The HFPA Has Market Power.***

21       The Ninth Circuit's *Newcal* decision establishes that Flaa's antitrust claims

22  fail absent allegations that HFPA has "market power within a 'relevant market.'"

23  *Newcal*, 513 F.3d at 1044.  Given the complaint's failure to allege any cognizable

24  relevant antitrust markets, perhaps it should not be surprising that there are no

25  allegations that HFPA has "market power."  Most antitrust plaintiffs attempt to

26  allege that a defendant possesses a certain percentage of the relevant market or

27  other indicia of market power.  *See Rutman Wine Co. v. E. & J. Gallo Winery*, 829

28  F.2d 729, 736 (9th Cir. 1987) (rejecting monopolization claim where the plaintiff

1   alleged that Gallo controlled 25–33% of the United States market for wine sales

2   because that is insufficient to demonstrate market power).  Not Flaa.  What is

3   particularly striking about the complaint is the utter absence of *any* allegations

4   regarding the HFPA's alleged market power.  That failing alone mandates the

5   dismissal of the antitrust claims.  *See, e.g.¸ LLM Bar Exam, LLC v. Barbri, Inc.*,

6   271 F. Supp. 3d 547, 583 (S.D.N.Y. 2017) ("LBE's Section 2 [of the Sherman Act]

7   monopolization claim fails because the First Amended Complaint does not

8   plausibly allege that Barbri has market power."), *aff'd*, 922 F.3d 136 (2d Cir.

9   2019).

10      It is not surprising that there are no allegations of market power because it is

11   not plausible (and contrary to common sense and economics) to believe that the

12   HFPA controls any "market" for reporting "entertainment news."  Yes,

13   membership in the HFPA conveys reputational and other benefits upon its

14   members.  But Flaa loudly proclaims that reporters like her have had substantial

15   success without becoming HFPA members.  These proclamations confirm that the

16   HFPA can in no way control the output of reporting of "entertainment news."

17              **3.    *The Complaint Does Not Allege Any Antitrust Injury.***

18      Flaa's complaint should also be dismissed because she lacks standing to

19   pursue her antitrust claims as she has failed to plead facts sufficient to show that

20   her alleged injuries flow from harm to *competition*.  *See Brunswick*, 429 U.S. at

21   488–89; *Christoferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1172 (9th

22   Cir. 1988).  The claimed injuries are no more than the alleged exclusion of one

23   reporter from one Association—and are thus at most harm to a competitor, not

24   competition—which means that Flaa does not have antitrust standing.

25      The Supreme Court in *Associated General Contractors v. California State*

26   *Council of Carpenters* identified certain factors for determining whether a plaintiff

27   has antitrust standing: (1) the nature of the plaintiffs' alleged injury; that is,

28   whether it was the type the antitrust laws were intended to forestall; (2) the

1   directness of the injury; (3) the speculative nature of the harm; (4) the risk of

2   duplicative recovery; and (5) the complexity of apportioning damages.  *See* 459

3   U.S. at 545–46 (1983).  Flaa's complaint should be dismissed because her own

4   allegations demonstrate that she has not suffered any injury in fact—and certainly

5   not an injury of the kind that "'antitrust laws were intended to prevent.'"  *See*

6   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197–98, 1200 (9th Cir. 2012)

7   (quoting *Big Bear Lodging*, 182 F.3d at 1102).

8          Flaa's recitation of her career accomplishments reveals the falsity of her

9   assertion that she has been directly harmed by the HFPA's conduct.  She asserts

10  that she has reported on entertainment, lifestyle, fashion, and trends for major

11  newspapers and magazines in Norway, and that she continued to flourish

12  professionally after transitioning to New York in 2007 and California in 2015.

13  (*See* Compl. ¶¶ 18–21.)  *All of this was accomplished without being a member of*

14  *the HFPA*.  Flaa has also received numerous awards and accolades for her

15  reporting work, including industry prizes for her interviews of highly popular

16  celebrities of the sort Flaa claims are typically off-limits to non-HFPA members.

17  As a result, Flaa's own complaint demonstrates that HFPA's alleged conduct has

18  not prevented her from competing as an entertainment news reporter.

19  Just as critically, even if Flaa had not undercut her own claims of injury in fact, the

20  complaint does not state facts sufficient to show that Flaa's alleged injuries flow

21  from harm to *competition*.  *See Brunswick,* 429 U.S. at 488–89; *Les Shockley*

22  *Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989);

23  *Christoferson Dairy*, 849 F.2d at 1172.  The alleged injuries are, at best, the

24  alleged exclusion of one participant from the supposed market—and are thus at

25  most harm to a competitor, not competition, which means that Flaa does not have

26  antitrust standing.  *See Austin*, 979 F.2d at 739 (the exclusion of a single

27  competitor "does not prove anticompetitive effect"); *BCB Anesthesia Care, Ltd. v.*

28  *Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 669 (7th Cir. 1994) ("A

1   [hospital's] staffing decision does not itself constitute antitrust injury. 'If the law

2   were otherwise, many a physician's workplace grievance with a hospital would be

3   elevated to the status of an antitrust action.'") (quoting *Oksanen v. Page Mem'l*

4   *Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991)).[11]  Flaa's antitrust claims are fatally

5   flawed and should be dismissed.

