1   David W. Quinto (Bar No.106232)
    dquinto@onellp.com
2   **ONE LLP**
    Joanna Ardalan (Bar No. 285384)
3   jardalan@onellp.com
4   **ONE LLP**
    9301 Wilshire Blvd.
5   Penthouse Suite
    Beverly Hills, CA 90210
6   Telephone:   (310) 866-5157
    Facsimile:    (310) 943-2085
7

8
    Attorneys for Plaintiff
9   Kjersti Flaa

10              **UNITED STATES DISTRICT COURT**

11             **CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| KJERSTI FLAA, an individual, | Case No. 2:20-cv-06974 DMG (Ex) |
| | Hon. Stanley Blumenfeld, Jr. |
| Plaintiff, | |
| | **PLAINTIFF'S MEMORANDUM OF** |
| v. | **POINTS AND AUTHORITIES IN** |
| | **OPPOSITION TO MOTION TO** |
| HOLLYWOOD FOREIGN PRESS | **DISMISS** |
| ASSOCIATION, a California Mutual | |
| Benefit Corporation; AUD | Date:        November 20, 2020 |
| BERGGREN MORISSE, an individual; | Time:        8:30 a.m. |
| TINA JOHNK CHRISTENSEN, an | Place:        Courtroom 6C |
| individual; ANIKO SKORKA NAVAI, | First Street Courthouse |
| an individual: LORENZO SORIA, an | 350 W. 1st Street |
| individual; MEHER TATNA, an | |
| individual; and DOES 1-20, inclusive, | |
| | |
| Defendants. | |

21

22

23

24

25

26

27

28

---

# <u>TABLE OF CONTENTS</u>

**(Page)**

I.    PRELIMINARY STATEMENT.....................................................................1

II.   DEFENDANTS' REQUEST TO DISMISS FLAA'S RIGHT OF FAIR PROCEDURE CLAIM IS BASED ON A MISREADING OF THE FACTS AND LAW. .....................................................................................................3

    A.    Dismissal Is Improper Because Defendants Do Not Dispute Either That They Are Obligated to Treat Non-Members No Less Favorably Than Members or That They Manifestly Do Not Do So. ............................3

    B.    Defendants Are Not Entitled to Summary Adjudication. ....................6

    C.    Defendants Also Ignore That Plaintiff Is Entitled to Pursue Her Profession *Here*. .................................................................................10

III.  DEFENDANTS' ARGUMENTS THAT PLAINTIFF FLAA IS NOT ENTITLED TO SEEK DECLARATORY RELIEF ARE EACH TOO CLEVER BY HALF. ....................................................................................11

    A.    The Court May Strike the Reference to 28 U.S.C. § 7428. ...............11

    B.    The Court May Grant Declaratory Relief Pursuant to Its Federal Question Jurisdiction............................................................................12

    C.    Plaintiff Has Alleged a Substantial Controversy. ..............................15

IV.  PLAINTIFF HAS PROPERLY ALLEGED ANTITRUST CLAIMS, WHICH ARE TYPICALLY QUESTIONS OF FACT ANYWAY...........................16

    A.    The HFPA Is Trying to Have It Both Ways in Telling the IRS That Southern California Is a Geographic and Product/Service Market for Motion Picture Reporting While Denying to this Court That It Is.....16

    B.    What the Relevant Markets Are Is a Question of Fact for Resolution at Trial. ................................................................................................19

    C.    Plaintiff Flaa Has Sufficiently Alleged the HFPA's Anti-Competitive Effects. ...............................................................................................20

    D.    Plaintiff Has Alleged That the HFPA's Conduct Has Injured Her by Harming Competition. ........................................................................21

    E.    Defendants' Argument that Plaintiff Lacks "Standing" to Allege an Anti-trust Claim Does Not Apply to Simple, Straightforward Claims.22

V.   CONCLUSION. ......................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABA Retirement Funds v. United States*,
    2013 U.S. Dist. LEXIS 60086 (N.D. Ill. Apr. 25, 2013)......................................12

*Ascroft v. Iqbal*,
    556 U.S. 662 (2008) ...........................................................................................7

*Associated Gen'l Contractors v. Cal. State Council of Carpenters*,
    459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) ...............................22, 23

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................7

*Bhan v. NME Hosps., Inc.*,
    929 F.2d 1404 (9th Cir. 1991).............................................................................20

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465, 102 S. Ct. 2540, 23 L. Ed. 2d 149 (1982) ..................................23

*Bluetooth SIG Inc. v. United States*,
    611 F.3d 617 (9th Cir. 2010)...............................................................................12

*Brown Shoe v. United States*,
    370 U.S. 294, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962) .......................................19

*Brunswick Corp. v. Pueble Bowl-O-Mat, Inc.*,
    429 U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977) .......................................21

*Christofferson Dairy v. MMM Sales, Inc.*,
    849 F.2d 1168 (9th Cir. 1988).............................................................................22

*Eastman Kodak Co. v. Image Technical Servs., Inc.*
    504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) .................................19

*Empire HealthChoice Assurance, Inc. v. McVeigh*,
    547 U.S. 677, 126 S. Ct. 2121, 165 L. Ed. 2d 131 (2006) .................................13

*Ezekial v. Winkley*,
    20 Cal. 3d 267 (1977)..........................................................................................10

ii

*F.T.C. v. Indiana Fed'n of Dentists*,
    476 U.S. 447, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986) ..................................20

*Franchise Tax Board v. Construction Laborers Vacation Trust*,
    463 U.S. 1, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983) .........................................13

*Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*,
    545 U.S. 308, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005) ............................13, 14

*Gunn v. Minton*,
    568 U.S. 251, 133 S. Ct. 1059, 185 L. Ed. 2d 72 (2013) ...................................14

*Hudson Valley Black Press v. IRS*,
    409 F.3d 106 (2d Cir. 2005) ...............................................................................12

*Indep. Living Ctr. of S. Cal., Inc. v. Kent*,
    909 F.3d 272 (9th Cir. 2018) ..............................................................................14

*King v. Regents of the University of California*,
    138 Cal. App. 3d 812 (1982) .........................................................................10, 11

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ...........................................................................................15

*Merit Halthcare Int'l, Inc. v. Merit Med. Sys., Inc.*,
    721 F. App'x 628 (9th Cir. 2018) .......................................................................15

*Merrill Dow Pharmaceuticals, Inc. v. Thompson*,
    478 U.S. 804, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986) ...................................13

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368, 132 S. ct. 740, 181 L. Ed. 2d 881 (2012) ....................................14

*National Muffler Dealers Ass'n v. United States*,
    565 F.2d 845 (2d Cir. 1977) ..................................................................................4

*Newcal Indus., Inc. v. Ikon Office Sol., Inc.*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................................19

*Ohio v. Am. Express Co.*,
    ___ U.S. ___, 138 S. Ct. 2274, 201 L. Ed. 2d 678 (2018) .................................20

