UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: 2:20-cv-06974-SB (Ex) | Date: November 20, 2020 |
|---|---|

Title: *Kjersti Flaa v. Hollywood Foreign Press Association, et al.*

Present: The Honorable **STANLEY BLUMENFELD, JR., U.S. District Judge**

| Victor Cruz | Katie Thibodeaux |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| David W. Quinto | Marvin S. Putnam<br>Christopher S. Yates |

**Proceedings: ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (DKT. NO. 30)**

Plaintiff Kjersti Flaa, a journalist specializing in entertainment reporting, unsuccessfully sought membership in the Hollywood Foreign Press Association ("HFPA"). In response, she filed suit against Defendants HFPA, Aud Berggren Morisse, Tina Johnk Christensen, Aniko Skorka Navai, and Meher Tatna, claiming violations of the right to fair procedure and the antitrust laws in a 42-page complaint. Defendants filed a motion to dismiss (Mot., Dkt. No. 30), which is fully briefed (Opp., Dkt. No. 31; Reply, Dkt. No. 32). For the following reasons, the Court **GRANTS** the motion.

# I. INTRODUCTION

## A. Plaintiff's Background as a Journalist and Reporter

Plaintiff Kjersti Flaa is from Oslo, Norway and has worked as a journalist since 2003. (Compl., Dkt. No. 1, ¶ 18.) She moved to New York in 2007, reporting on entertainment, lifestyle, fashion, and trends for news outlets in Norway. (*Id.* ¶ 19.) She also became the principal celebrity interviewer for the biggest entertainment television show in Norway, "*God Kveld Norge*" (Good Evening Norway) and frequently appeared on Norway's NRK TV and Radio network (Norway's equivalent of the BBC). (*Id.*)

In 2015, Plaintiff moved to Southern California, where she founded her own production company in 2018. (*Id.* ¶ 20.) In 2018, her company produced 130 episodes of a short-form entertainment series titled "Hollywood Stories" for VIAPLAY, Scandinavia's biggest streaming service, which was distributed to over forty countries. (*Id.*) Plaintiff has also produced entertainment segments and served as a Hollywood correspondent for networks abroad. (*Id.*) She has a YouTube channel, "*Flaawsome Talk*," which has over 69.7 million views. (*Id.*)

Plaintiff has received awards for her journalism and other professional recognition. She serves as a moderator for an annual three-day seminar designed to "build a bridge between entertainment industry professionals in Scandinavia and Hollywood" and has been profiled as a Hollywood expert in five documentaries. (*Id.* ¶¶ 20-21.)

## B. Brief Overview of the HFPA

The HFPA was founded in 1943 by "a group of journalists[] [who] desire[d] to efficiently and accurately cover all aspects of the world of entertainment. (*Id.* ¶ 27.) In the late 1940s, the HFPA began conferring "Golden Globe®" awards, which "recogniz[e] outstanding achievement . . . within the motion picture and television industry, both foreign and domestic." (*Id.* ¶¶ 3, 29.) The Golden Globes are viewed as a precursor to the "Oscar®" awards, and as a result, Hollywood studios seek to accommodate HFPA members to the exclusion of non-HFPA members. (*Id.* ¶¶ 3-5, 33-34.) HFPA members also enjoy access to worldwide "press junkets" and direct benefits from the HFPA itself. (*Id.* ¶¶ 38, 41.) At the time the Complaint was filed, the HFPA had 87 members. (*Id.* ¶¶ 1, 50.)

In 1967, the HFPA was incorporated as a California Mutual Benefit Corporation and was later granted 501(c)(6) tax-exempt status as a trade association under the Internal Revenue Code. (*Id.* ¶¶ 2, 28, 30.) The HFPA's stated purposes include, "promoting interest in the study of the arts, including specifically promoting the development of the motion picture art form," "providing facilities for education and instruction in the arts of motion picture production," "establishing favorable relations and cultural ties between foreign countries and the USA through the exhibition of motion picture photoplays," and "promoting interest in the motion picture art form." (*Id.* ¶ 29.)

