Name David W. Quinto
Address 9301 Wilshire Blvd., Penthouse Suite
City, State, Zip Beverly Hills, CA 90210
Phone (310) 866-5157
Fax (310) 943-2085
E-Mail dquinto@onellp.com

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☐ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

KJERSTI FLAA, et al.,

PLAINTIFF(S),

v.

HOLLYWOOD FOREIGN PRESS ASSOCIATION, et al.,

DEFENDANT(S).

CASE NUMBER:
2:20-cv-06974-SB-E

**NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that Kjersti Flaa and Rosa Gamazo Robbins hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify): Minute Order Granting Defendants' Motion to Dismiss First Amended Complaint

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on _____. Entered on the docket in this action on 03/23/2021.

A copy of said judgment or order is attached hereto.

April 12, 2021
Date

/s/ David W. Quinto
Signature
☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-06974-SB (Ex) | Date: | 3/23/2021 |
|---|---|---|---|

| Title: | *Kjersti Flaa, et al. v. Hollywood Foreign Press Association, et al.* |
|---|---|

| Present: The Honorable | STANLEY BLUMENFELD, JR., U.S. District Judge |
|---|---|

| Victor Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):       Attorney(s) Present for Defendant(s):

None Appearing                                          None Appearing

**Proceedings:   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT [DKT. NO. 38]**

Plaintiffs Kjersti Flaa (Flaa) and Rosa Gamazo Robbins (Gamazo) are entertainment news reporters who want access to American actors for interviews to be used in their foreign reporting. Although they allege that the Hollywood studios control access, Plaintiffs wish to become members of the Hollywood Foreign Press Association (HFPA) because the studios offer preferential access to that organization. According to Plaintiffs, the antitrust laws require that the HFPA open its membership to "all objectively qualified applicants," and that its failure to do so is *per se* illegal.

This is a new antitrust theory. In her original complaint, Plaintiff Flaa invoked the rule of reason in asserting her antitrust claims. The Court, however, dismissed those claims because Plaintiff had failed to plausibly allege a product and geographic market and the requisite power within the relevant market. The Court also questioned whether Plaintiff had adequately alleged antitrust injury. Plaintiff then amended her complaint, offering a *per se* theory that seeks to avoid the deficiencies that rendered her rule-of-reason theory nonviable (while still

maintaining the rule-of-reason theory in the alternative).  Plaintiff also has added a co-party, Gamazo—who has not applied for HFPA membership but wishes to gain entry through the antitrust laws.  Defendants HFPA, Aud Berggren Morisse, Tina Johnk Christensen, Aniko Skorka Navai, and Meher Tatna have now filed this second motion to dismiss (Mot., Dkt. No. 38), which is fully briefed (Opp., Dkt. No. 41; Reply, Dkt. No. 43).  For the reasons below, the Court **GRANTS** the motion.

## I.    BACKGROUND

Flaa is a Norwegian entertainment journalist and reporter who has worked in the United States since 2007.  (First Amended Complaint (FAC), Dkt. No. 35, ¶¶ 18-19.)  In 2015, Flaa moved from New York to Southern California, where she founded her own production company.  (*Id.* ¶¶ 19-20.)  Since 2018, Flaa's company has produced 130 episodes of a short-form entertainment series titled "Hollywood Stories" for VIAPLAY, Scandinavia's biggest streaming service, which was distributed to over forty countries.  (*Id.* ¶ 20.)  Flaa has also produced entertainment segments and served as a Hollywood correspondent for networks abroad.  (*Id.*)  She has a YouTube channel, "*Flaawsome Talk*," which has over 69.7 million views.  (*Id.*)  Flaa has received awards for her journalism, and other journalists—including HFPA members—recognize her journalistic talents.  (*Id.* ¶¶ 21-25.)   Flaa unsuccessfully applied for HFPA membership in 2018, 2019, and 2020.  (*Id.* ¶¶ 23, 26, 27.)  She alleges that Defendants Morisse and Christensen conspired to deny her membership, fearing that she would "disturb their monopoly by using admission to the HFPA to compete with them."  (*Id.* ¶¶ 86, 89, 92-96.)[1]