6         **C.**   **Flaa's Claim For Declaratory Relief Should Be Dismissed.**

7               **1.**   ***This Court Lacks Jurisdiction Over Flaa's Claim For***

8                     ***Declaratory Relief.***

9         The Declaratory Judgment Act bars jurisdiction over most federal tax

10  controversies, except those "brought under section 7428 of the Internal Revenue

11  Code of 1986." 28 U.S.C. § 2201(a).  Flaa's request for a judicial declaration that

12  certain provisions of the HFPA's bylaws "are unlawful in light of the HFPA's

13  commitments and obligations as a tax-exempt mutual benefit corporation" (Compl.

14  at 39), is thus jurisdictionally barred for two reasons.  *First*, although Flaa asserts

15  this Court has subject matter jurisdiction pursuant to Section 7428 (Compl. ¶ 16),

16  only "the organization the qualification or classification of which is at issue" may

17  file a pleading. 26 U.S.C. § 7428(b)(1); 28 U.S.C. § 2201(a).[12]  Flaa has no

18  standing to bring a claim regarding the HFPA's tax-exempt status, as only the

19  HFPA could bring such a claim. *See Rsch. Consulting Assocs. v. Elec. Power*

20  *Rsch. Inst., Inc.*, 104 F.R.D. 619, 621 (D. Mass. 1985) ("[T]he only entity which

21  _____

22  [11] It is clear from the complaint that Flaa has not been "excluded" from competing
    as an entertainment journalist but, rather, believes that she could do even better if
23  she were a member of the HFPA.  However, nothing in the antitrust laws requires
    entities such as the HFPA to admit all applicants.  And, since the Supreme Court's
24  decision in *Verizon Commc'ns, Inc., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004), it has been crystal clear that a business may generally
25  exercise "independent discretion as to parties with whom [it] will deal." *Id.* at 408
    (internal quotations omitted); *see also Qualcomm*, 969 F.3d at 985, 993, 996 (9th
26  Cir. 2020) (applying the *Trinko* independent discretion standard even where the
    parties were not "competitors").

27  [12] Unless otherwise noted herein (*e.g.*, a reference to the Sherman or Clayton Acts),
    the term "Section" refers to a section of the Internal Revenue Code of 1986 as
28  amended.

1    may bring an action under § 7428(a) regarding [defendant's] tax-exempt status is

2    [defendant organization]."); *Am. New Covenant Church v. Comm'r of Internal*

3    *Revenue*, 74 T.C. 293, 303 (T.C. 1980) ("[A] pleading for a declaratory judgment

4    under section 7428 can only be filed by the organization, the qualification of which

5    is at issue.").[13]

6        *Second*, jurisdiction under Section 7428 is limited to "the United States Tax

7    Court, the United States Court of Federal Claims, or the district court of the United

8    States for the District of Columbia."  26 U.S.C. § 7428(a).  Therefore, this Court is

9    not a proper forum for a claim regarding the HFPA's tax-exempt status.  *See Allen*

10   *v. Beirich*, No. CV CCB-18-3781, 2019 WL 5962676, at *2, *4 (D. Md. Nov. 13,

11   2019) (dismissing claim by a third party for a judicial declaration that a tax-exempt

12   organization's "improper and illegal actions contravene and violate requirements

13   for its 501(c)(3) status" because "[t]his court is not a proper forum").

14       As Flaa is not a proper party to bring such a claim and this Court is an

15   improper forum for it, Flaa's claim for declaratory relief should be dismissed for

16   lack of jurisdiction.

17       **2.    *Flaa Fails To State A Claim For Declaratory Judgment.***

18       Flaa's claim for declaratory relief also fails because she lacks standing, in

19   multiple respects, to bring a claim regarding the HFPA's 501(c)(6) status.

20       *First*, private citizens, like Flaa, do not have any private right of action for

21   declaratory judgment regarding an organization's tax-exempt status.  *See* 26 U.S.C.

22   § 501; *see also Harrison v. Christus St. Patrick Hosp.*, 430 F. Supp. 2d 591, 595

23   (W.D. La. 2006) ("The tax-exempt status of hospitals does not confer private rights

24   of action on citizens."); *Schmitt v. Protestant Mem'l Med. Ctr., Inc.*, No.