*Oltz v. St. Peter's Cmty. Hosp.*,
    861 F.2d 1440 (9th Cir. 1988) ............................................................................20

iii

**OPPOSITION TO MOTION TO DISMISS**

*Oneida Indian Nation of N.Y. v. Cnty. Of Oneida*,
  414 U.S. 661, 94 S. Ct. 772, 39 L. Ed. 2d 73 (1974) ........................................... 13

*Produce Exchange Stock Clearing Ass'n v. Helvering*,
  71 F.2d 142 (2d Cir. 1934) ............................................................................... 4

*Queen City Pizza v. Domino's Pizza*,
  124 F.3d 430 (3d Cir. 1997) ............................................................................. 19

*Redbox Automated Retail, LLC v. Buena Vista Home Entm't, Inc*,
  399 F. Supp (C.D. Cal. 2019) ..................................................................... 19, 20

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) .................................. 13

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ............................................................................. 20

*Washington v. United States*,
  2016 U.S. Dist. LEXIS 167014 (C.D. Cal. Mar. 31, 2016) ............................... 11

*Yari v. Producers Guild of America, Inc.*,
  161 Cal. App. 4th 172 (2008) ........................................................................... 10

**Statutes**

15 U.S.C. §§ 1-38 ...................................................................................................... 21

26 U.S.C. § 501(a) ........................................................................................ 4, 11, 12, 13

28 U.S.C. § 1331 ................................................................................................... 12, 14

28 U.S.C. § 7428 ................................................................................................... 11, 12

I.R.C. § 501(c)(6) .................................................................................................. *passim*

**Other Authorities**

26 C.F.R. 1.501(c)(6)-1 ................................................................................................ 4

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 19

Rev. Rul. 69-106, 1969-1 C.B. 153 (Jan. 1969) .......................................................... 5

Rev. Rul. 70-801, 1970-1 C.B. 130 (Jan. 1970) .......................................................... 5

iv

Rev. Rul. 74-553, 1974-2 C.B. 168 (July 1974)......................................................4, 5

Rev. Rule 61-1701, 1961-2 C.B. 112 (July 1963).......................................................5

v
**OPPOSITION TO MOTION TO DISMISS**

# I.   PRELIMINARY STATEMENT.

Defendants' Mudslinging.  Although the *sole* issue raised by a motion to dismiss is whether the plaintiff has adequately pleaded his or her claims, Defendants have seen fit to hurl all manner of insults at Plaintiff Flaa, but their accusations prove too much.  They characterize the Complaint as "salacious and inflammatory," "incoherent," "verbose, confusing and contradictory," "muddled and fatally flawed," and "nebulous."  They accuse Plaintiff of having "bad-faith motives for this lawsuit: to garner publicity, intimidate HFPA members . . . and publicly shame members."  Significantly, though, they do not characterize Plaintiff's allegations as "untruthful," "dishonest," or "inaccurate." They dare not do so because such accusations could not be defended as statements of opinion but would be demonstrably false.

Defendants are not above stretching things to absurd lengths, as with their claim Plaintiff and her counsel launched an "international press tour" after filing suit.  HFPA Brf. at 11:5-6. When asked the basis for that oft-repeated accusation during the meet-and-confer session that preceded the filing of Plaintiff's motion given that neither Plaintiff nor her counsel issued any press release, attended any press conference, or travelled anywhere, Defendants' attorney Robert Ellison explained that it was based on posts Plaintiff had made on her social media accounts.[1]

Similarly, Plaintiff's claimed "history of racist remarks" is based solely on the fact that during an interview of a foreign actor who had read the *Harry Potter* series when she was nine, Plaintiff asked whether the actor had read them in her native Korean or in English.  A few Korean Internet trolls deemed that "racist" and a Korean newspaper wrote about it.  Neither the Korean actor nor the American actor with at the time her characterized the question as "racist."  On the other hand,

---

[1] Declaration of David W. Quinto dated Oct. 30, 2020 ("Quinto Dec."), ¶ ___.

**OPPOSITION TO MOTION TO DISMISS**

the HFPA has been publicly accused of institutionalized racism directed toward Black applicants.  *See* Exhibit J to the Quinto Declaration.

Defendants' contention that the use of "*omertà*" in the complaint was "a not-so-veiled swipe" at the Italian heritage of the HFPA's recently deceased president,[2] Lorenzo Soria (HFPA Brf. at 10:27-28), ignores that the complaint was drafted by Plaintiff's attorney, David Quinto, who is of Italian Jewish heritage.[3]

Defendants evidently hope that character assassination can divert the Court's attention from the real basis of their argument—that they are above the law and that Plaintiff should not be permitted to bring any claim against them.  But as shown below, their legal arguments cannot withstand scrutiny.

<u>Defendants' Baseless Arguments</u>.  The gravamen of Plaintiff's claim for breach of the right of fair procedure is that she is substantially impaired in her ability to earn a living from her chosen lawful profession here.  It is irrelevant that she can earn a living as a journalist in another country or state, or by pursuing a different occupation, just as it is irrelevant that a doctor unfairly denied admitting privileges at a hospital could practice his or her profession elsewhere or could choose a new line of work.  Practicing her chosen profession here requires that Plaintiff be able to participate in press junkets where news-making actors, directors, producers, and other talent speak and give interviews.  HFPA members are invited to all such junkets, foreign entertainment reporters excluded from membership in the HFPA are only rarely invited, and nothing else can substitute for participating in those junkets, as reflected in Exhibits A-G to the Quinto Declaration.

---

[2] The HFPA's general counsel, Gregory Goeckner, has told others that Plaintiff was responsible for Soria's death and has demanded that she apologize to his survivors.
[3] The town of Quinto is in the Italian province of Verona; Quinto di Treviso is in the Italian province of Treviso; Quinto Vicentino lies just east of Vicenza, Italy; and Quinto, Switzerland lies in the Italian-speaking canton of Ticino.

**OPPOSITION TO MOTION TO DISMISS**

Defendants' argument that this Court lacks subject matter jurisdiction to hear Plaintiff's declaratory relief claim concerning the HFPA's admission requirements hinges on the argument that district courts lack jurisdiction to hear tax claims, but Plaintiff has not raised any allegation concerning the HFPA's taxes. Rather, Plaintiff accepts for purposes of her claim that the HFPA should pay no taxes because it is tax exempt. Plaintiff instead seeks declaratory relief that given the HFPA's tax-exempt status, certain bylaw provisions are impermissible. Defendants' further argument that only HFPA members have standing to challenge the admissions requirements set forth in the Bylaws is preposterous given that someone who is already a member could not have a case or controversy giving rise to such a challenge. Only persons who are denied admission are injured by the Bylaw requirements.