### C. Plaintiff's Rejected Applications for HFPA Membership

To gain admission to the HFPA, prospective members must meet both objective and subjective requirements. (*Id.* ¶ 62.) Applicants must provide: (i) press credentials, (ii) 24 press clippings from applicant's articles over the past three years, (iii) proof of payment for those articles, (iv) proof the applicant has belonged to the Motion Picture Association of America ("MPAA") for 2 years, and (v) two letters of sponsorship from active HFPA members. (*Id.* ¶ 64.) Plaintiff alleges that obtaining two letters of sponsorship is difficult because HFPA members pressure other members not to sponsor candidates they do not like or will compete with them. (*Id.* ¶ 65.) After an applicant manages to satisfy the objective criteria, the applicant must be approved by a majority vote of the members. (*Id.* ¶ 68.) Should an applicant pass muster, they are admitted as a provisional member and may become an active member after one year and a majority vote. (*Id.* ¶ 76.)

Plaintiff unsuccessfully applied for HFPA membership in 2018, 2019, and 2020. In 2018, Plaintiff applied for membership but was rejected. (*Id.* ¶ 79.) In 2018, she allegedly was denied membership because Defendants Morisse and Christensen would not agree to it. She learned the reason for denial from Ramzy Malouki, one of her 2019 sponsors—who later withdrew his 2019 sponsorship at Morisse's behest. (*Id.*) Plaintiff also alleges that another member, Frank Rousseau, wrote a letter to other HFPA members addressing the "unjustifiable" reasons for excluding Plaintiff. (*Id.* ¶ 80.) Plaintiff's 2019 replacement sponsor, Magnus Sundholm, expressed the view that Plaintiff was the target of a coordinated plan by Morisse and Christensen to deny her membership in 2018, despite Plaintiff's agreement not to compete with Morisse in the Norwegian market. (*Id.* ¶¶ 81-85.) In 2019, Plaintiff's second application for membership was denied. She alleges that Morisse and Christensen "teamed up again" to deny her access to the HFPAs, this time with then-president, Defendant Tatna, who allegedly ordered members to stay silent about the 2019 membership vote. (*Id.* ¶¶

87-88.) In 2020, Morisse and Christensen allegedly continued to conspire to deny her membership. (*Id.* ¶ 89.) This time, Morisse and Christensen purportedly recruited a different Norwegian journalist, Mari Glans, hoping to persuade other HFPA members that the organization had "enough Norwegian members for the foreseeable future." (*Id.* ¶¶ 89-90.) Plaintiff further alleges that Defendant Navai falsely accused her of ageism and "actively participated in the scheme to unlawfully deprive Plaintiff of admission to the HFPA" (*id.* ¶ 91), and that Defendant Soria (recently deceased and dismissed from this action) sought to protect the HFPA's corrupt and unlawful practices. (*Id.* ¶ 92.)

## II. REQUEST FOR JUDICIAL NOTICE

A court generally may not consider material beyond the pleadings in ruling on a motion to dismiss. *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993). One of the few exceptions is that a court may take judicial notice of undisputed facts contained in public records. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *see* Fed. R. Evid. 201(b).

In support of the Motion, Defendants ask the Court to take judicial notice of two Form 990 Internal Revenue Service documents (RJN, Dkt. No. 30-4), a 2017 Form 990's from the Producer's Guild of America (the "Producer's Guild") (*id.*, Ex. A, Dkt. No. 30-2) and the Academy of Motion Picture Arts and Sciences (the "Academy") (*id.*, Ex. B, Dkt. No. 30-3). The two forms are publicly available documents and their accuracy cannot be reasonably questioned. The Court therefore **GRANTS** Defendants' unopposed request.

## III. LEGAL STANDARD

### A. Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6), a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

That is, a pleading must set forth allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts "'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Assuming the veracity of well-pleaded factual allegations, a court next must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

### B. Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a case for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* "[I]n a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* In resolving a factual attack, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* (citing *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)). The court does not need to presume the truthfulness of the plaintiff's allegations. *Id.*

Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the opposing party bears the burden of establishing the Court's jurisdiction. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