Gamazo is a citizen of Spain, and like Flaa, has made a career as a celebrity interviewer and journalist for foreign news outlets, including those in Spain, Mexico, Colombia, Holland, and Finland.  (*Id.* ¶¶ 28-29.)  Since 2013, Gamazo has been a Los Angeles based entertainment news correspondent for numerous outlets, including *La Razón*, one of the most circulated newspapers in Madrid.  (*Id.* ¶ 29.)  Gamazo has never applied for membership after she failed to secure the requisite sponsorship from HFPA members.  (*Id.* ¶¶ 30-37.)  Gamazo alleges that her inability to gain the support of a Spanish HFPA member, Rocio Ayuso, resulted from Ayuso's desire to protect her "bread and butter."  (*Id.* ¶¶ 31-32.)  Gamazo's attempts to persuade a Colombian HFPA member, Mario Amaya, were met with similar results.  (*Id.* ¶ 34.)  Despite a pledge to stop writing for Spanish print

---

[1] A description of the HFPA's admission requirements can be found in the Court's previous dismissal order.

publications, Gamazo was never able to meet the sponsorship requirements. (*Id.* ¶¶ 36-37.)

Flaa filed her initial complaint on August 3, 2020, bringing claims for violations of the right of fair procedure and the antitrust laws and for declaratory relief. (Compl., Dkt. No. 1.)  Defendants filed a motion to dismiss. (Dkt. No. 30.) The Court granted Defendants' motion in whole, granting Flaa leave to amend her antitrust claims. (Order, Dkt. No. 34.)  Plaintiffs filed their FAC on December 4, 2020, adding Gamazo as a plaintiff.  On December 18, 2020, Defendants filed the instant motion.

## II.  LEGAL STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6), a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. That is, a pleading must set forth allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Courts "'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Assuming the veracity of well-pleaded factual allegations, a court next must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*[2]

---

[2] Defendants seek judicial notice of several of photos taken from Plaintiffs' social media accounts.  (Dkt. No. 38-11.)  Defendants' requests are denied as moot. Plaintiffs' untimely request for judicial notice of several newspaper articles (Dkt. No. 47) is also denied.

# III. DISCUSSION

Plaintiffs allege that Defendants have committed a *per se* violation of the Sherman Act by engaging in a group boycott and agreeing upon an illegal horizontal market allocation. (FAC ¶¶ 38, 60-62, 105; Opp. at 6-12.) Though Plaintiffs primarily rely on a *per se* theory, Plaintiffs contend that they also have stated viable antitrust claims analyzed under the rule of reason. (Opp. at 12-19.) Plaintiffs are mistaken on both counts.

## A. Plaintiffs Fail to Allege a *Per Se* Violation.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. However, the Supreme Court has never "taken a literal approach to [its] language." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). "Rather, the Court has repeated time and gain that § 1 'outlaw[s] only unreasonable restraints.'" *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

### 1. The Presumption Against *Per Se* Treatment

Consistent with its interpretation of the Sherman Act, "[the] [Supreme] Court presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Dagher*, 547 U.S. at 5 (citing *Khan*, 522 U.S. at 10-19). "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Id.* (quoting *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978)). Stated differently, a restraint must have "manifestly anticompetitive" effects and "lack any redeeming virtue" to qualify for *per se* treatment. *Leegin*, 551 U.S. at 886 (citations omitted). Due to this high standard, courts only apply the *per se* rule after they "have had considerable experience with the type of restraint at issue," and if it is "immediately obvious" the restraint is invalid. *Id.* at 886-87 (citations omitted). Examples of *per se* unlawful restraints include horizontal agreements among competitors to fix prices or divide markets. *Id.* at 886.