_____

[13] Section 7428 previously pertained only to organizations recognized as tax-exempt under Section 501(c)(3), *e.g.*, public charities and private foundations.  In 2015, Section 7428 was amended by the Protecting Americans from Tax Hikes Act of 2015 (PATH Act), Pub. L. No. 114-113, Div. Q, § 406, which added Section 7428(a)(1)(E) to expand declaratory judgment rights to all Section 501(c) and 501(d) organizations effective for pleadings filed after December 18, 2015.

04CV00577 DRH, 2005 WL 4157466, at *5 (S.D. Ill. Feb. 23, 2005) ("Nothing in
the express language of the comprehensive tax code suggests . . . a private right of
enforcement.  Indeed, the tax code . . . in most instances reserves the
administration and enforcement of the code directly to the federal government.").
This is because "[t]he Declaratory Judgment Act does not authorize actions to
decide whether federal statutes have been or will be violated when no private right
of action to enforce the statutes has been created by Congress." *Jones v. Hobbs*,
745 F. Supp. 2d 886, 893 (E.D. Ark. 2010).  Accordingly, Flaa has no standing for
her claim that the HFPA is in violation of its 501(c)(6) status.  (Compl. ¶¶ 107–
111.)

        *Second*, to state a claim for declaratory relief, a "plaintiff must allege facts
that[,] 'under all the circumstances, show that there is a substantial controversy,
between parties having adverse legal interests.'"  *Merit Healthcare Int'l, Inc. v.
Merit Med. Sys., Inc.*, 721 F. App'x 628, 629 (9th Cir. 2018) (quoting *MedImmune,
Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).  Here, Flaa is not a party to the
HFPA's bylaws, and she thus lacks a sufficient legal interest to challenge their
legality, as *Choate v. United States*, 413 F. Supp. 475, 480–81 (N.D. Okla. 1976),
makes clear.  In that case, plaintiff argued an "actual controversy" (a statutory
requirement of the federal and California declaratory judgment statutes) existed
with respect to certain National Collegiate Athletic Association ("NCAA")
contracts and the NCAA's bylaws.  *Id.*  In analyzing the NCAA's bylaws as
"contracts," the court held that there was no "justiciable controversy" sufficient to
substantiate the plaintiff's claim for declaratory relief since he was "not a party" to
the bylaws and, as such, did "not possess an interest sufficient to insure that the
dispute sought to be adjudicated will be presented in an advers[e] context."  *Id.*
        This conclusion is consistent with the Ninth Circuit's statement that
"[d]eclaratory relief should be denied when it will neither serve a useful purpose in
clarifying and settling the *legal relations* in issue nor terminate the proceedings

1    and afford relief from the uncertainty and controversy faced by the parties."

2    *United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985) (emphasis

3    added).  Flaa's desired changes to the bylaws would not "serve a useful purpose in

4    clarifying and settling the legal relations in issue" or "terminate the proceedings

5    and afford relief from the uncertainty and controversy faced by the parties," *id.*, as

6    Flaa is not, and has never been, a party to the HFPA's bylaws.

7        *Finally*, Flaa's claim for declaratory relief is not an independent cause of

8    action, and claims for declaratory relief must fail if the causes of action on which

9    they are based cannot state a claim.  *See Cueto v. World Sav. Bank, FSB*, No. 17-

10   CV-01144-H-AGS, 2017 WL 3131859, at *6 (S.D. Cal. July 24, 2017) (granting

11   motion to dismiss because "a cause of action for declaratory relief does not state an

12   independent action, but rather 'merely seeks relief,'" and plaintiff failed to state

13   any viable causes of action) (quoting *Audette v. Int'l Longshoremen's &*

14   *Warehousemen's Union*, 195 F.3d 1107, 1111 n.2 (9th Cir. 1999).  As Flaa's

15   declaratory relief claim is not based on any viable cause of action, this claim fails

16   as a matter of law.

17   **V.**     **CONCLUSION**

18        For the foregoing reasons, Flaa's complaint should be dismissed in its

19   entirety with prejudice.

20   Dated:  October 5, 2020             Respectfully submitted,

21                           LATHAM & WATKINS LLP
                             Marvin S. Putnam

22                              Christopher S. Yates
                             Robert J. Ellison

23

24

25                        By  /s/ Marvin S. Putnam
                             Marvin S. Putnam

26                              Attorneys for Defendants
                             HOLLYWOOD FOREIGN PRESS

27                              ASSOCIATION, AUD BERGGREN
                             MORISSE, TINA JOHNK

28                              CHRISTENSEN, ANIKO SKORKA
                             NAVAI, and MEHER TATNA