Defendants' argument that Plaintiff has failed to identify the relevant geographic and product (or service) markets ignores that as a mutual benefit corporation, the HFPA must serve all competitors within a geographic and product market. Thus, the relevant markets are co-extensive with the HFPA's geographic and product markets. As the Complaint alleges in detail, members of the HFPA enjoy enormous competitive benefits vis-à-vis non-member foreign entertainment journalists. Finally, the HFPA's Bylaw requirements *expressly intended to prevent competition* hurt competition, as required to properly allege anti-trust claims.

## II.   DEFENDANTS' REQUEST TO DISMISS FLAA'S RIGHT OF FAIR PROCEDURE CLAIM IS BASED ON A MISREADING OF THE FACTS AND LAW.

### A.   Dismissal Is Improper Because Defendants Do Not Dispute Either That They Are Obligated to Treat Non-Members No Less Favorably Than Members or That They Manifestly Do Not Do So.

Defendants nowhere contest that, "[a]s an organization afforded tax-free treatment by both the Internal Revenue Service and the California Franchise Tax

3

Board, defendant HFPA is a quasi-public organization" that "is required to act in the best interests of the entire class of professionals from which its members derive . . . without regard to membership status."   (Complaint, ¶ 95)  And as Defendants tacitly concede, the Complaint alleges that the HFPA utterly fails in its obligation to do so.  (*See* Complaint, ¶¶ 33-46, 98-99)

The Internal Revenue Code provides at 26 U.S.C. § 501(a) that, "[a]n organization described in subsection (c) . . . shall be exempt from taxation . . .."  In turn, Section 501(c)(6) identifies "[b]usiness leagues . . . not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual" may be exempted from taxation.  The HFPA has obtained tax-exempt status as a business league.  (*See* Complaint, ¶ 95)

"A business league is an association of persons having some common business interest . . ..  It is an organization of the same general class as a chamber of commerce or board of trade.  Thus, its activities should be directed to the improvement of business conditions of one or more line of business as distinguished from the performance of particular services for individual persons." 26 C.F.R. 1.501(c)(6)-1.

To comply with the requirements for exemption under § 501(c)(6) as a business league, an organization must "benefit an entire 'line of business.'" *National Muffler Dealers Ass'n v. United States*, 565 F.2d 845 (2d Cir. 1977).

In contrast, an organization that merely serves the convenience of its members is not entitled to a tax exemption.  *See Produce Exchange Stock Clearing Ass'n v. Helvering*, 71 F.2d 142 (2d Cir. 1934).  An "organization [that] is performing particular services for its members as distinguished from the improvement of business conditions"  in the industry "does not qualify for exemption from Federal income tax under section 501(c)(6)."[4]  Rev. Rul. 74-308,

---

[4] Defendants might attempt to analogize the HFPA with a medical peer review board operated "for the primary purpose of establishing and maintaining standards

**OPPOSITION TO MOTION TO DISMISS**

1974-2 C.B. 168 (July 1974).  Similarly, when a nonprofit trade association of manufacturers in a particular line of business allowed members, but not non-members,  to use its certification mark, the association did not qualify for tax-exempt status *even though all manufacturers in that line of business were free to join it.  See* Rev. Rul. 70-801, 1970-1 C.B. 130 (Jan. 1970).  Similarly, when an industry research group conducted research in areas of common interest, it did not qualify for tax-exempt status under section 501(c)(6) because it shared the fruits of its research only with members notwithstanding that "membership in the organization [wa]s open to all businesses in the industry on an equal basis."  Rev. Rul. 69-106, 1969-1 C.B. 153 (Jan. 1969).  And an association of nurses that supported and operated a registry primarily to afford greater employment opportunities to its members was "not a business league" and was "not entitled to exemption from Federal income taxes."  Rev. Rule 61-1701, 1961-2 C.B. 112 (July 1963).

But even if the HFPA were not obligated by the tax laws to treat all class members as if they were HFPA members, California's common law right of fair procedure would impose that obligation.  Defendants acknowledge, as they must, that "quasi-public" entities are obligated to ensure fair procedures in membership decisions.  HFPA Mem. at 21:8-10.  As they further acknowledge, entities that "provide important . . . services" or that have "superior bargaining power" fall within that rubric.  It defies credulity that an association of reporters dedicated to reporting to the world developments in one of California's most important industries would contend, as the HFPA does, that its services are unimportant.  Hollywood's studios obviously think otherwise.  They lavish attention, gifts, and access on the HFPA's members.  *(See* Complaint, ¶¶ 33-35, 37, 53)

_____

for quality, quantity, and  reasonableness of costs," which can qualify for a § 501(c)(6) exemption.  *See* Rev. Rul. 74-553, 1974-2 C.B. 168 (July 1974).  To fit into that category, however, the HFPA would have to judge applicants based on the work they produce, but it manifestly does not do so.  (*See* Complaint, ¶¶ 69-75)

**OPPOSITION TO MOTION TO DISMISS**

1       The HFPA's contention that Plaintiff Flaa also failed to allege that it has

2   superior bargaining power is wishful thinking that again ignores the clear

3   allegations of the Complaint.  All HFPA members get unparalleled access to movie

4   stars and entertainment newsmakers; foreign entertainment reporters excluded

5   from membership in the HFPA do not.  (*See id.*)

6       Plaintiff Flaa has clearly alleged that she is a member of the class of

7   professionals from which the members of the HFPA are drawn and that she has

8   unfairly been denied the benefits of membership.  For this reason, alone,

9   Defendants' request to dismiss Flaa's claim for breach of the right of fair

10  procedure must be denied.

11      **B.**    **Defendants Are Not Entitled to Summary Adjudication.**

12      Defendants' principal argument in seeking dismissal of Plaintiff's right of

13  fair procedure claim hinges on the false premise that as a factual matter, Plaintiff

14  Flaa has not been impaired in her ability to practice her chosen, lawful profession.

15  They point to the allegations that Plaintiff was successful in practicing her

16  profession *in Norway and New York* and has won *awards* in Los Angeles while

17  supplementing her income through other work, such as operating a production

18  company.  In doing so, they ignore that whether Plaintiff Flaa is economically

19  disadvantaged in her pursuit of chosen profession is a factual question, rather than

20  a legal question appropriate for summary resolution now.