## IV. DISCUSSION

### A. Plaintiff's Fair Procedure Claim

Plaintiff claims that the HFPA's decision to reject her membership application is subject to the right of fair procedure. Derived from the common law, the right of fair procedure applies to an organization that "occupies a quasi public position similar to that of a public service business." *James v. Marinship Corp.*, 25 Cal. 2d 721, 731 (1944) ("Where a union has, as in this case, attained a monopoly of the supply of labor by means of closed shop agreements and other forms of

collective labor action, such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations."). A quasi-public organization loses its right to freely associate when its membership decisions "affect[] the fundamental right to work for a living." *Id*. With such decision-making power comes the responsibility to decide fairly. *Id*. at 737; *see also Potvin v. Metropolitan Life Ins. Co.*, 22 Cal. 4th 1060, 1066 (2000) (noting that the "the decisionmaking 'must be both substantively rational and procedurally fair'"). As Defendants correctly argue, Plaintiff is unable to demonstrate that (1) the HFPA is a quasi-public entity and (2) the HFPA's decision deprived her of the ability to practice her profession. *See Yari v. Producers Guild of Am., Inc.*, 161 Cal. App. 4th 172, 175 (2008).

**1. The HFPA Is Not a Quasi-Public Entity.**

A quasi-public entity is a private entity that "operate[s] in the public interest." *Id.* at 179; *see Ezekial v. Winkley*, 20 Cal. 3d 267, 274 (1977) (public interest shown when a hospital "has assumed the power to permit or prevent their practice of a surgical specialty"); *Pinsker v. Pac. Coast Soc. of Orthodontists*, 1 Cal. 3d 160, 166 (1969) (public interest shown when orthodontist associations "hold themselves out to the public and the dental profession generally as the sole organizations [that] . . . determine standards . . . for the practice and certification of orthodontics"); *James*, 25 Cal. 2d at 731 (public interest shown when labor union "attained a monopoly of the supply of labor"); *see also Potvin*, 22 Cal. 4th at 1070 (noting the importance of the finding in *Ezekial*, *Pinsker*, and *James* that the organization "was a private entity affecting the public interest"). California courts have considered several factors in deciding whether an entity is quasi-public, including "[t]he important products or services which [they] provide, their express or implied representations to the public concerning their products or services, their superior bargaining power, [and] legislative recognition of their public aspect. . . ." *Yari*, 161 Cal. App. 4th at 179 (quoting *Potvin*, 22 Cal. 4th at 1070).

The HFPA is an association of journalists who cover entertainment. Plaintiff alleges that the HFPA is nevertheless a quasi-public entity because of its tax-free status. (Compl. ¶ 95 ("As an organization afforded tax-free treatment by both the Internal Revenue Service and the California Franchise Tax Board, defendant HFPA is a quasi-public organization.").) Plaintiff's theory is that an entity organized under 26 U.S.C. § 501(c)(6) is necessarily "quasi-public" because it is required by tax law to be open to all in the same line of business. (*See* Opp. at 4-5.) This theory—which if accepted would extend to all such non-profit organizations—misapprehends the limited nature of the right to fair procedure and

is contrary to California law. The question is whether "industry-related organizations like [D]efendants operate in the public interest" within the meaning of the applicable doctrine. *Yari*, 161 Cal. App. 4th at 174. They do not. *See id*. (concluding that the Academy of Motion Picture Arts and Sciences and the Producers Guild of America are not quasi-public entities).

Plaintiff next alleges that the HFPA is a quasi-public entity because it serves as a "gatekeeper organization" for foreign entertainment reporters wishing to work in Southern California. (*Id.* ¶ 96.) Plaintiff argues that the HFPA's gatekeeper role is indisputable because it provides an important service to the public—reporting on "one of California's most important industries." (Opp. at 5.) Plaintiff also contends that the HFPA wields superior bargaining power because members are afforded "unparalleled access to movie stars and entertainment newsmakers" not available to nonmembers. (*Id.* at 6.) As before, Plaintiff's arguments do not square with California law. *See Yari*, 161 Cal. App. 4th at 174.

In *Yari*, plaintiff was one of six producers receiving screen credit for the movie *Crash*. When the movie was nominated for an Academy Award for Best Picture, the Academy applied its rules to select two of the six producers to receive producer credit, excluding the plaintiff. *Id*. at 175. On appeal, the plaintiff argued that the Academy and the Producer's Guild were quasi-public institutions because of "the enormous public interest" in the Academy Awards and the Academy's other important services to the public. *Id.* at 179. The court rejected this argument, reasoning:

> [T]he movie industry is an important industry, and movies may affect the ways in which people view the world. Yet, we do not believe that we disparage defendants when we draw a distinction between a medical organization's public representation that one of its members erred in his treatment of patients—a matter outside the expertise of most patients and potential patients—and defendants' awards, which announce themselves as subjective determinations of merit. It is surely true that, as Yari argues, the public is interested in the motion picture industry. That does not mean that industry-related organizations like defendants operate in the public interest.