Plaintiffs are challenging their exclusion from the HFPA, a professional association of entertainment journalists with discretionary membership rules that

admits new members on an annual basis. Their challenge is novel: they contend that the preferential treatment given to the HFPA by the Hollywood studios that control access to talent requires open membership to all "qualified" applicants. Plaintiffs cite no authority for—let alone a substantial history of—courts applying the *per se* rule under similar circumstances. On this basis alone, the *per se* rule is inapplicable. *See id.*; *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act.") Faced with this fundamental impediment, Plaintiffs instead attempt to portray Defendants' conduct as a traditional group boycott and illicit horizontal market division.

### 2. Plaintiffs' Horizontal Group-Boycott Theory

Plaintiffs argue that Defendants have engaged in a concerted refusal to deal, or group boycott, falling within the ambit of the *per se* rule. (Opp. at 6-8.)

Boycotts can exist in a variety of forms, but not all are condemned *per se*. *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1411-12 (9th Cir. 1991). On the contrary, the Supreme Court has urged "care . . . in defining the category of concerted refusals to deal that mandate *per se* condemnation." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (citations omitted). To aid courts in making this assessment, the Supreme Court identified traits of boycotts worthy of *per se* treatment, noting that they typically involve a joint effort by one or more firms with market power to disadvantage competitors by coercing necessary suppliers or customers to cease dealing with those competitors for no procompetitive purpose. *See id.* Under these principles, Plaintiffs' characterization of Defendants' activities as a group boycott fails to warrant *per se* condemnation.

First, Plaintiffs fail to offer non-conclusory allegations that the HFPA or its members have market power.[3] As the Supreme Court long ago stated:

> A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted

---

[3] The market power analysis is difficult because Plaintiffs still fail to coherently define the market.

> refusals to deal are predominantly anticompetitive. When the plaintiff challenges expulsion from a joint buying cooperative, some showing must be made that the cooperative possesses market power or unique access to a business element necessary for effective competition.

*Id*. at 298.

Even on their own terms, Plaintiffs' theory of market power fails. As Plaintiffs allege, the Hollywood studios—not Defendants—control the coveted "access to talent" for this narrowly defined brand of entertainment news. (FAC ¶¶ 40-41.) Moreover, Plaintiffs describe the HFPA as a small organization comprised of 85 members—a number that exaggerates the reporting significance of its membership because "[o]nly half the HFPA's members are considered truly 'active'" due to the "advancing age" of its membership. (*Id.* ¶¶ 58, 62.) This leaves approximately 43 members who "report for 49 countries," and even this membership number overstates things because "some are journalists while others are photographers[,] some journalists report in print while others report for electronic media[,] [and] some report for outlets in the same country but in different languages." (*Id.*) Plaintiffs further diminish the HFPA's contribution to reporting on entertainment news by alleging that "most of the association's so-called journalists are intermittent freelancers at best," whose "bylines, usually in obscure publications, tend to be impossible to find." (*Id.* ¶ 63 (embracing a publication's description of the HFPA) (quotation omitted).)

In their allegations, Plaintiffs do not describe an organization wielding market power of global proportions. Instead, they complain about an organization that has a cozy relationship with the studios who seek its favor by doling out preferential treatment to a small number of "so-called journalists" who write "intermittently" and in obscurity. And the journalistic work is typically not lucrative, nor is it the principal financial benefit of belonging to the HFPA. According to Plaintiffs, the market for journalism is not what generates a member's income:

> HFPA members do not need to worry about market conditions, pandemics, or working hard to prosper. Most reporters have never been well paid. That is especially true of reporters for news outlets in less populous countries, such as the foreign entertainment reporters who live in Southern California. They frequently receive just a few hundred dollars for an article. That is not a concern for the HFPA's members, though. The HFPA pays its 85 members well over

> $2,000,000 annually to perform trivial or non-existent tasks. Of course, non-member journalists are ineligible for those makeweight jobs.

(*Id.* ¶ 53.)

This is not market power over entertainment news reporting. Nor is it "unique access to a business element necessary for effective competition," at least not in any antitrust sense. *Nw. Wholesale Stationers*, 472 U.S. at 298. While it is understandable that Plaintiffs would want access to the non-market financial benefits of membership, they have not plausibly alleged that the HFPA provides exclusive access to the market for entertainment news reporting. *See Int'l Test & Balance, Inc. v. Associated Air & Balance Council*, 14 F. Supp. 2d 1033, 1042 (N.D. Ill. 1998) (explaining the meaning of "unique access to a business element" in the context of membership in a trade association). On the contrary, Plaintiffs have constructed their antitrust case on the type of access that the HFPA concededly does not control.