21      The Complaint alleges (in ¶ 37) that, "foreign entertainment reporters in Los

22  Angeles excluded from membership in the HFPA are greatly impaired in their

23  ability to report stories that can generate meaningful income for them."  Further,

24  "most support themselves by moonlighting at another job."  (*Id.,* ¶ 39)  Plaintiff's

25  career reflects the economic disadvantage she faces as the result of her repeated

26  rejection by the HFPA:

27        [S]he [has been] unable to get access to hundreds of press conferences

28        attended by major Hollywood talent.  Had she been able to attend (as

6

**OPPOSITION TO MOTION TO DISMISS**

all HFPA members were), she would have been able to conduct and
sell dozens of print interviews to Norwegian and other Scandinavian
publications.  In addition, she would have been able to conduct dozens
of video interviews that she would then have been able to sell to
television shows and media outlets in Scandinavia.  Further, Flaa has
a fast-growing YouTube channel on which she shares her video
interviews. . . . Had she been admitted to the HFPA, Flaa would have
been able to conduct far more celebrity video interviews and would
have derived far more income from her YouTube channel as a
consequence.  (*Id.,* ¶ 101)

Further, "[f]oreign entertain reporters in Los Angeles excluded from
membership in the HFPA are thus economically disadvantaged because they
cannot afford to compete with reporters able to tap into the HFPA's largesse." (*Id.,*
¶ 40)

If the Court finds that the foregoing allegations are insufficient to satisfy the
pleading requirements announced in *Ascroft v. Iqbal*, 556 U.S. 662 (2008), and
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Flaa requests leave to
supplement her allegation with additional factual averments, including the
following:

During July-September 2020, every member of the HFPA was
given at least 25 opportunities to record interviews of major
Hollywood talent for television broadcast while Plaintiff Flaa got
none.  Further, all members of the HFPA were offered the following
print interview opportunities from which Plaintiff Flaa was excluded:

Don Cheadle / Regina Hall Black Monday (Showtime); Sean Penn
Roundtable; Alison Brie / Dan Stevens / Dave Franco Rental, The
(IFC Films)

7

**OPPOSITION TO MOTION TO DISMISS**

Jane Elliott Roundtable; Gemma Arterton / Gugu Mbatha-Raw
Summerland (IFC Films) (Gemma also talking about King's Man,
The (Disney) Ralph Fiennes / Talent TBC: Matthew Vaughn / Harris
Dickinson)); Armando Iannucci, Director / Dev Patel Personal History
of David Copperfield (Fox S/L) TBC; Ellen Page Umbrella Academy
(Netflix); Joel Courtney / Joey King / Jacob Elordi Kissing Booth 2,
The (Netflix) TBC; Liam Neeson / Michael Richardson Made in Italy
(IFC Films); Whoopi Goldberg Roundtable (via BlueJeans) TBC;
Natalie Krinsky, director / Geraldine Viswanathan / Dacre
Montgomery Broken Hearts Gallery, The (Sony) TBC; Jacki Weaver
Stage Mother (Momentum Pictures); Trai Byers 24th, The (Vertical
Entertainment) Mary J. Blige / Method Man Power Book II: Ghost
(Starz); Don McLean Roundtable; I'm Thinking of Ending Things
(Netflix); X Men: New Mutants (Disney) TBC; Gabrielle Union LA's
Finest (Sony); Ridley Scott / Travis Fimmel Raised by Wolves (HBO
Max) TBC; Kaley Cuoco Flight Attendant, The (HBO Max) TBC;
Keanu Reeves and Alex Winter, paired Bill and Ted Face the Music
(Orion) TBC; John Leguizamo Critical Thinking (Vertical Limit);
Arnold Schwarzenegger Roundtable; Janelle Monae / Gerald Bush
and Christopher Reinz, Directors, paired Antebellum (Lionsgate)
TBC; Foreign Language Film Series #1 Live Q&A; Maya Erskine /
Anna Konkle Pen15 (Hulu); Evan Rachel Wood / Gina Rodriguez /
Richard Jenkins / Miranda July Kajillionaire (Focus); John Cusack /
Gillian Flynn Utopia (Amazon) TBC; Ethan Hawke / Joshua Caleb
Johnson Good Lord Bird (Showtime); Sean Durkin, Director / Talent
TBC: Carrie Coon / Jude Law Nest, The (IFC Films); Kim Cattrall
Filthy Rich (Fox) TBC; John Cusack / Gillian Flynn Utopia (Amazon)
TBC; Jude Law Nest, The (IFC Films); Gerard Butler / Morena

8

**OPPOSITION TO MOTION TO DISMISS**

1  Baccarin Greenland (STX); Jessica Alba LA's Finest (SonyTV); Lily
2  Collins / Darren Starr Emily in Paris (Netflix), Talent TBC: Aaron
3  Sorkin / Eddie Redmayne / Sacha Baron Cohen / Jeremy Strong /
4  Joseph Gordon-Levitt / Frank Langella / Mark Rylance / Yahya
5  Abdul-Mateen II Trial of Chicago 7, The (Netflix); Talent TBC: Joe
6  Mantello, Director / Jim Parsons / Matt Bomer and Andrew Rannells,
7  paired / Zachary Quinto and Charlie Carver, paired Boys In The Band,
8  The (Netflix) Foreign Language Film Series #2 Live Q&A (via
9  Zoom); Talent TBC: Aaron Sorkin / Eddie Redmayne / Sacha Baron
10  Cohen / Jeremy Strong / Joseph Gordon-Levitt / Frank Langella /
11  Mark Rylance / Yahya Abdul-Mateen II Trial of Chicago 7, The
12  (Netflix).

13      Because Plaintiff was prevented by her HFPA non-member status
14  from participating in the foregoing events, she was not able to produce
15  interviews based on them. From the inception of the Covid 19 lockdown
16  through October 30, 2020, she has been unable to conduct any television
17  interviews.  In contrast, upon information and belief, HFPA member
18  Margaret Gardiner conducted at least 28 television interviews between the
19  lockdown and October 21, 2020 (*see*
20  https://www.youtube.com/c/MargaretGardinerUniverse/videos); HFPA
21  member Janet Nepales uploaded at least 20 interviews during that period
22  (*see*
23  https://www.youtube.com/channel/UCtW1Ch7qq4Y51DC9QNfevqg/videos
24  ); and HFPA member Henry Arnaud uploaded at least 13 interviews.  *See*
25  https://www.instagram.com/monsieurhollywood/.  By adding new content,
26  they grow their profiles on social media.  In contrast, Plaintiff, who relies on
27  social media for a substantial part of what little income she earns as an
28  entertainment reporter, is further disadvantaged in that she cannot maintain

9

**OPPOSITION TO MOTION TO DISMISS**

1    or increase her social media profile without constantly providing new

2    content.

3    **C.    Defendants Also Ignore That Plaintiff Is Entitled to Pursue Her**

4    **Profession *Here.***

5    Defendants' reliance on the allegations that Plaintiff Flaa was successful in

6    practicing her profession *in Norway and New York* and has won awards in Los

7    Angeles while supplementing her income by practicing other trades also ignores

8    that the right of fair procedure exists to protect people's ability to earn income

9    here, not in other countries or states, by practicing that profession rather than by

10   engaging in another.  All the cases Defendants cite so reflect.