*Id.* at 180.

Plaintiff's arguments here are materially indistinguishable from those advanced in *Yari*. According to *Yari*, a powerful organization in the movie

industry that confers substantial, prestigious, and rewarding benefits on selected industry participants is not a quasi-public entity like a medical organization that makes public representations about the medical care provided by its members. *Id*. In conferring such benefits, the Academy does not "operate in the public interest" in the same way as the labor union in *James* (which had the power to preclude employment of African Americans in the shipbuilding trade), the orthodontist associations in *Pinsker* (which had the power to curtail a dentist's ability to specialize in orthodontics), the health insurer in *Potvin* (which had the power to preclude a physician's employment in a geographic area), and the hospital in *Ezekial* (which had the power to preclude physicians from practicing their surgical specialty). So, too, here.

In short, the right to fair procedure is a limited one that applies to an organization that operates in the public interest—and not one that engages in activity of some interest to the public. The California Supreme Court recognized this distinction in declaring: "Our concern in such cases is with protecting persons seeking membership in, or expelled by, private organizations that *occupy positions of special importance in society*." *California Dental Assn. v. Am. Dental Assn.*, 23 Cal. 3d 346, 353 (1979) (citing *Pinsker* and *James*) (emphasis added). With that limited focus, the doctrine has been applied in cases of exclusion from "membership in a professional society, a trade union or a limited group of health[care] [organizations]." *Kim v. S. Sierra Council Boy Scouts of Am.*, 117 Cal. App. 4th 743, 747 (2004); *see also Delta Dental Plan v. Banasky*, 27 Cal. App. 4th 1598, 1607 (1994) ("Fair procedure comes into play where private organizations are 'tinged with public stature or purpose' or attain a 'quasi-public significance' . . . ."). It has not been applied in the field of entertainment. *See Yari*, 161 Cal. App. 4th at 180. When California courts speak of a public interest "of special importance in society," they are not talking about public diversion. *Id*.; *cf. Kim*, 117 Cal. App. 4th 743, 747 & 747 n.4 (questioning, as "debatable," whether the "Boy Scouts [of America] is a quasi-public organization affecting the public interest").

### 2. Plaintiff Has Failed to Allege Exclusion from the HFPA Forecloses Her Ability to Work as an Entertainment Reporter.

Even if the HFPA were a quasi-public entity, Plaintiff still would not be able to assert a right of fair procedure because the right does not attach to every decision made by such an entity. "[T]he right applies only to private decisions which can effectively deprive an individual of the ability to practice a trade or profession." *Yari*, 161 Cal. App. 4th at 177 (citing *Ezekial*, 20 Cal. 3d at 273); *see also Kim*, 117 Cal. App. 4th at 747 (noting that the doctrine requires a two-part showing). It is not sufficient to allege that a favorable decision would have enhanced a plaintiff's career or reputation, or that an unfavorable decision had the opposite effect. *Yari*, 161 Cal. App. 4th at 178. "[N]o case holds that the doctrine applies to all private decisions which have economic ramifications, and it is quickly apparent that economic ramifications are not enough." *Id*. at 179. Yet this is the nature of Plaintiff's complaint: she argues that lack of membership "greatly impairs" her career because she does not have access to various press junkets and other economic advantages. (Compl. ¶¶ 37-40.)

Moreover, the allegations in the complaint demonstrate that Plaintiff cannot prove that she is effectively unable to practice her trade or profession absent HFPA membership. Plaintiff has had a long history of professional success, including since moving to Southern California in 2015. She explains:

> [Plaintiff] began transitioning to living in Southern California in 2015, where she founded and became the creative director of a production company, Content Now TV in 2018. Her company produced 130 episodes of the short form entertainment series "Hollywood Stories" for Scandinavia's biggest streaming network, VIAPLAY, in 2018. The show was sold to over 40 countries. Flaa has also produced entertainment segments for *Entertainment Tonight MBC Arabic*, and served as the Hollywood correspondent for SBS, Channel 6, *Shownieuws* in Holland for five years. [Plaintiff] also serves as the moderator for NOW - Nordic Oscar Weekend - an annual three-day seminar and event in Los Angeles having as its principal goal to build a bridge between entertainment industry professionals in Scandinavia and Hollywood. As a testament to her skill, her celebrity interviews on the YouTube "Flaawsome Talk" channel have been viewed 69.7 million times.