The antitrust construct, moreover, is a tenuous one. If access to Hollywood talent is a necessary element of business survival, then Plaintiffs fail to reasonably explain how they have managed to succeed as foreign entertainment news reporters for so many years without it. In fact, Plaintiffs claim that they have long been given only limited access and could only "hope[] to compete for the few available junket and interview slots remaining after the vast majority of the slots were awarded to members of the HFPA and reporters for large U.S. media outlets." (FAC ¶ 45.) The Ninth Circuit has rejected an access claim on facts far more compelling than the one presented in this case. In *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869, 877 (9th Cir. 1987), the court rejected a *per se* group boycott theory based on the refusal to admit a fleet operator as a member of a taxi-driver association that held exclusive airport access rights. The court concluded that the association's exclusive franchise was not sufficiently "probative of market power" and that its control over the "Airport-outbound market, though important, is not essential to effective competition." *Id*.

Second, Plaintiffs' group-boycott theory fails because they do not plead facts establishing a joint effort among horizontal competitors. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959) (describing group boycotts as a refusal to deal among traders in a way that "interferes with the natural flow of interstate commerce"). A refusal to deal with a competitor may constitute an antitrust violation when the relevant industry "requires dealing among

horizontal competitors." *Charley's Taxi*, 810 F.2d at 877. In *Charley's Taxi*, the Ninth Circuit held that the taxi industry in Oahu, Hawaii was not such an industry. *Id*. In this case, Plaintiffs have not alleged that the foreign entertainment news reporting industry requires horizontal competitors to deal with one another. They do not, for instance, claim that HFPA members pool their resources to disseminate the news. *Associated Press v. United States*, 326 U.S. 1, 15-16 (1945) (condemning a concerted and exclusionary arrangement, implemented through a membership structure, "to acquire, to purchase, and to dispose of news reports through the channels of commerce" for the purpose of thwarting competition). Rather, Plaintiffs generally allege that each active member of the HFPA operates independently in his or her own country. (FAC ¶¶ 58, 62.)

### 3. Plaintiffs' Horizontal Market Division Theory

Plaintiffs next argue that Defendants' practice of assigning journalists to different geographic regions constitutes an illegal horizontal market division. (Opp. at 9-12.)

"[A] classic horizontal market division agreement" is one "in which competitors at the same level agree to divide up the market for a given product." *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 844 (9th Cir. 1996); *see Topco*, 405 U.S. at 608 (condemning as a *per se* violation an "agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition"). Plaintiffs' theory of horizontal market division, as far as it can be discerned, does not resemble the classic form. They implausibly suggest that approximately 43 active journalists have agreed to divide territories into 49 countries with each member generally taking one country and controlling the foreign entertainment news reporting for that country.

Plaintiffs try to make the implausible seem plausible by defining the relevant product market in an artificially narrow way. They say that the product is not entertainment news or even a substantially smaller slice of that news, American movies. The product, they allege, is narrower still—i.e., "news concerning forthcoming American movies and the talent responsible for creating them." (FAC ¶ 100.) And even this small sliver requires refinement, or at least explanation. Plaintiffs insist that the news about "forthcoming American movies" must allow them direct access to Hollywood talent to generate consumer interest. Otherwise, they are left to "publish less interesting articles based on milquetoast public relations releases from the studios" or "on wire service reporting." (*Id.* ¶ 103.) This allegedly hurts consumers, who are "deprived [of] interviews of talent and the

information derived from them . . .” (*Id.*)  The defined product, therefore, is entertainment news about forthcoming American movies based on direct access to "the talent responsible for creating them."