11   Specifically, Defendants cite *Ezekial v. Winkley*, 20 Cal. 3d 267, 272 (1977),

12   for the proposition that "[e]xclusion from membership in a private organization is

13   thus subject to the common law right of fair procedure . . . *when it restricts one's*

14   *'right to practice a lawful trade or profession*.'"  (Emphasis added.)  Defendants

15   then aver that contrary to the express allegations of the Complaint, Flaa fails to

16   "submit any facts demonstrating that her lack of HFPA membership . . .

17   *significantly impairs* her . . . ability to pursue her chosen career."  HFPA Mem. At

18   19:18-20 (emphasis in original).

19   Defendants' reliance on *Yari v. Producers Guild of America, Inc.*, 161 Cal.

20   App. 4th 172 (2008), and *King v. Regents of the University of California,* 138 Cal.

21   App. 3d 812 (1982), is misplaced.  They not only support a contrary conclusion but

22   are inapposite in that neither involved membership in a private organization.

23   Concerned that producer credits were becoming devalued as lawyers demanded

24   them in partial compensation for clearing film rights, financiers demanded them

25   for funding motion pictures, and actors demanded them in exchange for accepting

26   reduced compensation, the Producers Guild of America ("PGA") obtained a

27   certification mark that it allowed studios to use in movie credits to indicate which

28   "producers" had truly acted as such.  In 2004, the PGA determined that although

10

**OPPOSITION TO MOTION TO DISMISS**

Bob Yari was responsible for the financing of *Crash*, he had not substantially performed the duties of a producer.  In deciding which "producers" would be entitled to receive an "©Oscar®" if *Crash* won the Best Picture Academy Award®, the Academy of Motion Picture Arts and Sciences applied the PGA's test and refused to recognize Yari as a producer of that movie.  Those decisions did not exclude Yari from membership in either organization or affect his ability to earn a living.  Indeed, top-grossing films very seldom win Academy Awards.  For example, *Crash* fell more than $260 million short of making the top-10 list of highest grossing movies the year it was released. And *King* involved only a non-tenured professor's denial of a tenured teaching position.  Neither case involved membership in an organization.

But if the Court nevertheless finds that Plaintiff has insufficiently pleaded that denial of membership in the HFPA significantly impairs her ability to practice her profession, Plaintiff requests leave to amend her complaint to allege that the denial of membership in the HFPA has caused her to suffer economic injuries in excess of $100,000  *per year* and to incorporate facts found in Exhibits A-G to the accompanying Quinto Declaration.

## III.   DEFENDANTS' ARGUMENTS THAT PLAINTIFF FLAA IS NOT ENTITLED TO SEEK DECLARATORY RELIEF ARE EACH TOO CLEVER BY HALF.

### A.   The Court May Strike the Reference to 28 U.S.C. § 7428.

Defendants' argument that the Court lacks subject matter jurisdiction to hear Plaintiff Flaa's second claim for relief, seeking a declaratory judgment, is based on her allegation that 28 U.S.C. § 7428 imbues it with jurisdiction.  (Complaint, p. 2 at 12)  Although Plaintiff's claim requires an interpretation of the Internal Revenue Code, that section applies only to disputes between the government and taxpayers concerning the *amount* of taxes owed.  Put another way, the limitation applies to "civil suits related to assessment or determination of taxes."  *Washington v. United*

11

1  *States,* 2016 U.S. Dist. LEXIS 167014, at *11-12 (C.D. Cal. Mar. 31, 2016) (citing

2  *Hudson Valley Black Press v. IRS,* 409 F.3d 106, 112-13 (2d Cir. 2005)).

3  When an interpretation of the Internal Revenue Code does not concern the

4  payment of taxes, any district court may decide it.  Thus, for example, the Western

5  District of Washington found that an association that owned and marketed the

6  Bluetooth wireless networking protocol and trademark was not entitled to an

7  exemption from federal income tax under section 501(c)(6) of the Internal Revenue

8  Code—the section at issue herein.  On appeal, the Ninth Circuit affirmed.  *See*

9  *Bluetooth SIG Inc. v. United States*, 611 F.3d 617 (9th Cir. 2010).  In *ABA*

10 *Retirement Funds v. United States,* 2013 U.S. Dist. LEXIS 60086 (N.D. Ill. Apr.

11 25, 2013), the Northern District of Illinois found that the American Bar

12 Association's retirement fund did not qualify for a section 501(c)(6) exemption.

13 Because Plaintiff is not challenging the HFPA's status as a section 501(c)(6)

14 organization but is merely seeking a declaration concerning whether certain of its

15 Bylaw provisions are in conformity with that status, Plaintiff's declaratory relief

16 claim is not barred.  And because she is not challenging the HFPA's tax-exempt

17 classification, her allegation that 28 U.S.C. § 7428  provides a basis for the

18 assertion of subject matter jurisdiction may be stricken.

19 As will be shown below, striking it makes no material difference.  The Court

20 retains federal question jurisdiction to decide the claim.  If, however, the Court

21 disagrees with that conclusion, Plaintiff requests leave to amend to allege the

22 existence of supplemental jurisdiction in that the challenged Bylaw provisions

23 have the effect of denying applicants for membership in the HFPA fair procedure..

24 **B.    The Court May Grant Declaratory Relief Pursuant to Its Federal**

25 **Question Jurisdiction.**

26 A district court has "original jurisdiction of all civil actions arising under the

27 Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  What that

28 means has been refined by a series of Supreme Court decisions.

12

1        In *Merrill Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 106 S. Ct.

2    3229, 92 L. Ed. 2d 650 (1986), the Court held that "a case may arise under federal

3    law 'where the vindication of a right under state law necessarily turn[s] on some

4    construction of federal law.'" *Id*. at 808-809 (*quoting Franchise Tax Board v.*

5    *Construction Laborers Vacation Trust*, 463 U.S. 1, 9, 103 S. Ct. 2841, 77 L. Ed. 2d

6    420 (1983)).

7        The Court next declared that federal courts lack jurisdiction over claims

8    involving federal law "only when the claim is 'so insubstantial, implausible,

9    foreclosed by prior decisions of this Court, or otherwise completely devoid of

10   merit as to not involve a federal controversy.'" *Steel Co.  v. Citizens for a Better*

11   *Env't,* 523 U.S. 83, 89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (citing *Oneida*

12   *Indian Nation of N.Y. v. Cnty. Of Oneida*, 414 U.S. 661, 666, 94 S. Ct. 772, 39 L.

13   Ed. 2d 73 (1974)).

14       In 2005, the high court again addressed whether "federal-question

15   jurisdiction will lie over state-law claims that implicate significant federal issues,"

16   holding that "federal jurisdiction demands not only a contested federal issue, but a

17   substantial one, indicating a serious federal interest in claiming the advantages

18   thought to be inherent in a federal forum." *Grable & Sons Metal Prods. v. Darue*

19   *Eng'g & Mfg.,* 545 U.S. 308, 312-13, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005).