(Compl. ¶ 20.)

Plaintiff goes on to explain that her professional success has led to significant professional recognition:

> [Plaintiff's] professional achievements have earned her professional recognition. She has appeared as a Hollywood expert in five documentaries shown in Germany by *Kabel Eins* and has been profiled multiple times by major outlets in Norway concerning her success reporting on celebrities and her involvement with NOW. She also earned the second place at the SoCal Journalism Awards Contest in 2018 for a profile of Jane Fonda, and her television interview of Henry Winkler earned second runner-up honors at the 12th National Arts & Entertainment Journalism Awards in 2019.

(*Id*. ¶ 21.)

Such laudable success and professional recognition have come without HFPA membership—and could not have been achieved if she were denied the ability to practice her profession. Because Plaintiff has failed to plead facts showing that the HFPA is subject to a right of fair procedure claim and has failed to plead facts showing the HFPA controls her ability to work, the Court **DISMISSES** Plaintiff's fair procedure claim.

### B. <u>Plaintiff's Antitrust Claims</u>

Plaintiff alleges that her exclusion from the HFPA violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16750(a).[1] (Compl. ¶¶ 112-125.) Defendants move to dismiss these claims because Plaintiff has failed to allege (1) a viable antitrust market; (2) market power; and (3) antitrust injury. (Mot. at 22-31.)

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)). "The relevant market encompasses notions of geography

---

[1] Plaintiff's Cartwright Act claim is analyzed under the same framework as her claims brought under the Sherman Act. *See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015).

as well as product use, quality, and description." *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1023 (D. Or. 2015); *see Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008) ("Antitrust law requires allegation of both a product market and a geographic market.").

Market definition is said to be a fact question. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 282-83 (6th Cir. 2014). This is not to say that a plaintiff may make vague, confusing, or economically nonsensical market allegations free from challenge at the pleading stage. A court may dismiss a complaint when "the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus.*, 513 F.3d at 1045. A definition is "facially unsustainable" where "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Vesta Corp.*, 129 F. Supp. 3d at 1023.

### 1. Plaintiff Fails to Allege a Facially Sustainable Geographic Market.

The relevant geographic market includes the area of "effective competition," or the area "where buyers can turn for alternative sources of supply." *See Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001). A geographic market must "'correspond to the commercial realities' of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).

Plaintiff alleges that the relevant geographic market "for foreign entertainment reporters" is "Southern California, and the Los Angeles area in particular." (Compl. ¶¶ 113-114.) Defendants argue that such "amorphous, conclusory statements are wholly insufficient to plead a relevant antitrust market." (Mot. at 26.) Ninth Circuit law supports this argument. *See, e.g.*, *Tanaka*, 252 F.3d at 1063.

In *Tanaka*, a USC soccer player sought to transfer to UCLA, but USC opposed her transfer and invoked a transfer sanction under Pac-10 rules. *Id.* at 1061-62. Tanaka filed suit and claimed a violation of Section 1 of the Sherman Act. *Id.* at 1062. The Ninth Circuit affirmed the district court's dismissal of her complaint, finding her geographic market definition of "Los Angeles" to be insufficient because she admittedly had opportunities to play for other universities

across the country. *Id.* at 1063. Here, Plaintiff's geographic market definition invites the same fate. As in *Tanaka*, Plaintiff's own allegations demonstrate that entertainment news is created and consumed throughout the country, if not the world. (*See* Compl. ¶¶ 18-19 (highlighting Plaintiff's success outside of Southern California).) Thus, Plaintiff's "own experience strongly suggests that the relevant geographic market is [at least] national in scope." *Tanaka*, 252 F.3d at 1063.