Having narrowly defined the product market, Plaintiffs turn to the geographic market, which allegedly consists of foreign submarkets—namely, "the specific countries for which entertainment reporters report." (*Id.* ¶ 102.)  In describing these submarkets, Plaintiffs effectively defeat their claim of a horizontal market division.  Plaintiffs allege that "each country has unique outlets for such reporting" and typically requires "country-specific news reporters and news stories." (*Id.*)  A reporter from one country generally is not able to provide a story in another country (*id.*), because "stories by reporters from particular countries written for consumers in those countries will be sensitive to nuances of language and will reflect knowledge of the distinct cultures, interests, and concerns of their readership or viewership" (*id.* ¶ 103).

According to this description, the HFPA members are generally not able to compete with one another because of the peculiar characteristics of each geographic submarket.  If HFPA members cannot compete, then they cannot agree to divide a market.  *See United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990) (describing the per se violation as "an agreement to allocate or divide customers between competitors within the same horizontal market")).  An agreement between noncompetitors not to compete is not much of an agreement.  And it surely is not one that deserves *per se* treatment as a matter of first impression under the antitrust laws.

### B. Plaintiff's Antitrust Claims Still Fail Under the Rule of Reason.

Plaintiff next argue, in the alternative, that their exclusion from the HFPA violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16750, under the rule-of-reason test. (Opp. at 12-19.)  Plaintiffs' Cartwright Act claims are analyzed under the same framework as the Sherman Act claims.  *See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015).  Once again, these claims fail the test.

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)).  "The relevant market encompasses notions of geography

as well as product use, quality, and description." *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1023 (D. Or. 2015); *see Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008) ("Antitrust law requires allegation of both a product market and a geographic market.").

Market definition is said to be a fact question. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 282-83 (6th Cir. 2014). This is not to say that a plaintiff may make vague, confusing, or economically nonsensical market allegations free from challenge at the pleading stage. A court may dismiss a complaint when "the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus.*, 513 F.3d at 1045. A definition is "facially unsustainable" where "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Vesta Corp.*, 129 F. Supp. 3d at 1023.

### 1. The Product Market

A relevant product market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

Flaa previously defined the product market as "entertainment news." The Court found this definition inadequate, stating: "This product description is ambiguous, as she fails to identify the relevant type, source, or medium of entertainment news. She also fails to allege that 'entertainment news,' even if limited to movies and television programs, is not reasonably interchangeable with other forms of entertainment news (e.g., sports, music, literature, and travel)." (Order at 12-13.)

Plaintiffs have now refined the definition of the product market to such a degree that it is not only limited to a narrow subset of entertainment news ("forthcoming American movie releases"), but is further circumscribed by a specific source of that news ("the talent responsible for creating them"). A market definition, however, must be based on the commercial concern of the antitrust laws rather than the economic convenience of the parties to a lawsuit. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (defining the relevant market to include reasonably interchangeable goods in order to determine a party's

ability to control price and competition with resulting anticompetitive effects).

In justifying the finely tuned definition of entertainment news, Plaintiffs allege that consumers interested in American movies will not accept reporting on music, video games, or sports as a substitute. (FAC ¶ 100.) Even so, Plaintiffs do not account for the interchangeability of other related entertainment news. For instance, Gamazo has been "reporting [for numerous foreign outlets] on *entertainment news, trends, restaurants, and newsworthy aspects of life in Los Angeles*." (*Id.* ¶ 29 (emphasis added).) And Plaintiffs acknowledge the existence of various sources and formats of admittedly growing interest to consumers, including streaming content, blogging, and social media. (*Id.* ¶ 45 (noting the increasing presence of "bloggers and social media influencers" in the market).) Indeed, Flaa alleges that she has enjoyed considerable success on these platforms. (*Id.* ¶¶ 20, 29.) In 2018, Flaa produced 130 episodes of a short-form entertainment series titled "Hollywood Stories" for Scandinavia's biggest streaming service, which was distributed to over forty countries. (*Id.* ¶ 20.) She also has produced entertainment segments, served as a Hollywood correspondent for networks abroad, and interviewed celebrities on her YouTube channel that has been viewed almost 70 million times. (*Id.*) In producing content for her YouTube channel, Flaa conducted "400 interviews."[4] (*Id.* ¶ 88 (adopting a statement describing her achievements).)