20   It then explained that for a federal issue to be "substantial," there must be "a

21   serious federal interest in claiming the advantages thought to be inherent in a

22   federal forum," one that "justif[ies] resort to the experience, solicitude, and hope of

23   uniformity that a federal forum offers." *Id.*

24       In *Grable*, the plaintiff's claim depended on an interpretation of the Internal

25   Revenue Code.  Significantly, the Court held that, "[t]he meaning of the federal tax

26   provision is an important issue of federal law that sensibly belongs in a federal

27   court." *Id.*  at 315.  Obviously, the resolution of the federal law question would be

28   dispositive of the claim and would be controlling in other cases. *See Empire*

1   *HealthChoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700, 126 S. Ct. 2121, 165

2   L. Ed. 2d 131 (2006); *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 377, 132 S.

3   ct. 740, 181 L. Ed. 2d 881 (2012) ("[I]f the claim requires resolution of significant

4   issues of federal law, the case may arise under federal law for 28 U.S.C. § 1331

5   purposes.").

6        The Court revisited the *Grable* test in 2013, explaining that:

7        [F]ederal jurisdiction over a state law claim will lie if a federal issue

8        is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4)

9        capable of resolution in federal court without disrupting the federal-

10       state balance approved by Congress.  Where all four of these

11       requirements are met, we held, jurisdiction is proper because there is a

12       'serious federal interest in claiming the advantages thought to be

13       inherent in a federal forum,' which can be indicated without

14       disrupting Congress's intended division of labor between state and

15       federal courts.

16  *Gunn v. Minton*, 568 U.S. 251, 258, 133 S. Ct. 1059, 185 L. Ed. 2d 72 (2013)

17  (quoting *Grable*, 545 U.S. at 313-14).

18       The Court explained that the substantiality of an issue must be determined

19  from the perspective of the federal system itself.  *Gunn* at 259.  And, to determine

20  whether an issue is "capable of resolution" in federal court without disrupting the

21  balance between federal and state courts requires the courts to consider whether

22  Congress intended to displace state-law causes of action and whether the states

23  have a legitimate interest in deciding claims that depend on the federal issue.  *See*

24  *also Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 278 (9th Cir. 2018)

25  (holding that if it appears that some substantial, disputed question of federal law is

26  a necessary element of one of the well-pleaded state claims, federal jurisdiction

27  may lie).

28

**OPPOSITION TO MOTION TO DISMISS**

1   Here, the issues raised by Plaintiff Flaa's declaratory relief claim present

2   questions of law in that they address whether restrictions imposed on the HFPA's

3   admissions process are impermissible under federal given the HFPA's status as a

4   section 501(c)(6) tax exempt organization; the resolution of those questions may

5   affect other 501(c)(6) entities; the federal government has a substantial interest in

6   having the court decide the case in that if the restrictions are impermissible, it

7   might be entitled to collect taxes should the I.R.S. pursue them.

8       **C.    Plaintiff Has Alleged a Substantial Controversy.**

9       Defendants' argument that only its members may challenge its Bylaw

10  requirements governing how non-members may become members is nothing less

11  than an argument that the HFPA is above the law.  By definition, someone who is

12  *already* a member of the HFPA could not have "'a substantial controversy'"

13  arising from its admissions requirements involving "'adverse legal interests.'"  *See*

14  *Merit Halthcare Int'l, Inc. v. Merit Med. Sys., Inc.,* 721 F. App'x 628, 629 (9th Cir.

15  2018) (quoting *MedImmune, Inc.  v. Genentech, Inc*., 549 U.S. 118, 127 (2007)).

16  Members are quite obviously not affected by the requirements to become

17  members.

18      Defendants' final point, that because declaratory relief merely affords a

19  remedy, a grant of declaratory relief also requires a substantive basis for liability, is

20  not well taken.  The Complaint incorporates the allegations supporting Plaintiff's

21  claim for breach of the right of fair procedure into her declaratory relief claim.

22  Indeed, Plaintiff has alleged that through the Bylaw provisions placed in issue by

23  the Declaratory Relief claim, the HFPA denies applicants for membership fair

24  procedure in deciding whether they will be admitted.

25  / / /

26  / / /

27  / / /

28

---

15

**OPPOSITION TO MOTION TO DISMISS**

**IV.    PLAINTIFF HAS PROPERLY ALLEGED ANTITRUST CLAIMS, WHICH ARE TYPICALLY QUESTIONS OF FACT ANYWAY**

**A.    The HFPA Is Trying to Have It Both Ways in Telling the IRS That Southern California Is a Geographic and Product/Service Market for Motion Picture Reporting While Denying to this Court That It Is.**

Defendant HFPA enjoys tax-free status under Internal Revenue Code section 501(c)(6), which applies to "business leagues, chambers of commerce, real estate boards, boards of trade and professional football leagues." As shown in section II, above, having that status requires that the HFPA act for the benefit of every competitor within its geographic and product or service market.

Plaintiff Flaa has attempted to allege co-extensive markets for the purpose of her anti-trust claims. Unfortunately, neither the HFPA's Articles of Incorporation nor its Restated Articles of Incorporation attempt to define those markets beyond claiming the HFPA's right to involve itself in a variety of ways with a great many forms of entertainment, both here and abroad. The HFPA's Bylaws (Exh. I to the Quinto Dec.) are, however, more helpful in defining the relevant markets.

Although the Bylaws nowhere define "Hollywood," they reflect that the geographic market is Southern California. They provide that Active Members must be "Active and regular Hollywood correspondents" (Quinto Dec., Exh. I at Art. IV, Sec. A.1.(a)); Active Members must attend at least five membership meetings every year (Art. IV, A.2.(c), Art. IV, Sec. 4.5.C.2)); Active Members must attend at least 25 "qualifying press conferences (press conferences in the Los Angeles area or optional press conferences outside the Los Angeles area) (Art. IV, Sec. A.2.(d)); New Member applicant sponsors must state "[h]ow long the applicant has been located in this area" (Art. IV, Sec. 4.2.A.6.(b)); "[m]embers who give up residence in Southern California may remain in the Association as affiliate members" for three years and may be reinstated to Active Membership

16

and "[u]pon return to Southern California" (Art. IV, Sec. 4.8.B.); and must follow specified procedures to prevent competition for publications with correspondents "in the Hollywood area" or "in Hollywood" (Art. IV, Sec. 4.12.A. and B.). Finally, the HFPA's membership directory reflects that apart from the possible exception of eight members who list the HFPA's offices as their home address, all live in either Los Angeles or San Diego Counties.  (*See* Exh. H to the Quinto Dec.)