The HFPA bylaws cannot be read to support a local market. (Opp. at 16-17.) According to Plaintiff, HFPA members must live in the area, attend meetings, and participate in a number of industry events in the area each year. (*Id.*) Plaintiff also asserts that it is "blindingly obvious" that Southern California is the proper market given the HFPA's role in the Golden Globe awards and its members' access to corresponding events. (*Id.* at 17-18.) While Southern California's connection to the entertainment industry may be obvious, the thrust of Plaintiff's assertion is not. To the extent that Plaintiff is generally suggesting that the location of market participants defines the geographic market, this suggestion is supported neither by the law of economics nor the law of the Ninth Circuit. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (concluding that "[w]here [a defendant] competes does not define the market"). Plaintiff does not allege that all entertainment news occurs or is consumed in Southern California, and she cannot allege that all entertainment news reporting is done in Southern California. Her complaint makes clear that she has achieved notable professional success in reporting entertainment news without proximity to the events.

**2. Plaintiff Fails to Allege a Facially Sustainable Product Market.**

A relevant product market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka*, 252 F.3d at 1063.

Plaintiff defines the product market as "entertainment news." (*See* Compl. ¶¶ 113-114, 119-120.) This product description is ambiguous, as she fails to identify the relevant type, source, or medium of entertainment news. She also fails to allege that "entertainment news," even if limited to movies and television programs, is not reasonably interchangeable with other forms of entertainment news (e.g., sports, music, literature, and travel). "Where a plaintiff fails to define [her] proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant

market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in his favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *UGG Holdings, Inc. v. Severn*, No. CV 04-1137-JFW (FMOx), 2004 WL 5458426, at *3 (C.D. Cal. Oct. 1, 2004) (citing *Tanaka*, 252 F.3d at 1063; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

In her opposition, Plaintiff attempts to fill in her pleading gaps by stating that the relevant market is reporting on motion pictures, which she claims is a distinct submarket. (Opp. at 19-20 (citing *Brown Shoe*, 370 U.S. at 325).) But "[i]t is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss." *Bastidas v. Good Samaritan Hospital LP*, No. 13-cv-04388-SI, 2014 WL 6900051, *4 n.3 (N.D. Cal. Dec. 8, 2014) (collecting cases). And the pleading defect is not cured by conclusorily asserting a submarket without alleging facts that motion pictures provide a unique form of non-interchangeable entertainment news.

In short, because Plaintiff fails to plead a facially sustainable market definition, her antitrust claims fail at the outset (and the Court therefore need not reach the questions of market power or antitrust harm).[2]

### C. Plaintiff's Claim for Declaratory Relief

Plaintiff seeks a declaration that several provisions of the HFPA's bylaws are unlawful in light of its tax-exempt status. (Compl. ¶¶ 104-111.) Defendants argue that Plaintiff's claim is jurisdictionally barred and that she lacks standing to challenge the HFPA's tax-exempt status. (Mot. at 31-34.)

The Declaratory Judgment Act bars jurisdiction over most federal tax controversies, except those "brought under section 7428 of the Internal Revenue Code of 1986." 28 U.S.C. § 2201(a). Plaintiff's complaint seeks declaratory relief under section 7428. (Compl. ¶ 16.) As Defendants correctly note, Plaintiff lacks

---

[2] In declining to reach these questions, the Court does not mean to suggest that they lack merit. The complaint makes analysis of the antitrust claims challenging, and the Court is not willing to deny leave to amend—especially in light of the liberal standard—when Plaintiff's antitrust theory is difficult to comprehend. If Plaintiff elects to amend, she should take seriously the questions of market power and antitrust harm in asserting a facially plausible claim.

standing to bring this claim.[3] The plain language of section 7428 makes this clear: "A pleading may be filed under this section only by the organization the qualification or classification of which is at issue." 26 U.S.C. § 7428(b)(1). Plaintiff concedes as much in her opposition (Opp. at 11-12), yet contends that this Court may still determine whether certain provisions of the HFPA's bylaws are compliant with section 501(c)(6) on the basis of federal question jurisdiction (*id.* at 12-15.)