In short, the allegations in the amended complaint remain "hopelessly muddled as to what product market (or markets) are at issue here." *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1195 (C.D. Cal. 2008). The proffered market definition is artificially narrow and does not account for interchangeable substitute products as demonstrated by the contradictory allegations in the pleading.

---

[4] This allegation appears to undercut Plaintiffs' claim that the market should be defined to include news about forthcoming American movies based only on "the talent responsible for creating them." Presumably, the 400 interviews were not of that narrow group of individuals—or, if so, then Plaintiffs are ill-positioned to complain that they lack access to talent when an HFPA member had only 25 such opportunities in a three-month period in 2020. (*Id.* ¶ 48).

### 2. The Geographic Market

The relevant geographic market includes the area of "effective competition," or the area "where buyers can turn for alternative sources of supply." *See Tanaka*, 252 F.3d at 1063. A geographic market must "'correspond to the commercial realities' of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).

The allegations of the relevant geographic market have taken a dramatic turn. In the original complaint, Flaa alleged that the relevant geographic market for foreign entertainment reporters is "Southern California, and the Los Angeles area in particular." (Compl. ¶¶ 113-114.) In support, Flaa argued that it is "blindingly obvious" that Southern California is the proper market given the HFPA's role in the Golden Globe awards and its members' access to corresponding events. In response, this Court concluded: "While Southern California's connection to the entertainment industry may be obvious, the thrust of Plaintiff's assertion is not. To the extent that Plaintiff is generally suggesting that the location of market participants defines the geographic market, this suggestion is supported neither by the law of economics nor the law of the Ninth Circuit. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991))." (Order at 12.)

Plaintiffs no longer find it obvious that the geographic market is the Los Angeles area. In their amended complaint, they argue that the relevant market is far from local. It is not in Southern California—or anywhere in the United States. They allege that each foreign market is a unique submarket. (FAC ¶¶ 102-103; *see also* Opp. at 15 (arguing that the "[f]oreign market is a distinct, geographic market").) Indeed, Plaintiffs now contend that consumer preferences in the American and foreign markets are so different that the U.S. market hardly matters. "Were that not so, foreign outlets would license the right to translate and republish American domestic motion picture news reports or rely on wire-services for their reporting while dispensing with foreign correspondents." (Opp. at 15.)

In their opposition, Plaintiffs do not explain the remarkable shift in defining the geographic market or the seeming contradiction that Flaa produced an entertainment series of "Hollywood Stories" that "was sold to over 40 countries." (FAC ¶ 20.) Aside from these shifts and contradictions, Plaintiffs have so narrowly defined the product market that they have rendered the newly defined geographic submarkets economically insignificant. They allege that "[m]ost reporters have never been well paid," as they "frequently receive just a few

hundred dollars for an article" (*Id.* ¶ 53); and Plaintiffs note that "every member of the HFPA was given at least 25 opportunities to record interviews of major Hollywood talent for television broadcast" in a three-month period in 2020 (*id.* ¶ 48). These allegations of low pay for limited opportunities undermine Plaintiffs' efforts to define an "economically significant" geographic market. *Brown Shoe*, 370 U.S. at 336.

### 3. Market Power and Harm to Competition

Courts do not define the relevant product and geographic markets just for the sake of it. A realistic definition is necessary to evaluate the power a challenged party has in the relevant market and the harm to competition produced by the exercise of that power. *See Qualcomm*, 969 F.3d at 992.

Plaintiffs have not shown that the HFPA has the requisite power even in their narrowly defined market. As discussed, the power to control access to the talent responsible for creating forthcoming American movies is concededly in the hands of the Hollywood studios. While the HFPA may benefit from preferential treatment by the desire of the studios to curry favor, it is the studios that purportedly hold the power and control its exercise. Plaintiffs have not alleged that the HFPA has created or commercially acquired this benefit, nor have they cited any authority that in such circumstance the HFPA can be said to possess "market power."