The HFPA's Bylaws also provide guidance as to the product/service market and Plaintiff anticipates that the HFPA's Credentials Committee will provide further evidence of it during discovery.  Although the HFPA's Bylaws broadly declare that Active members must be "[j]ournalists who cover the entertainment industries" and fulfill any of five requirements (Quinto Dec., Exh. I at Art. IV, Sec. A.1.), the first two requirements are that they be "active and regular Hollywood correspondents" or "active and regular Hollywood columnists, [or] radio or television reporters."  Still further, all Active members are annually required to attend "at least twenty-five qualifying HFPA press conferences."  (Art. IV, Sec. 4.2.[d]  Thus, the subject matter of those press conferences will evidence the product/service market.  Still further, the HFPA requires that all applicants for membership must have been accredited by the Motion Picture Association of America ("MPAA") "for at least two years preceding the date of application to the HFPA" (Art. IV., Sec. 4.2.A.5.) and must submit "[a]t least twenty-four clippings of their more recent articles [sic] from the previous three years (with at least six clippings from each year)" (Art. IV., Sec. 4.2.A.3.).  The HFPA's reasons for requiring that all applicants be veteran members of the MPAA, as well as the nature of accepted clippings, will also evidence the product/service market.

And, blindingly obvious is that the HFPA's Active members decide who will win Golden Globe awards.  Although Golden Globe awards are conferred to recognize achievement in both motion pictures *and television*, the latter medium is irrelevant to defining the relevant market.  Motion pictures are released and

---

17

**OPPOSITION TO MOTION TO DISMISS**

watched virtually simultaneously worldwide; American television shows typically are not viewed worldwide and, even when they are broadly viewed, they are typically shown well after they were aired in the United States[5].  The HFPA's members report Hollywood news to consumers in foreign markets.  Accordingly, the product/service they purchase is information concerning motion pictures in current release. Although that information may be conveyed in various ways—through print publications, radio, television, the Internet, and social media—it is obtained during press junkets that all members of the HFPA are invited to attend and that very few other journalists who report for other countries are permitted to attend.

Consistent with the foregoing, Plaintiff has alleged that the geographic area for Hollywood reporting is Southern California (Complaint, ¶¶ 2, 5), the product market is Southern California entertainment news (*Id.,* ¶¶ 5, 34, 37, 114, 119), the HFPA wields tremendous economic power within those markets and its members enjoy enormous economic benefits as a consequence  (*Id.,* ¶¶  32, 34, 35, 38, 41-44), and the HFPA harms competitors and competition (*Id.,* ¶¶ 37, 39, 40, 46-49, 52-56, 75, 83-87, 89, 90, 121).  If the Court finds that Plaintiff has not properly alleged the relevant geographic and product/service markets, Plaintiff requests leave to amend and refers the Court to the accompanying Quinto and Flaa Declarations for evidence of additional facts that can be alleged.

---

[5] That television programs lack the universal appeal of motion pictures is evidenced by the fact that in December 2015, the following U.S. programs were the most popular in the following countries: Argentina (The Simpsons); Australia (The Big Bang Theory); Brazil (The Blacklist); France (Forever); Germany (CSI: Crime Scene Investigation); Hungary (The Mentalist); Indonesia (The Karate Kid); Italy (The Bold and the Beautiful); Mexico (SpongeBob SquarePants); Poland (The Book of Negroes); Romania (CSI: New York); Russian Federation (Game of Thrones); South Africa (Modern Family); South Korea (Scandal); Spain (The Flash); Sweden (Mr. Robot); and the United Kingdom (Humans).  *See* https://www.vulture.com/2015/12/most-popular-us-tv-shows-around-the-world.html (accessed October 26, 2020).

18

**OPPOSITION TO MOTION TO DISMISS**

1
2

## B.      What the Relevant Markets Are Is a Question of Fact for Resolution at Trial.

3   As the Ninth Circuit has held, there is no requirement that the elements of an

4   anti-trust claim be pleaded with specificity and an anti-trust complaint survives a

5   Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the

6   alleged market—"which is typically a factual element rather than a legal element"-

7   -suffers a fatal legal defect.  *See Newcal Indus., Inc. v. Ikon Office Sol., Inc.*, 513

8   F.3d 1038, 1045 (9th Cir. 2008) (reversing grant of motion to dismiss anti-trust

9   claims).  A complaint may not be dismissed unless the "'relevant market'

10  definition is facially unsustainable." *Id.*, citing *Queen City Pizza v. Domino's

11  Pizza,* 124 F.3d 430, 426-37 (3d Cir. 1997).

12        Further, an anti-trust claim need not be based on the monopolization of an

13  entire market.  "[I]t is legally permissible to premise antitrust allegations on a

14  submarket" if, following discovery, the plaintiff can show "that the alleged

15  submarket is economically distinct from the general product market." *Id.*  Indicia

16  of an economically distinct submarket include industry or public recognition of the

17  submarket as a separate economic entity, the product's peculiar characteristics and

18  uses, unique production facilities, distinct customers.  *See Brown Shoe v. United

19  States,* 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962).  Accordingly, an

20  anti-trust plaintiff may properly restrict the alleged market to consumers of a single

21  brand.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*  504 U.S. 451, 112

22  S. Ct. 2072, 119 L. Ed. 2d 265 (1992); *Redbox Automated Retail, LLC v. Buena

23  Vista Home Entm't, Inc,* 399 F. Supp, 3d 1018, 1027 (C.D. Cal. 2019) (finding that

24  an allegation that Disney was restraining trade in "the nationwide market for

25  rentals and sales of movies on DVD, Blu-ray, and digital platforms for home

26  entertainment" was legally sufficient although it excluded cable television, digital

27  streaming services such as Netflix, content platforms such as YouTubed, and

28  special events."

**OPPOSITION TO MOTION TO DISMISS**

1   Here, Plaintiff Flaa need allege only that the relevant market consists of

2   reporting on a particular type of entertainment—motion pictures.   Notably,

3   Defendants have not pointed to anything missing from Plaintiff's claimed

4   product/service market or put another way, to anything that substitutes for motion

5   picture reporting.

6   **C.    Plaintiff Flaa Has Sufficiently Alleged the HFPA's Anti-**

7   **Competitive Effects.**

8   Defendants argue incorrectly that Plaintiff must allege that the HFPA "has

9   market power."  To the contrary, she must allege that the HFPA engages in

10   conduct having anti-competitive effects. *See Oltz v. St. Peter's Cmty. Hosp.,* 861

11   F.2d 1440, 1448 (9th Cir. 1988) ("Because market definition and market power are

12   merely tools designed to uncover competitive harm, proof of 'actual detrimental

13   effects . . .  can obviate the need . . . [for] elaborate market analysis.'") (quoting

14   *F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460-61, 106 S. Ct. 2009, 90 L.