Plaintiff asserts that because she is not challenging the amount or the payment of taxes, the jurisdictional bar does not apply. (*Id.* at 11-12.) In support of this assertion, Plaintiff cites irrelevant cases. One addresses an irrelevant statute that allows civil damages for unauthorized collection actions. *Washington v. United States*, No. CV-15-2360-DSF (AGR), 2016 WL 6995355, at *5 (C.D. Cal. Mar. 31, 2016) (discussing 26 U.S.C. § 7433). The other two address whether a plaintiff was entitled to a tax refund because it was exempt under section 501(c)(6). *Bluetooth SIG Inc. v. United States*, 611 F.3d 617 (9th Cir. 2010); *ABA Retirement Funds v. United States*, No. 09-C-6993, 2013 WL 1788297 (N.D. Ill. Apr. 25, 2013). The only case that even addressed the viability of a claim for declaratory judgment concluded that there was a jurisdictional bar. In *Bluetooth SIG*, the Ninth Circuit stated:

> SIG appears to seek a declaratory judgment that it is eligible for business league status. We lack jurisdiction over such a claim. *See* 28 U.S.C. § 2201 (barring jurisdiction over federal tax controversies). Although the Declaratory Judgment Act allows for suits to determine non-profit status, they are limited to organizations claiming exemption under § 501(c)(3), not § 501(c)(6). *See* I.R.C. § 7428.

611 F.3d at 619 n.1.

In other words, the Ninth Circuit was careful to distinguish between a claim for a tax refund due to purportedly exempt status (for which there is jurisdiction) and a claim for a declaration of exempt status (for which there is no jurisdiction). Plaintiff cannot circumvent the jurisdictional limitation by inviting federal courts to declare whether an organization is in violation of its exempt status, thereby

[3] Nor is this Court the proper forum for such a dispute. *See* 26 U.S.C. § 7428(a) (petitioner may bring a challenge in "the United States Tax Court, the United States Court of Federal Claims, or the district court of the United States for the District of Columbia.").

rendering it ineligible for such status without expressly so stating. Federal jurisdiction is not susceptible to such ready manipulation.[4]

In sum, the jurisdictional bar of the Declaratory Judgment Act precludes Plaintiff's claim for declaratory relief. The Court therefore **DISMISSES** this claim.

### D. Leave to Amend

If a court dismisses certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts[.]'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 112 (9th Cir. 2000) (en banc)); *see also* Fed. R. Civ. P. 15(a).

On the claim of a right to fair procedure, Plaintiff requests leave to amend to allege that "the denial of membership in the HFPA has caused her economic injuries in excess of $100,000 *per year* and to incorporate facts found in [declarations from other journalists who have been denied membership]." (Opp. at 11.) Based on California law, granting leave to amend would be futile. The proposed amendment will not cure the threshold obstacle that the HFPA is not a quasi-public entity under the doctrine of fair procedure. *See* discussion *supra* (discussing *Yari*); *see also Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (federal courts should follow an intermediate appellate decision in California unless it appears the California Supreme Court would reject it). Moreover, even when an entity is a quasi-public one, the right of fair procedure has been more narrowly construed to apply when membership exclusion denies the applicant of the ability to practice her trade or profession. *Yari*, 161 Cal. App. 4th at 177. Plaintiff's own allegations defeat such a claim; and the injury she wishes to allege—i.e., lost economic opportunity that would have enhanced her income—is of the kind found legally inadequate in *Yari*.

---

[4] Plaintiff also asserts that jurisdiction to declare bylaws inconsistent with section 501(c)(6) can be found in the "substantial" federal interest in the question. (Opp. at 12-15.) But this assertion is nowhere to be discovered in the cited Supreme Court decisions about general principles of federal question jurisdiction. Congress has addressed the jurisdictional issue more specifically. 26 U.S.C. § 2201(a) (barring jurisdiction in claims seeking declaratory relief over tax controversies).

Plaintiff concedes that her declaratory relief claim is derivative of her fair procedure claim. (Opp. at 12 ("Plaintiff requests leave to amend to allege the existence of supplemental jurisdiction in that the challenged Bylaw provisions have the effect of denying applicants for membership in the HFPA fair procedure.").) Because her fair procedure claim is untenable, so is her declaratory relief claim. The claim also fails on jurisdictional grounds.

The Court therefore **DENIES** Plaintiff leave to amend her fair procedure and declaratory relief claims. However, the Court cannot state that leave to amend the antitrust claims would be futile (in part because the allegations in the complaint are so vague and difficult to comprehend from an antitrust perspective). The request for leave to amend those claims is therefore **GRANTED**.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED**. Plaintiff's right of fair procedure claim and declaratory relief claim are **DISMISSED without leave to amend**. Plaintiff's antitrust claims are **DISMISSED with leave to amend**. Plaintiff may file an amended complaint within **fourteen (14) days** of this order.

0/20