But assuming the HFPA stands in the shoes of the studios for these purposes, Plaintiffs have not satisfactorily alleged harm to competition. "In assessing alleged antitrust injuries, courts must focus on anticompetitive effects 'in the market where competition is [allegedly] being restrained.'" *Qualcomm*, 969 F.3d at 992 (citation omitted). The allegations in the FAC do not demonstrate any harm to competition. Plaintiffs have touted their success as foreign entertainment news reporters achieved without HFPA membership. They now claim that it is "illogical" to consider their alleged success, stating: "Defendants make the illogical contention that because Plaintiffs were successful in the past, they cannot be injured today—and do so notwithstanding that the FAC alleges that they have not worked for many months." (Opp. at 18 (citing FAC ¶ 52).) But Plaintiffs do not explain why their change in professional fortune proves antitrust injury or harm to competition when their status as non-HFPA members has remained constant.

While Plaintiffs do not address this point, they do provide an alternative explanation for their changed fortune in the amended pleading—an evolving

competitive landscape. As Plaintiffs themselves emphasize, "the ability of foreign non-HFPA member journalists to [gather entertainment news] is disappearing rapidly as the interview slots that might once have been available to them are now given to American bloggers and social media influencers." (Opp. at 16 (citing FAC ¶¶ 38, 45, 101).) This does not show "a less competitive market due to either artificial restraints or predatory and exclusionary conduct." *Qualcomm*, 969 F.3d at 990. It demonstrates an increasingly competitive market in a changing technological world in which streamers, bloggers, and influencers vie for the consumer's attention—often at the expense of "real journalist[s]" who "might ask hard or probing questions" when interviewing Hollywood talent. (FAC ¶ 45.) The antitrust laws provide Plaintiffs no protection against this competition. *See Brown Shoe*, 370 U.S. at 320 (noting that the antitrust laws protect "competition, not competitors").

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED**. Plaintiff's First Amended Complaint is **DISMISSED without leave to amend**. In denying leave to amend, the Court has concluded that it would be futile to give Plaintiffs another opportunity to do so. *See Chodos v. West Publishing Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (court has broad discretion in deciding subsequent motions); *see also id.* (analyzing factors enumerated in *Foman v. Davis*, 371 U.S. 178 (1962)). When given a second chance, Plaintiffs fashioned an antitrust theory that is creative but implausible and contradictory. And it is increasingly apparent that many of the allegations in the original and amended complaint stand immovably in the way of stating a viable antitrust claim. In these circumstances, leave to amend is not warranted. *See Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (leave should be given when a deficient pleading can be cured).

# **NINTH CIRCUIT REPRESENTATION STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 12(b) and Ninth Circuit Rules 12-2 and 3-2(b), undersigned counsel states as follows: One LLP represents Plaintiffs and Appellants Kjersti Flaa and Rosa Gamazo Robbins in this appeal. Counsel for Plaintiffs-Appellants is registered for electronic filing in the Ninth Circuit. Below is a list identifying all of the parties to the action and their counsel by name, email address, firm, mailing address, and telephone number.

**Attorney for Plaintiffs-Appellants Kjersti Flaa and Rosa Gamazo Robbins:**

> David W. Quinto
> Email: dquinto@onellp.com
> Joanna Ardalan
> Email: jardalan@onellp.com
> ONE LLP
> 9301 Wilshire Blvd.
> Penthouse Suite
> Beverly Hills, CA 90210
> (310) 866-5157

**Attorney for Defendants-Appellees Hollywood Foreign Press Association, Aud Berggren Morisse, Tina Johnk Christensen, Aniko Skorka Navai, and Meher Tatna:**

> Christopher S. Yates
> Email: chris.yates@lw.com
> **LATHAM AND WATKINS, LLP**
> 505 Montgomery Street, Suite 2000
> San Francisco, CA 94111-2562
> (415) 391-0600
>
> Marvin S. Putnam
> Email: marvin.putnam@lw.com

Robert J. Ellison
Email: robert.ellison@lw.com
**LATHAM AND WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067