15   Ed. 2d 445 (1986)).  A "plaintiff can show anticompetitive effect in a relevant

16   market either through direct proof of actual adverse effects or indirectly, through

17   'proof of "market power"' plus some evidence that the challenged restraint harms

18   competition." *Redbox Automated Retail* at 1028 (quoting *Ohio v. Am. Express Co.,*

19   ___ U.S. ___, 138 S. Ct. 2274, 2284, 201 L. Ed. 2d 678 (2018)). Accordingly,

20   when an anti-trust plaintiff has "sufficiently alleged actual anticompetitive effects,

21   . . . further indications of market power may not be required." *Redbox Automated*

22   *Retail* at 1029 (citing *Indiana Fed'n of Dentists* at 460-61; *Todd v. Exxon Corp.,*

23   275 F.3d 191, 206 (2d Cir. 2001)).

24   "[T]o demonstrate injury to competition, a plaintiff 'must delineate a

25   relevant market and show that the defendant plays enough of a role in that market

26   to impair competition significantly.'" *Redbox Automated Retail* at 1026 (quoting

27   *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991)).  Plaintiff has

28

**OPPOSITION TO MOTION TO DISMISS**

1    alleged facts showing just that.  *See Complaint*, ¶¶ 34, 35, 37-46, 83-87, 89-91,

2    116, 120, and 121.

3         Again, though, if the Court disagrees, Plaintiff requests leave to amend her

4    complaint to allege additional facts.  Importantly, to the extent that the Complaint

5    alleges anti-competitive acts by individuals, that conduct can now be alleged

6    against the HFPA, which has begun providing the individual Defendants with a

7    legal defense.  Pursuant to the HFPA's Bylaws, Article VII, Section 7.2. (Quinto

8    Dec. Exh. I), the HFPA may indemnify a person who is sued by a third party only

9    "by reason of the fact that such person is or was an agent of the Association . . . if

10   he acted in good faith and in a manner he reasonably believed to be in the best

11   interests of the Association."

12        **D.**   **Plaintiff Has Alleged That the HFPA's Conduct Has Injured Her**

13             **by Harming Competition.**

14        Defendants have deliberately misrepresented the Complaint in asserting that

15   it alleges nothing more "than the alleged exclusion of one reporter from one

16   Association."  (HFPA brf. at 29:22-23)  In fact, paragraph 75 of the Complaint

17   names 15 persons who have allegedly been excluded from membership recently

18   and paragraph 76 alleges that during 2018-19, five of six applicants were denied

19   admission.  Further, the Complaint alleges that HFPA members have access to a

20   tremendous number of press conferences and junkets from which competitors

21   (including Plaintiff Flaa) are excluded by virtue of their exclusion from

22   membership in the HFPA.

23        The HFPA points to *Brunswick Corp. v. Pueble Bowl-O-Mat, Inc.*, 429 U.S.

24   477, 488-89, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977) (construing Section 7 of the

25   Clayton Act, which is not in issue herein), for the proposition that the plaintiffs

26   therein had to prove they suffered an "injury of the type the antitrust laws were

27   intended to prevent and that flows from that which makes defendants' acts

28   unlawful."  *Id.* at 489.  Under the Sherman Act, a plaintiff must show the existence

21

of a contract, combination, or conspiracy that unreasonably restrains trade, the restraint affects interstate commerce, and that she suffered an injury resulting from the illegal conduct. *See Christofferson Dairy v. MMM Sales, Inc.,* 849 F.2d 1168, 1172 (9th Cir. 1988).

Plaintiff's Complaint alleges numerous facts showing that members of the HFPA actively conspire with one another to prevent competition. In addition to the numerous factual allegations of the Complaint reflecting just that, Exhibit K to the Quinto Declaration evidences that then-President Lorenzo Soria was "seriously considering" sponsoring Plaintiff Flaa for membership and was not concerned that Defendant "Tina cretina" Johnk Christensen of Denmark might object but had to clear it with Defendant Aud Berggren Morisse of Norway. Plaintiff has further alleged that the Bylaws enshrine the members' right to be protected from competition in reporting motion picture entertainment news worldwide. Finally, Plaintiff has alleged that non-member foreign correspondents, of whom Plaintiff is one, are denied the "enormous economic benefits" that membership brings. Complaint, ¶ 32, 37, 40, 45, and 101.

**E.    Defendants' Argument that Plaintiff Lacks "Standing" to Allege an Anti-trust Claim Does Not Apply to Simple, Straightforward Claims.**

Defendants rely on a Supreme Court case that, they claim, "identified certain factors for determining whether a plaintiff has antitrust standing." HFPA brf. at 29:25-27 (citing *Associated Gen'l Contractors v. Cal. State Council of Carpenters,* 459 U.S. 519, 545-46, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) (addressing a dispute among parties to a multi-employer collective-bargaining agreement)).

There, the Supreme Court actually addressed factors for use "in keeping the scope of complex antitrust trials within manageable limits" and avoiding "the risk of duplicative recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Associated General Contractors* at 543. In that case,

---

22

1   "[t]he plaintiff unions allege[d] that in violation of the antitrust laws, the multi-

2   employer association and its members coerced certain third parties, as well as some

3   of the association's members, to enter into business relationships with nonunion

4   firms." *Id.* at 520.  The Court reasoned that "Congress did not intend to allow

5   every person tangentially affected by an antitrust violation to maintain an action to

6   recover threefold damages." *Id.* at 535 (citing *Blue Shield of Virginia v.*

7   *McCready,* 457 U.S. 465, 476-77, 102 S. Ct. 2540, 23 L. Ed. 2d 149 (1982)).

8   Because the plaintiffs were only indirect victims of the alleged wrongful activities

9   and the direct victims could sue, and because the alleged harm could have resulted

10  from independent factors, the Court deemed the damages claim to be highly

11  speculative. *See id.* at 542.

12      Not only is *Associated General Contractors* inapposite but the HFPA has

13  misstated its holding: in addition to the factors discussed above, "[o]ther relevant

14  factors—the nature of the Union's injury, the tenuous and speculative character of

15  the relationship between the alleged antitrust violation and the Union's alleged

16  injury, the potential for duplicative recovery or complex apportionment of

17  damages, and the existence of more direct victims of the alleged conspiracy—

18  weigh heavily against judicial enforcement of the Union's antitrust claim." *Id.* at

19  545.

20      Standing is not in issue herein because the anti-trust violations alleged could

21  hardly be simpler and more straight forward.

22  **V.      CONCLUSION.**

23      For the reasons set forth above, Defendants' Motion to Dismiss should be

24  denied in its entirety.  If, however, the Court finds that any of Plaintiff Flaa's

25  / / /

26  / / /

27  / / /

28

**OPPOSITION TO MOTION TO DISMISS**

claims are not well pleaded, Plaintiff respectfully requests leave to file an amended complaint to address any defects.

Dated:  October 30, 2020                    **ONE LLP**


                                             By: /s/ David W. Quinto
                                                 David W. Quinto
                                                 Joanna Ardalan

                                                 Attorneys for Plaintiff
                                                 Kjersti Flaa

**OPPOSITION TO MOTION TO DISMISS**